**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | |
|---|---|
| Texas Alliance for Retired Americans, Sylvia Bruni, DSCC, and DCCC,<br><br>                    Plaintiffs,<br><br>     v.<br><br>RUTH HUGHS, in her official capacity as the Texas Secretary of State,<br><br>                    Defendant. | Civil Action No. 5:20-cv-128<br><br>Related to *Bruni, et al. v. Hughs*, No. 5:20-cv-35 (S.D. Tex.) |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs Texas Alliance for Retired Americans, Sylvia Bruni, DSCC, and DCCC, by and through their undersigned counsel, file this Complaint for Declaratory and Injunctive Relief against Defendant RUTH HUGHS, in her official capacity as the Texas Secretary of State, and allege as follows[1]:

### NATURE OF THE ACTION

1.      This lawsuit challenges Texas's effort to end straight-ticket voting, which under normal circumstances would unjustifiably and discriminatorily burden Texans' fundamental right to vote, but in November will also unjustifiably and discriminatorily increase those voters' exposure to a deadly virus.

2.      Following record growth in both voter turnout and use of straight-ticket voting in a

---

[1] On June 24, 2020, this Court dismissed, without prejudice, claims asserted in this Complaint on the ground that the Court "lack[ed] subject-matter jurisdiction to adjudicate th[e] case" because the plaintiffs' factual allegations did not support the finding of impending injury. *Bruni v. Hughs*, --- F. Supp. 3d ---, 2020 WL 3452229, at *4, *7 (S.D. Tex. June 24, 2020). In addition to asserting claims on behalf of a new party, this Complaint supplements the prior allegations and also offers evidence not considered in the Court's earlier ruling, all of which demonstrate that HB 25 will cause injury to Plaintiffs, as well as their members and constituents. This Complaint also re-asserts and emphasizes Plaintiffs' theory of associational standing based on direct injury to Plaintiffs' members and constituents, which, Plaintiffs respectfully suggest, the Court's June 24 ruling did not address.

State that consistently ranks at the bottom of the country for voter turnout, Texas decided voting had become too convenient for its citizens, and especially its minority citizens. In ending a century-old voting practice that Texans have relied on to exercise their most fundamental and sacred rights—the rights to political participation and association—Texas has recklessly created a recipe for disaster at the polls in 2020.

3.     In Texas, if a voter decides she wants to support the candidates running under the banner of a party that voter supports, straight-ticket or one-punch voting ("STV") gives her the option of making an initial selection corresponding to that party, which automatically chooses the candidate in each race who runs as that party's candidate. The voter may then modify her choices for any individual office.

4.     STV plays a critical role in Texas's elections: during Texas's 2018 general election, approximately two-thirds of voters—*more than 5.6 million Texans*—cast their votes using STV. Voters and election administrators have come to rely on STV as an integral component of the voting process that reduces voting time and minimizes wait times at polling places. STV's efficiency is particularly important because Texas is larger than most states by size and population, and its electoral ballots are among the longest in the country. In fact, in Texas's largest counties, voters can be asked to make decisions in as many as 95 races. For the past century, STV has allowed Texans to vote for the candidates of their choice in an efficient, yet deliberate manner. During the COVID-19 pandemic, of which Texas is now a global epicenter, the option to vote straight-ticket is not only efficient but can also help save lives.

5.     Even with the overwhelming use of STV in Texas and the significant amount of time it saves voters when casting a ballot, Texans often encounter unreasonably long polling-place lines. During the 2018 election, for example, Texas voters encountered hours-long waits both on

Election Day and during the early-voting period. And because the November 2020 general election "is expected to strain the state's voting systems with record turnout,"[2] Texas's long polling-place lines are poised to get much worse.

6.      Under normal circumstances, long polling-place lines harm voters. Today, a novel coronavirus, SARS-CoV-2, is spreading throughout the country, infecting hundreds of thousands with the disease known as COVID-19. In Texas alone, at least 500,000 cases of COVID-19 and 8,700 deaths from the virus have been reported, and those numbers are continuing to grow. As a result, come November, voters forced to wait in long lines at the polls will be subject to the risk of contracting a virus that has killed thousands of Texans. Public health experts predict that the ongoing COVID-19 pandemic will extend well into the fall. And while Texas is currently facing a massive resurgence of COVID-19 infections, experts predict that a separate wave of infections will occur. As discussed below, by increasing the amount of time voters must stand in line and in the voting booth, HB 25 will put Texans in harm's way.

7.      Texas's longest polling-place lines exist in its most populous counties, whose populations are disproportionately African American and Hispanic. As a result, even when STV is available, African American and Hispanic voters in Texas must, on average, wait longer to exercise their fundamental right to vote than non-minority voters. The risk of coronavirus infection adds an unjustifiable health risk to increasing the wait times for these same voters, as African American and Hispanic Texans experience increased rates of cases, hospitalizations, and deaths from the virus as compared to white Texans.

8.      Despite all of this, on September 1, 2020, Secretary of State Hughs will order the elimination of the STV option from all Texas ballots pursuant to House Bill 25 ("HB 25"). HB 25

---

[2] Alexa Ura, *Two major Texas counties are trimming polling locations as workers pull out over coronavirus*, Tex. Trib. (July 9, 2020), https://www.texastribune.org/2020/07/09/texas-voting-coronavirus/.

was passed on a party line vote with almost every Democrat opposing the bill and almost every Republican supporting it. Nearly all minority members of the Texas Legislature opposed HB 25, which the Legislature passed over repeated and strenuous objections that it would disproportionately burden minority voters with longer lines and confusion at the polls.

9.      HB 25 will be a disaster for Texas's elections. If HB 25 takes effect, each of the more than 5.6 million Texans who relied on STV in the last election will take significantly more time to complete their ballots at their polling place. As a result, already lengthy polling-place lines will grow, forcing Texans who wish to exercise their fundamental right to vote to endure unreasonably long wait times. Just a few months ago, Texans across the state—especially those in areas with high minority populations—endured hours-long waits to cast their primary ballots. Texas itself has recognized that increases in polling-place lines harm voters by discouraging them from exercising their right to vote. *See Cotham v. Garza*, 905 F. Supp. 389, 399 (S.D. Tex. 1995). Despite this, Texas has done nothing to prepare its election system to avoid the predictable longer lines that will result from the repeal of STV.

10.     Moreover, as experiences from Texas's recent July 14 primary runoff election demonstrate, the COVID-19 pandemic prevents county officials from taking actions that would otherwise mitigate the increase in wait times caused by HB 25's elimination of the STV option. The need to maintain social distancing within the polling place significantly limits counties' ability to increase the number of voting machines used at a given polling place, and in many instances will require *decreasing* the number of voting machines at polling places. Venues that previously allowed their spaces to be used as polling places will not be willing to do so out of fear of contamination, preventing counties from increasing the number of polling places, and in many instances requiring a decrease in the number of total polling places. Counties have experienced,

and will continue to experience, a poll worker shortage, further limiting the number of polling places they can offer voters. Finally, Governor Abbott's decision in March 2020 to allow local jurisdictions to postpone their elections until November will cause Texas voters to encounter even longer ballots than usual this fall, further increasing voting time and, thus, further increasing wait times at the polls.

11.     The severe burdens of increased polling-place lines caused by HB 25 will uniquely and disparately impact minority voters. African American and Hispanic Texans utilize STV at a higher rate than white Texans, and they live in more densely populated areas of the state. The combination of a higher proportion of voters switching away from STV and heavily-populated areas will result in longer lines for these voters. Making matters worse, due to their bearing the socioeconomic effects of a pervasive history of discrimination, African American and Hispanic Texans are more likely to live in poverty, work jobs that are less flexible and accommodating, have less access to transportation, and have less access to child care assistance. As a result, on average, African American and Hispanic Texans have significantly less ability to wait in line at a polling place. Each of these factors compounds the other, making it even harder for minority voters to participate in Texas's elections. And because African Americans and Hispanics are being infected with COVID-19 at disproportionate rates and are suffering disproportionately worse health outcomes, it is even more dangerous for those voters to stand in longer polling-place lines in November.

12.     HB 25's elimination of STV will also impose a significant and disparate burden on the Democratic Party and its supporters. Because African Americans and Hispanic Texans (who utilize STV at a significantly greater rate than whites in Texas) overwhelmingly support the Democratic Party, the elimination of STV will disproportionately impede the electoral

participation of those who support the Democratic Party. As a result, HB 25 will directly harm Texas Democrats' fundamental right to associate with one another and elect the candidates of their choice.

13.     None of these detriments are justified by a legitimate governmental interest. Though HB 25's proponents claimed it would lead to a more educated electorate, no evidence was offered to support this claim; indeed, numerous legislators raised concerns that elimination of STV would not achieve this purported purpose at all. Republican proponents of the bill admitted they did not conduct any inquiry into whether HB 25 would actually achieve their purported goals and that they were unaware of any evidence from Texas or anywhere else that indicated that elimination of STV leads to a more informed electorate.

14.     Instead, Republican proponents of HB 25 ignored repeated warnings that HB 25 would cause reduced voter engagement, long lines at the polls, and a disparate impact on minority voters. These concerns were neither evaluated nor answered. In fact, Republican legislators admitted they had not conducted any inquiry into whether HB 25 would disparately impact minorities, especially African Americans and Hispanics, and claimed ignorance when repeatedly reminded that minority voters use STV at far higher rates than white voters.

15.     In light of these facts, HB 25 violates a bevy of constitutional and statutory rights. HB 25 violates the First and Fourteenth Amendments to the U.S. Constitution because it unduly burdens Texans' right to vote and the rights of voters who support the Democratic Party to associate and elect their candidates. HB 25 violates Section 2 of the Voting Rights Act because it will deny African American and Hispanic voters an equal opportunity to participate in Texas's elections. HB 25 violates the Fourteenth and Fifteenth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act because a substantial and motivating factor behind its passage

was an intent to depress electoral participation among racial and ethnic minorities. And HB 25 violates the First and Fourteenth Amendments because it was intended to harm voters due to their political beliefs.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the United States Constitution and the Voting Rights Act, 52 U.S.C. § 10301.

17.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States, and involve the assertion of a deprivation, under color of state law, of a right under the Constitution of the United States and an Act of Congress providing for equal rights of citizens or of all persons within the United States.

18.     This Court has personal jurisdiction over the Defendant, the Texas Secretary of State, who is sued in her official capacity.

19.     Under 28 U.S.C. § 1391(b)(2), venue is proper in the Laredo Division of the U.S. District Court for the Southern District of Texas because a substantial part of the events that give rise to Plaintiffs' claims will occur in this District.

20.     This Court has authority to enter a declaratory judgment in this action under 28 U.S.C. §§ 2201 and 2202.

## PARTIES

21.     The Texas Alliance for Retired Americans (the "Alliance") is incorporated in Texas as a 501(c)(4) nonprofit, social welfare organization under the Internal Revenue Code. The Alliance is a chartered state affiliate of the Alliance for Retired Americans. The Alliance's mission is to ensure social and economic justice and full civil rights that retirees have earned after a lifetime

of work. The Alliance has chapters in various major cities throughout Texas, including Austin, Dallas, Fort Worth, Houston, Beaumont, Corpus Christi, and San Antonio. The Alliance has over 145,000 members in Texas, composed of retirees from public and private sector unions, community organizations, and individual activists. More than five percent of the Alliance's membership is under the age of 65, making them too young to qualify to vote by mail under Texas Election Code § 82.003. HB 25 frustrates the Alliance's mission because it will burden—and in some cases entirely deprive—the Alliance's individual members of the right to vote, threatens the electoral prospects of its endorsed candidates whose supporters will face greater obstacles casting a vote and having their votes counted, and makes it more difficult for the Alliance and its members to associate to effectively further their shared political purposes. The Alliance and its individual members spend resources on voter registration, phone banking, and get-out-the-vote ("GOTV") activities, as well as activities aimed at expanding the Alliance itself, such as recruiting new members, opening new chapters, and making presentations to members' groups and seniors' groups. The Alliance is aware of HB 25 and the long lines that it threatens to create. Because of the threat of long lines, and the increased danger of COVID-19 infection it creates, the Alliance has diverted, and will continue to divert, resources from furthering its other activities towards educating people on how to safely vote in person despite long lines. If not for HB 25, the Alliance would be investing more resources into other efforts such as voter registration and promoting its substantive policy campaigns. The Alliance also asserts the claims in this Complaint on behalf of its members and constituents.

22.     Plaintiff Sylvia Bruni was elected to be the Chair of the Webb County Democratic Party, the countywide organization representing Democratic candidates and voters throughout Webb County, on March 3, 2020. Ms. Bruni's goal is to elect Democratic Party candidates to

public office throughout Webb County and Texas. To accomplish this, Ms. Bruni supports Democratic Party candidates through fundraising and organizing work, including providing GOTV assistance and actively supporting the development of programs benefiting Democratic Party candidates. Ms. Bruni plans to continue to engage in fundraising, GOTV assistance, and the development of programs to elect Democratic Party candidates in Webb County and Texas. If allowed to take effect, HB 25 will directly harm Ms. Bruni in several ways. By imposing severe burdens on the right to vote through increased polling-place lines, HB 25 will directly harm Ms. Bruni by frustrating her goal of, and efforts in, turning out voters in Webb County who support Democratic Party candidates. The confusion HB 25 will cause among Texas voters by unsettling a century-old reliance on STV will also directly harm Ms. Bruni by frustrating her goal of, and efforts in, turning out voters who support Democratic Party candidates in Webb County. Ms. Bruni is aware of the effects that HB 25 will cause, and to combat these effects in the 2020 general election in Texas, she will divert and expend additional time and resources in voter education and turnout efforts in Webb County at the expense of her other efforts in Webb County.

23.     Plaintiff DSCC is the national senatorial committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party to the U.S. Senate across the country, including those running in Texas. DSCC works to accomplish its mission by, among other things, assisting state parties throughout the country, including in Texas. In 2018, DSCC made millions of dollars in contributions and expenditures to persuade and mobilize voters to support Senate candidates who affiliate with the Democratic Party. In 2020, there will be a Senate election in Texas, and DSCC will work to elect the Democratic candidate for U.S. Senate. DSCC intends to and will make substantial contributions and expenditures to support the Democratic candidate for U.S. Senate in Texas in 2020. If allowed to take effect, HB

25 will directly harm DSCC in several ways. By imposing severe burdens on the right to vote through increased polling-place lines, HB 25 will directly harm DSCC by frustrating its mission of, and efforts in, turning out Texas voters who support the Democratic candidate for U.S. Senate. The confusion HB 25 will cause among Texas voters by unsettling a century-old reliance on STV will also directly harm DSCC by frustrating its mission of, and efforts in, turning out Texas voters who support the Democratic candidate. DSCC is aware of these effects that HB 25 will cause, and to combat the effects of HB 25 in the 2020 general election for U.S. Senate in Texas, DSCC will divert and expend additional funds and resources for voter education and turnout efforts in Texas at the expense of its other efforts in Texas and in other states. Because HB 25 will also impose disproportionate burdens on voters who support Democratic candidates, it will directly prevent DSCC, its members, volunteers, and constituents from fully exercising their associational rights to band together and elect candidates of their choice. HB 25 will also directly harm DSCC by decreasing the electoral prospects of the candidates DSCC supports and represents. DSCC also asserts the claims in this Complaint on behalf of its members and constituents.

24.     Plaintiff DCCC is the national congressional committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party to the U.S. House of Representatives from across the country, including those running in Texas's 36 congressional districts. DCCC works to accomplish its mission by, among other things, assisting state parties throughout the country, including in Texas. In 2018, DCCC made millions of dollars in contributions and expenditures to persuade and mobilize voters to support congressional candidates who affiliate with the Democratic Party. For 2020, DCCC has identified multiple specific congressional districts in Texas as targeted races, in which it will expend significant resources to support the Democratic candidates. Overall, in 2020, DCCC expects to make

contributions and expenditures in the millions of dollars to persuade and mobilize voters to support Democratic candidates in congressional elections around the country, including in Texas. If allowed to take effect, HB 25 will directly harm DCCC in several ways. By imposing severe burdens on the right to vote through increased polling-place lines, HB 25 will directly harm DCCC by frustrating its mission of, and efforts in, turning out Texas voters who support Democratic candidates for Congress. The confusion HB 25 will cause among Texas voters by unsettling a century-old reliance on STV will also directly harm DCCC by frustrating its mission of, and efforts in, turning out Texas voters who support Democratic candidates for Congress. DCCC is aware of these effects that HB 25 will cause, and to combat the effects of HB 25 in the 2020 general election for Texas's congressional seats, DCCC will divert and expend additional funds and resources in voter education and turnout efforts in Texas at the expense of its other efforts in Texas and in other states. In particular, due to HB 25, DCCC will devote additional resources to speaking with Texas voters in more detail about strategies for avoiding long lines at the polls during the November election. Because HB 25 will also impose disproportionate burdens on voters who support Democratic candidates, it will directly prevent DCCC, its members, volunteers, and constituents from fully exercising their associational rights to band together and elect candidates of their choice. HB 25 will also directly harm DCCC by decreasing the electoral prospects of the candidates DCCC supports and represents. DCCC also asserts the claims in this Complaint on behalf of its members and constituents.

25.    Defendant Ruth Hughs is the current Texas Secretary of State and is named as a Defendant in her official capacity. The Texas Secretary of State is Texas's chief elections officer and, as such, is responsible for the administration and implementation of election laws in Texas, including HB 25. *See* Tex. Elec. Code § 31.001(a). If HB 25 takes effect, the Secretary will act

under color of state law to implement its provisions. She is responsible for "adopt[ing] rules and establish[ing] procedures" for eliminating STV under HB 25, *id.* § 31.012(d), and for instructing county election administrators after September 1, 2020, "that [STV] has been eliminated pursuant to H.B. 25," *id.* § 31.012(b-1).

## FACTUAL ALLEGATIONS

### I.     Use of Straight-Ticket Voting in Texas

26.     Straight-ticket voting or one-punch voting has been available to Texans since the turn of the twentieth century. Today, STV is utilized by a vast majority of Texans, and for good reason—Texas's elections involve some of the longest ballots in the country. In the State's most populous counties, voters are sometimes faced with the task of making decisions in as many as 95 races. STV provides an efficient way for voters to indicate their electoral preferences. As one Senator who opposed HB 25 observed, "straight-ticket voting saves valuable time, especially when the ballot is long." [3]

27.     In 2018 in the 48 most populous Texas counties—comprising 86 percent of the State's population—over two-thirds of voters used STV to cast their votes. That is, more than *5.6 million* Texans utilized STV during the last election.

28.     STV in Texas is most popular among minority voters. The STV utilization rate among African American and Hispanic voters is significantly higher than among white voters. In the 2018 election, white Texans used the STV option at a rate of about 60%, compared to about 82% of African American voters, and about 72% of Hispanic voters.

---

[3] Tex. S. Journal, 85th Legislature, Reg. Sess., Sen. Zaffirini Statement Regarding HB 25 at 2086, (May 18, 2017) ("Sen. Zaffirini Statement"), https://journals.senate.texas.gov/sjrnl/85r/pdf/85RSJ05-18-F.PDF#page=12.

## II.      Long Lines During Elections in Texas

29.      Texans consistently report long lines at polling places. Waiting in line to vote is costly, and often prevents eligible voters from participating in elections. Most Texans, and especially those with lower socioeconomic status, inflexible job schedules, less access to transportation, and less access to child care, simply cannot afford to wait hours in line at their polling place. A nationwide study following the 2008 election estimated that approximately 11 percent of Americans who chose not to vote did so because of long lines. Indeed, Texas itself has recognized that increases in how long it takes a voter to mark a ballot will discourage others from exercising their right to vote. *Cotham*, 905 F. Supp. at 399.

30.      Recognizing the cost long polling-place lines produce, the Obama administration established the Presidential Commission on Election Administration to study the problem of long polling-place lines and other election administration issues. In its final report, the Commission concluded that, "*as a general rule, no voter should have to wait more than half an hour in order to have an opportunity to vote.*"[4]

31.      But Texans routinely wait longer than thirty minutes to cast their ballot. For example, on Election Day for the 2018 general election, Travis County residents reported waiting hours to vote.[5] A voter at the Austin City Hall precinct reported seeing at least a dozen voters "give up on their plans to cast a ballot and go back to work."[6] In Houston, voters faced hours-long lines, forcing many to give up their fundamental right to vote—a result that prompted a federal judge to

---

[4] Robert F. Bauer et al., *The American Voter Experience: Report and Recommendations of the Presidential Commission on Election Administration* 14 (Jan. 2014), http://web.mit.edu/supportthevoter/www/files/2014/01/Amer-Voting-Exper-final-draft-01-09-14-508.pdf, (emphasis in original).
[5] Katie Hall & Kelsey Bradshaw, *Record Midterm Turnout Brings Long Waits at Travis, Williamson Ballots*, Statesman (Nov. 7, 2018), https://www.statesman.com/news/20181106/record-midterm-turnout-brings-long-waits-at-travis-williamson-ballots.
[6] *Id.*

order nine polling locations to remain open after the official closing time.[7]

32.    Long lines at the polls in Texas are not limited to Election Day. During early voting for the 2016 general election, Texans reported waiting hours to cast a vote.[8] And during early voting for the 2018 general election, Travis County residents reported waiting up to 2 hours to vote.[9]

33.    On March 3, 2020, Texans across the State stood in line for hours to cast their primary ballots, forcing many to forego their right to vote. By 10:30 p.m.—over three hours after the polls were supposed to close—nearly half of polling places in Harris County, one of Texas's most diverse counties, remained open due to long lines.[10] At 11:15 p.m., more than 100 people were still waiting in line to vote at a polling place at Texas Southern University, a historically black college in Houston.[11] The last two voters to cast their ballots there finished voting after 1:00 a.m., after waiting over six hours to vote.[12] Throughout the State, African American and Latino voters unable to endure these lines left the polls without voting.[13] Similar long lines were reported in other parts of Houston, as well as Dallas, Austin, and other parts of the State.[14]

---

[7] Tess Owen, *Some Texans Had to Wait So Long to Vote That They Gave Up. A Lawsuit Is Giving Them a Second Chance*, Vice News (Nov. 6, 2018), https://www.vice.com/en_us/article/nepwng/some-texans-had-to-wait-so-long-to-vote-they-gave-up-a-lawsuit-is-trying-to-give-them-a-second-chance.

[8] Jim Malewitz, *In Some Counties, Early Voting Means Long Lines*, Texas Tribune (Oct. 24, 2016), https://www.texastribune.org/2016/10/24/some-texas-counties-long-lines-complicate-early-vo/.

[9] Sarah Navoy, *Travis County Fixes "Glitch" in Online Wait Times Tool Ahead of Election Day*, CBS Austin (Nov. 5, 2018), https://cbsaustin.com/news/local/travis-county-fixes-glitch-in-online-wait-times-tool-ahead-of-election-day.

[10] Garrett Haake (@GarrettHaake), Twitter (Mar. 3, 2020, 10:22 PM), https://twitter.com/GarrettHaake/status/1235057980086898688.

[11] Jen Rice (@jen_rice_), Twitter (Mar. 4, 2020, 11:15 PM), https://twitter.com/jen_rice_/status/1235071336860413952.

[12] Jen Rice (@jen_rice_), Twitter (Mar. 4, 2020 1:37 AM), https://twitter.com/jen_rice_/status/1235106957381349377.

[13] Nicole Narea, *Black and Latino voters were hit hardest by long lines in the Texas Democratic Primary*, Vox (Mar. 3, 2020), https://www.vox.com/2020/3/3/21164014/long-lines-wait-texas-primary-democratic-harris.

[14] *E.g.,* Alexa Ura, *Texas voting lines last hours after polls close on Super Tuesday*, Texas Tribune (Mar. 3, 2020), https://www.texastribune.org/2020/03/03/texas-voting-lines-extend-hours-past-polls-closing-super-tuesday/; Julia Craven, *Black and Latino Texas Voters Get Stuck in Long Super Tuesday Lines*, Slate (Mar. 4, 2020), https://slate.com/news-and-politics/2020/03/three-hour-waits-extend-texas-super-tuesday-voting-past-poll-closing-time.html.

34.     A significant contributor to long lines is that Texas prohibits voters from casting absentee (or "mail-in") ballots unless they fall within one of four extremely limited circumstances: (1) the voter will be absent from her county during Election Day or the early voting period, (2) the voter is disabled in such a way that "prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health," (3) the voter is at least 65 years of age, or (4) the voter is confined in jail but otherwise eligible to vote. Tex. Elec. Code §§ 82.001–82.004. Even in the midst of the COVID-19 pandemic that has killed thousands of Texans, the Secretary refuses to permit those who fear contracting COVID-19 to vote by mail. As a result, the vast majority of Texans must cast a ballot in person at a polling place to exercise their fundamental right to vote.

**III.     Passage of HB 25**

35.     Despite Texans' widespread reliance on STV and Texas's existing problem of long polling-place lines, the Texas Legislature passed HB 25 largely along party lines, with only three Democrats supporting its passage. Almost every minority legislator voted against HB 25.

36.     Even though HB 25 will upend a century of voting practices in Texas, the Legislature held just two public hearings on the bill. The Senate hearing was held before the Business & Commerce Committee, instead of the State Affairs Committee, which ordinarily hears election-related bills.

37.     Prior to HB 25's passage, numerous legislators expressed grave concerns that repealing STV was unconstitutional, violated the Voting Rights Act, and disproportionately burdened Texans of color. Proponents of HB 25 refused to engage with these concerns every time they were raised, leaving them unanswered and unrefuted. For example, four opponents of HB 25 stated "[they] believe that this sudden and unprovoked elimination of a voter's right to vote straight

ticket would be unconstitutional."[15] Many other legislators raised concerns that HB 25 violated the Voting Rights Act. Nevertheless, the Legislature, without any reasoning, rejected a proposed amendment to have the United States Department of Justice evaluate whether HB 25 violated the Voting Rights Act prior to its implementation.[16] A similar amendment for review of HB 25's constitutionality was also rejected.[17] What is more, in rejecting these and all other proposed amendments, the Legislature deviated from its usual process. Normally, the author of a bill takes a position on any proposed amendment and explains her reasoning for doing so prior to a vote on that amendment. But Rep. Ron Simmons, R-Carrollton, HB 25's drafter and chief proponent, only followed this process on one of a dozen proposed amendments, and only after other legislators commented on the irregularity of Rep. Simmons' silence.[18]

38.      Other opponents of HB 25 accurately protested that minority voters rely on STV at much higher rates than white voters.[19] Rep. Simmons repeatedly ignored such concerns. When asked to respond to this issue of disproportionate use of STV, Rep. Simmons claimed he was unaware of that fact.[20] Rep. Simmons also refused to provide an answer when asked if he would have offered the bill if he had been aware that it would disenfranchise African Americans and Hispanic voters.[21] In response to concerns that legislators had not considered whether HB 25 would violate the Voting Rights Act, Rep. Simmons first claimed that HB 25 "has nothing to do

---

[15] Tex. House Journal, 85th Legislature, Reg. Sess., Statement regarding HB 25, at 2842 (May 6, 2017), https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY65FINAL.PDF#page=78.
[16] House Amendment 1, 85th Legislature, Reg. Sess. (May 6, 2017), https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY65FINAL.PDF#page=78.
[17] House Amendment 2, 85th Legislature, Reg. Sess. (May 6, 2017), https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY65FINAL.PDF#page=78.
[18] Tex. House of Reps., Floor Debate on HB 25, 85th Legislature, Reg. Sess. (May 5, 2017) ("House Debate 1"), https://tlchouse.granicus.com/MediaPlayer.php?view_id=39&clip_id=13915.
[19] *Id.*
[20] *Id.*
[21] *Id.*

with race."[22] However, he ultimately admitted that neither he nor anyone else had actually examined whether repealing STV would disparately impact minorities, and that no disparate impact analysis or *any other study* on the bill had been conducted, despite widespread concern over the lack of analysis of HB 25's effects.[23] And when asked about the fact that in just the three months preceding that House debate, federal courts had issued three separate, well-publicized rulings finding Texas had intentionally discriminated against African American and Hispanic voters, Rep. Simmons replied that he was unaware of those rulings because he had "been busy down here."[24]

39.    Despite HB 25's impact on minority voters in Texas, neither the author of the bill nor its proponents consulted any minority leaders while drafting or considering the bill. None of the following groups or their leaders were briefed or contacted about HB 25: the Mexican-American Legislative Caucus, the Black Legislative Caucus, NAACP, MALDEF, LULAC, the Urban League, Southwest Voter, or Mi Familia Vota.[25] At a public hearing, the NAACP opposed the bill.[26]

40.    Numerous legislators also raised concerns that HB 25 would increase lines at the polls. One legislator observed that

> [l]ong waits at polling places already are huge problems in some parts of Texas, especially in urban areas where many voters line-up to vote for many races on the ballot. On the first day of early voting for the November, 2016, election, for example, long waits—sometimes hours—were reported in Bexar, Harris, Nueces, and Denton counties . . . . Lines and ballot fatigue can exhaust voters' patience, and eliminating the straight-party option would only make things worse and cause many

---

[22] *Id.*

[23] *Id.*; Tex. House of Reps. Floor Debate on HB 25, 85th Legislature, Reg. Sess. (May 6, 2017) ("House Debate 2"), https://tlchouse.granicus.com/MediaPlayer.php?view_id=39&clip_id=13915; Tex. Senate Bus. & Comm. Committee Hearing, 85th Legislature, Reg. Sess. (May 11, 2017) ("Senate Public Hearing"), https://tlcsenate.granicus.com/MediaPlayer.php?view_id=42&clip_id=12472.

[24] House Debate 1.

[25] House Debate 1; Tex. Senate, Floor Debate on HB 25, 85th Legislature, Reg. Sess. (May 17, 2017) ("Senate Debate"), https://tlcsenate.granicus.com/MediaPlayer.php?view_id=42&clip_id=12549.

[26] Senate Public Hearing.

> either to skip down-ballot races altogether or not go to the polls at all. The effect
> would be to suppress voting and voter turnout.

Sen. Zaffirini Statement at 2086. HB 25's proponents offered no response. In fact, they admitted

that they had not reviewed any studies regarding the potential for increased voting times, longer

lines, and decreased voter turnout as a result of the repeal of STV.

41.     Legislators also ignored concerns raised by election officials, including the

Chairman of Harris County's Republican Party, who testified that STV's elimination will cause

longer polling-place lines and require higher budgets for additional voting stations, and would hit

largest counties the hardest.[27] Ignoring the realities of the increased costs to large, urban, and

minority-heavy counties like Harris, the Legislature rejected a proposed amendment making

elimination of STV contingent on counties determining that sufficient funding would be allotted

to ensuring no increase in wait times at polls.[28] Similarly, the Legislature rejected a proposed

amendment that would have allowed for STV in counties where there are 25 or more total offices

and measures on the ballot.[29]

42.     Proponents of HB 25 also failed to consider Texas's uniquely lengthy ballots. When

asked whether he was aware that Dallas and Harris Counties have anywhere from 65 to 100 offices

on the ballot in each election, respectively, Rep. Simmons responded that he was not.[30] When

confronted with the reality that voters in these types of counties would have to work through 100

different races to fully exercise their right to vote, Rep. Simmons implied that he was comfortable

with voters not completing their ballots: "if that's how many places are on the ballot, they would,

---

[27] House Committee on Elections Hearing, 85th Legislature, Reg. Sess. (Mar. 13, 2017) ("House Public Hearing"),
https://tlchouse.granicus.com/MediaPlayer.php?view_id=40&clip_id=12966.
[28] House Amendment 5, 85th Legislature, Reg. Sess. (May 5, 2017),
https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY64FINAL.PDF#page=94.
[29] House Amendment 2, 85th Legislature, Reg. Sess. (May 5, 2017),
https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY64FINAL.PDF#page=94.
[30] Floor Debate 1.

assuming they wanted to vote in every race . . . that's what they would do. Of course, it's obviously their choice as to how they want to handle that."[31]

43.     HB 25 likewise failed to include *any* measures that would address HB 25's increased burdens on elections administrators, counties, and voters of color who will be forced to cope with long lines at the polls. For example, the Legislature could have (but did not) split large precincts, require additional voting machines, or provide more election funding. In fact, when asked who would cover increased costs of election administration resulting from HB 25, Rep. Simmons responded that he "was not advised as to what [those costs] would be or wouldn't be, so [he] d[id]n't know one way or the other."[32] He likewise had no response when presented with evidence that costs in Dallas County alone would go up by nearly $1 million as a result of HB 25.[33]

44.     These concerns have now become reality. Election officials who requested funding to cope with the longer lines HB 25 will cause have been told they are out of luck. For example, Hunt County Elections Administrator Mina Cook was informed that the State has no money for additional voting machines needed to handle anticipated increased lines as a result of the elimination of STV.[34]

45.     After hearing the dire warnings regarding HB 25's impact on minority voters, the Legislature's silence and utter refusal to study or take any measures to lessen the disproportionate impact upon African American and Hispanic voters—even when given the opportunity to do so—demonstrates that a substantial motivation behind HB 25's passage was the intent to depress

---

[31] *Id.*
[32] House Debate 1.
[33] *Id.*
[34] John Austin, *Changes Coming for Straight-Ticket Ballots,* Cleburne Times-Review (Oct. 7, 2018), https://www.cleburnetimesreview.com/news/changes-coming-for-straight-ticket-ballots/article_808e9396-c8e1-11e8-bf55-cbc94eaab3d2.html.

minority turnout in Texas's elections.

46.     Aside from HB 25's impact on minorities, the Legislature also supported HB 25 due to the disproportionate harms it will impose on voters who support Democratic candidates.

47.     Texas Republicans chose to pass HB 25 following consistent growth in Democratic use of STV and consistent decline in Republican use of STV, which resulted in electoral gains for Democratic candidates. During floor debates on the bill, Democratic legislators observed that HB 25 was proposed only after a Democratic "sweep" in Harris County.[35]

48.     Between 2004 and 2016 in every one of Texas's seven largest counties, which account for about 50 percent of Texas's current population, straight-ticket votes for the Democratic Party increased, while straight-ticket votes for the Republican Party fell. For example, in 2004, of all votes cast in Harris County, 34 percent were Republican straight-ticket votes and 29.9 percent were Democratic straight-ticket votes. By 2016, these numbers had flipped—30 percent of ballots cast were Republican straight-ticket and 35.3 percent were Democratic straight-ticket. The shifts in Dallas County were even more drastic. In 2004, 31.2 percent of ballots cast were Republican straight-ticket and 33.1 percent were Democratic straight-ticket. In 2016, Republican straight-ticket ballots fell to 23.8 percent and Democratic straight-ticket ballots grew to 41.3 percent of all ballots cast in Dallas County. The same happened in Bexar County. In 2004, 28.7 percent of ballots cast were Republican straight-ticket and 26.8 percent were Democratic straight-ticket. In 2016, Republican straight-ticket votes dropped to 23 percent and Democratic straight-ticket votes rose to 32.6 percent. Similar trends occurred in Texas's other largest counties, including Tarrant, Travis, Collin, and Denton.

49.     Proponents of HB 25 publicly testified that it would benefit Republicans by

---

[35] House Debate 1.

counteracting STV's pro-Democratic effect in the State's larger counties, where Democratic and minority voters are concentrated. One proponent of HB 25 from Bexar County explained that she supported the bill because "Republican judges in [] large population areas [] get swept out of office because of the straight party Democrat voting." House Public Hearing. A former Harris County Republican judge claimed that STV was "why [she's] no longer a judge" and "the only reason we all lost" in 2016.[36]

50.     Following his defeat in the race for Harris County Judge, a longtime Republican elected official tweeted "[k]eeping the straight ticket option for 1 more election cycle turned out to be a disaster for all Republicans."[37] Harris County GOP Chairman echoed these sentiments and lamented the fact that Republicans had failed to repeal STV sooner: "I've been warning about it for years. . . At the last minute, [lawmakers] put [STV] back in for 2018, and I told some legislators then, '2018 will not be the same as 2014.'"[38] The Communications Director for the Harris County Republican Party, Vlad Davidiuk, chimed in:

> I am mad . . . [m]ad at the avoidable losses wreaked across Texas by the Beto Wave of straight-ticket votes. That straight-ticket wave turned Fort Bend County Democrat, defeated Republicans on appellate courts across Texas, elected Democrats across the state to Congress and the Legislature, and swept every countywide vote in Harris County . . . . [T]o the detriment of Republicans across Texas, straight-ticket voting was left in place for one last election.[39]

51.     Now that HB 25 is set to take effect for the 2020 election, these same Republicans are optimistic about their party's odds. Harris County Republican Party chairman, Paul Simpson,

---

[36] *Id.*
[37] Ed Emmett (@EdEmmett), Twitter (Nov. 6, 2018, 12:10 PM), https://twitter.com/EdEmmett/status/1060233047646367745.
[38] Emma Platoff, *Straight-Ticket Voting Ends in 2020. For Some Down-Ballot Republicans, That Wasn't Soon Enough*, Tex. Tribune (Nov. 16, 2018), https://www.texastribune.org/2018/11/16/straight-ticket-voting-ed-emmett-harris-county-texas/.
[39] Jef Rouner, *Harris County GOP Blames Straight Ticket Losses and 'Communist' Votes*, HoustonPress (Nov. 9, 2018), https://www.houstonpress.com/news/the-last-year-of-straight-ticket-voting-hurt-republicans-says-gop-11025566.

declared that the end of STV will allow GOP candidates to prevail in Harris County.[40] The article

reported that "[w]ith the Texas Legislature eliminating [STV] in 2020, the GOP is convinced more

Republicans will win both judicial seats and legislative races."

**IV.   HB 25 will dramatically increase lines at the polls, severely burdening Texans'
rights, especially African American and Hispanic Texans and Democratic voters.**

52.     If allowed to go into effect, HB 25's elimination of STV in Texas will wreak havoc

in the upcoming general election, in which turnout is widely expected to reach record levels.

**A.     HB 25 will increase polling-place lines, severely burdening Texas voters.**

53.     Without the availability of STV, the more than *5.6 million Texans* who utilized STV

in 2018 will be forced to spend significantly more time completing their ballots. Given Texas's

existing problem of long polling-place lines during both Election Day *and* the early-voting period,

removing the STV option will exponentially increase the time Texans will have to wait to exercise

their fundamental right to vote, regardless of when they do so.

54.     That HB 25 will force voters to withstand longer polling-place lines is not just a

possibility; it is an inevitable result of eliminating the STV option. As Fort Bend County Elections

Administrator John Oldham explains, eliminating the STV option will "cause a significant increase

in the average amount of time Texas voters will spend casting their votes during general elections,"

particularly because "a significant majority of Texas voters use the straight-ticket voting option

during general elections." Ex. 1 (Decl. of John Oldham) at ¶ 4. And as Dr. Muer Yang explains,

because of the "non-linear relationship between voting time and average wait times," even small

increases in voting time produce large increases in wait times at the polls. Ex. 2 (Expert Decl. of

Dr. Muer Yang) at ¶ 20. "[A]s voting time increases incrementally, each increase produces a larger

---

[40] Jeremy Wallace, *Shell Shocked In 2016 and 2018, Harris County Republicans Are Planning a Comeback*,
Houston Chronicle (Sept. 6, 2019), https://www.houstonchronicle.com/news/politics/texas/article/
Shell-shocked-in-2016-and-2018-Harris-County-14421510.php.

expansion of average wait times at the polls." *Id.* "As a result, the increase in average voting time caused by Texas's planned elimination of straight-ticket voting will produce a significant increase in wait times at the polls." Oldham Decl. ¶ 5.

55.     Using Travis and Fort Bend Counties as examples, Dr. Yang illustrates the significant increase in wait times that eliminating STV will produce by showing how small expansions of voting time would have resulted in ever-increasing wait times at the polls in those counties on Election Day in 2016. To do so, he considers different scenarios of how eliminating STV can increase the average amount of time each voter spends in the voting booth.

56.     Dr. Yang first considers Travis County. First, if eliminating STV increased average total voting time in Travis County by *just 79 seconds*, countywide average wait times at the polls would have *nearly tripled*, increasing the proportion of Election Day voters who would expect to wait more than half an hour at the polls from 3% to 24%. Yang Decl. ¶ 42. Second, if those who previously relied on the STV option took just 10 seconds to make selections in each of the partisan races on their ballot, the average wait time across the county would have increased to more than *48 minutes*, with 29% of voters voting at polling places with average wait times of an hour. *Id.* ¶ 43, tbl. 2. And if those who previously relied on the STV option took just 15 seconds to make selections in each of the partisan races once the STV option was eliminated, the average wait time across the county would have been more than *79 minutes*, with almost half of all Election Day voters voting at a polling place with an average wait time of over an hour. *Id.* ¶ 44, tbl. 2.

57.     Dr. Yang also illustrates the effect eliminating STV would have had on wait times in Fort Bend County on Election Day 2016, where ballots were shorter and polling places were well equipped with voting machines to withstand an influx of unexpected turnout or delays in the voting process. As Dr. Yang demonstrates, despite the cushion of voting equipment Fort Bend

County administrators provided polling places on Election Day 2016, eliminating STV still would have wreaked havoc on the voting process. For example, if voters who previously relied on the STV option took just 15 seconds to complete each partisan race after the STV option was eliminated, the countywide average wait time would have gone from no wait at all to almost 15 minutes, with several polling places predicting average wait times of more than 100 minutes. *Id.* ¶¶ 61-62, tbls. 7, 10. And if eliminating STV caused average voting time to reach 10 minutes—a possibility raised by Fort Bend County officials—the countywide average wait time would have been more than 45 minutes, with more than a quarter of polling places expecting an average wait of over an hour. *Id.* ¶ 63.

58.     The increase in wait times caused by HB 25 will be even more drastic in 2022. Because Dr. Yang's declaration is offered to support Plaintiffs' motion asking the Court to preliminarily enjoin HB 25 during the 2020 election, his analyses focus only on presidential-year elections. But Texas's ballots in midterm-year elections are *much* longer than those in presidential-year elections. In Harris County, for example, while voters in the 2016 general election encountered as many as 50 partisan races, they encountered as many as 95 partisan races in the 2018 general election. And while Dallas County voters encountered as many as 25 partisan races in 2016, they encountered as many as 65 races in 2018. Because midterm-year elections feature significantly longer ballots, eliminating the STV option will force voters in midterm-year elections to spend even more time completing their ballots than in presidential-year elections. Thus, the increase in wait times during midterm-year general elections caused by the elimination of STV will be much greater than what even Dr. Yang's analyses suggest.

59.     The increased wait times to which voters will be subjected as a result of HB 25 will significantly burden Texans' right to vote. For many, the result will be outright

disenfranchisement. A substantial number of voters will leave polling-place lines without voting because they must return to work or other obligations. A substantial number of other voters will be dissuaded from attempted to vote completely. But for even those voters who are able to wait out the line and cast their vote, being forced to wait in excessively long lines amounts to a severe burden on the fundamental right to vote.

60.     Moreover, by significantly expanding polling-place lines, HB 25 will force Texas voters to subject themselves to an increased risk of contracting COVID-19. According to expert epidemiologist Dr. Catherine Troisi, it is "highly unlikely" that an effective vaccine will be available by November, and "herd immunity is unlikely to happen before a vaccine is available." Ex. 3 (Decl. of Dr. Catherine Troisi) at ¶¶ 24-27. In November, when humidity decreases, transmissions will become "enhanced," producing an "increased spread of the virus." *Id.* ¶ 23. Because voters, poll workers, and other individuals at the polls must come into close contact with one another, polling places present serious risk of virus transmission. *Id.* ¶ 22. And because HB 25 will force Texans to spend significantly more time in the voting booth and in line at the polling place, its implementation this fall "will increase risk of transmission." *Id.* ¶ 11.

61.     This risk is not speculative. After Wisconsin's April primary election, for example, 52 individuals who had voted in-person or worked as poll workers tested positive for COVID-19.[41] The longer voters have to wait in line at the polls and stand in the voting booth, the higher their risk of contracting COVID-19. And because the vast majority of Texans are ineligible to vote by mail, *see* Tex. Elec. Code §§ 82.001-82.004, HB 25 will force the vast majority of Texans to subject themselves to this heightened risk of contracting COVID-19 to exercise their fundamental

---

[41] Devi Shastri, *In-person voting was likely a 'disaster' for Wisconsin's efforts to flatten coronavirus curve, national experts say*, Milwaukee J. Sentinel (Apr. 8, 2020), https://www.jsonline.com/story/news/politics/elections/2020/04/08/coronavirus-wisconsin-election-likely-hurt-effort-flatten-curve/2961718001/.

right to vote.

62.     Beyond the fact that longer wait times at the polls will directly impose severe burdens on voters, confidence in the accuracy of Texas's elections will also decrease. When voters experience long polling-place lines, they lose confidence that votes are being accurately counted.[42] More broadly, the mere existence of long lines causes all voters—"even among those who do not personally experience long lines"—to lose confidence in the accuracy of their elections.[43]

63.     The long lines caused by HB 25's elimination of STV will disparately impact Texas's minority voters. HB 25 will cause the greatest increase in polling-place waits in Texas's high-density urban areas with large racial and ethnic minority populations, where ballots and polling-place wait times are already the longest. Ex. 4 (Decl. of Allan Lichtman) at 21-23 & tbls. 1-2, 57-58 & tbl. 7.

64.     Moreover, minority Texans utilize STV at a significantly high rate compared to white Texans. Ex. 5 (Decl. of Dr. Max Palmer) at tbl. 2. In the most recent general election, approximately 82% of African American voters used the STV option, as did approximately 72% of Hispanic voters. *Id.* By contrast, only approximately 60% of white voters in Texas used the STV option. *Id.* Thus, a disproportionately higher number of minority voters will be shifting from STV to making individual selections for each race on the ballot, significantly increasing wait times at the polls in minority neighborhoods. This will exacerbate the disparity in wait times that minority voters *already* face in Texas. Lichtman Decl. at 57-58 & tbl. 7.

65.     In the midst of the current COVID-19 pandemic, the longer lines that African American and Hispanic voters encounter will also make it more dangerous for them to exercise

---

[42] Charles Stewart III & Stephen Ansolabehere, *Waiting in Line to Vote*, CalTech/MIT Voting Tech. Project 3 (July 28, 2013), http://vote.caltech.edu/working-papers/114.
[43] *Id.* at 4.

their fundamental right to vote, particularly when, for the vast majority of such voters, the only way to vote is in person. Making matters worse, African Americans and Hispanics in Texas are more likely to contract coronavirus *and* experience worse health outcomes as a result. Troisi Decl. ¶¶ 14-15, 29.

66.     Even if the increase in wait times were uniform across polling places, the increase in waits would still disparately impact African American and Hispanic voters in Texas. Given the long and pervasive history of discrimination against these communities in Texas, African American and Hispanic voters are more likely to, among other things, (1) live in poverty, (2) have less flexible job schedules, (3) lack access to transportation, and (4) lack access to child care assistance. Such realities cause these voters to leave polling-place lines more quickly, to be more likely to be dissuaded from attempting to vote in the first place, and to be more likely to be dissuaded from attempting to vote in the first place. Thus, as polling-place lines grow, the relative burden on African American and Hispanic voters increases at a higher rate than the burden on non-minority voters.

67.     As a result of these effects, HB 25 will also disparately burden voters who support the Democratic Party. African American and Hispanic voters in Texas overwhelmingly support the Democratic Party. *See* Palmer Decl. at fig. 4. In the most recent federal election, African American support for statewide Democratic candidates was as high as 93%, and no lower than 90.4%, and Hispanic support for statewide Democratic candidates was as high as 76.8%, and no lower than 70.2%. *Id.* at tbl. A4.

68.     Thus, not only do Texas's long lines disproportionately harm minority voters, they also disproportionately harm voters who support the Democratic Party, Democratic candidates, and the Democratic Party itself, including Plaintiffs DSCC and DCCC. The disproportionate

decrease in turnout among African American and Hispanic Texans caused by HB 25 will in turn harm the electoral prospects of Democrats. As one African American Democratic legislator, Sen. Royce West of Dallas, explained: "Frankly, I don't see any purpose for this legislation other than trying to dilute the vote of Democrats and, more specifically, minorities."[44]

### B.  The ongoing COVID-19 pandemic prevents county officials from mitigating the increase in wait times caused by HB 25.

69.      The confluence of HB 25 and the ongoing COVID-19 pandemic places county officials in an impossible position. The State's elimination of STV will force voters to stand in unreasonably long lines at the polls unless counties take action at their own expense to mitigate those lines, such as increasing the number of voting machines at polling places. But the ongoing COVID-19 pandemic prevents counties from implementing such measures.

70.      First, the need to ensure that all individuals inside the polling place are continuously maintaining social distancing significantly limits counties' ability to deploy additional voting machines to individual polling places. Oldham Decl. ¶ 7. To ensure poll workers, voters, poll observers, and others are maintaining social distancing, counties must require that all equipment— including voting machines, check-in stations, and ballot drop-off stations—are sufficiently distanced from one another. *Id.* Not only does this prevent counties from increasing the number of voting machines in a polling place to offset the increase in voting time caused by HB 25, in most instances it requires *decreasing* the amount of voting machines that are deployed to individual polling places. *Id.* For example, in Fort Bend County, Elections Administrator John Oldham anticipates that maintaining social distancing within polling places could require reducing the number of voting machines previously used at each polling place by as much as *one third*. *Id.*

71.      Texas counties confronted this problem during the recent July 14 election, where

---

[44] House Debate 1.

election officials concluded that the need to maintain social distancing would lead to polling places offering "far fewer voting booths" than usual.[45] In Collin County, this required decreasing the number of voting machines at the county's main polling place from 20-25 machines to just eight.[46] While the predictably low turnout during the July run-off election allowed the county to avoid long lines, Elections Administrator Bruce Sherbert explained that the need to sufficiently space voting machines "will really be problematic for November."[47] In Tarrant County, elections officials concluded that they needed to reduce the amount of voting machines at certain polling places by *40 to 60 percent* to maintain proper social distancing.[48]

72.     Second, as November approaches, counties will continue to "los[e] polling places unwilling to host voters during the pandemic."[49] This is because "[t]he pandemic has caused, and will cause, individuals and organizations to be less willing to permit [counties] to use their physical spaces to be used as a polling place." Oldham Decl. ¶ 8. In the run-up to the July 14 election, counties around the state had to scramble as venues that previously agreed to serve as polling places backed out at the last minute due to fears about the virus. Williamson County lost "one of its busiest sites"; Bexar County "had to pull the county courthouse — a longtime voting site — and several school sites off [its] list of polling places"; and Travis County lost use of "regular voting sites at nursing homes, grocery stores and Austin Community College."[50] Venues that previously served as polling places in Fort Bend County also dropped out at the last minute. Oldham Decl. ¶ 8. It "is very difficult" to find substitute venues when this occurs, and if a county

---

[45] Alexa Ura, *Texans begin voting Monday in runoff elections. Officials are doing what they can to make it safe.*, Tex. Trib. (June 29, 2020), https://www.texastribune.org/2020/06/29/texas-election-first-test-voting-safety-pandemic/.
[46] *Id.*
[47] *Id.*
[48] Lili Zheng, *Primary Run-Offs, Early Voting to Be 'Contactless' in Tarrant County*, NBC-DFW (June 24, 2020), https://www.nbcdfw.com/news/local/primary-run-offs-early-voting-to-be-contactless-in-tarrant-county/2394923/.
[49] Ura, *supra* note 45.
[50] *Id.*

cannot find a substitute venue, "the number of total polling places will decrease," producing more congested lines at the remaining polling places. *Id.*

73.     Third, widespread fears over COVID-19 have caused, and will continue to cause, a shortage of poll workers, who "tend to be older and thus at higher risk for complications from the coronavirus."[51] A recent study suggests that "[a]bout 87% of Texas poll workers are over 60."[52] This shortage forced Dallas County to announce at the last minute that it would be offering "nearly *200 fewer voting centers* in part because of fear of the coronavirus" for the July 14 primary run-off.[53] Bexar and Tarrant Counties similarly had to reduce the number of polling places they planned to offer to voters due to an inability "to find election judges to run the polling places."[54] Fort Bend County faced the same problem. Oldham Decl. ¶ 9. Other states are already acknowledging that poll worker shortages will force them to reduce drastically the number of polling locations they can make available to voters in November. Maryland, for example, just announced that a poll worker shortage will force the State to switch to a voting-center system and "close nearly 80% of the polls" statewide, a plan the Governor lamented will produce "long lines and unsafe conditions, with crowds of people being forced into too few polling places."[55] Even if a county is able to find last-minute substitute poll workers, those substitutes are "less familiar with the voting process, and thus less efficient." Oldham Decl. ¶ 9. The shortage of poll workers in November will cause "an increase in average wait times at the polls." *Id.*

---

[51] Ura, *supra* note 2.
[52] John C. Moritz, *Texas primary runoffs: Despite COVID-19 pandemic, poll workers prep for July 14 election*, Statesman (June 23, 2020), https://www.statesman.com/news/20200621/texas-primary-runoffs-despite-covid-19-pandemic-poll-workers-prep-for-july-14-election.
[53] Jack Fink, *Pandemic Among Reasons For Nearly 200 Fewer Voting Centers In Dallas County For Primary Runoff*, CBS-DFW (July 13, 2020), https://dfw.cbslocal.com/2020/07/13/coronavirus-pandemic-fewer-voting-centers-dallas-county-primary-runoff/ (emphasis added).
[54] Ura, *supra* note 2.
[55] Emily Opilo & Pamela Wood, *Maryland Gov. OKs plan for just 360 voting centers statewide for November election amid lack of poll workers*, Baltimore Sun (Aug. 10, 2020), https://www.baltimoresun.com/politics/bs-md-pol-hogan-election-plan-20200810-evtrbvyjsvbeto6ygglkrfcrs4-story.html.

74.     Fourth, because of the COVID-19 pandemic, voters' ballots during the 2020 general election will be even longer than usual. On March 18, 2020, Governor Abbot issued a proclamation suspending section 41.0052(a) and (b) of the Texas Election Code and allowing political subdivisions that would otherwise hold elections in May 2020 to hold their elections on the same day as the November general election. As a result, voters "will face a significantly longer general election ballot with previously postponed municipal contests tacked onto the bottom."[56] "Due to the increase in ballot length in November, average voting time will increase, further increasing wait times at the polls." Oldham Decl. ¶ 10.

75.     Again, all of these issues will disproportionately burden "voters of color who are unequally burdened by regular breakdowns in the election process and whose communities have been disproportionately afflicted by the coronavirus."[57]

**V.     The elimination of STV is not appropriately tailored to any state interest.**

76.     The increase in wait times at the polls that HB 25 will produce are not justified by any legitimate, let alone compelling, governmental interest. Indeed, the detrimental effects described above were the motivation for HB 25's passage.

77.     Though proponents of HB 25 claimed it would lead to a more educated and engaged electorate that would be better informed about races down the ballot, they failed to cite a single piece of evidence demonstrating *how* eliminating straight ticket voting would actually achieve these goals—let alone that it *would* actually result in such outcomes. Rep. Simmons, the author of the bill, admitted that he was not aware of a single study or any empirical data that supported his hypothesis that eliminating STV would lead to a more informed electorate.[58] Nor did proponents

---

[56] Ura, *supra* note 45.
[57] Ura, *supra* note 45.
[58] House Debate 1.

of HB 25 themselves engage in any efforts to confirm their beliefs.[59]

78.     Even if encouraging voters to focus on down ballot races was a legitimate state interest, eliminating STV would not have that effect. For example, HB 25 does not require any additional information to be provided to voters about down-ballot candidates and offers no support for voter-education efforts.

79.     Instead of serving legitimate or compelling state interests, the elimination of STV in Texas will burden the fundamental rights of all Texans to vote and associate, and will place disproportionate burdens on African American and Hispanic Texans, as well as those who support the Democratic party.

## VI.   African Americans and Hispanics have historically been excluded from Texas political life.

80.     HB 25, which disparately impacts African American and Hispanic Texans, was enacted against a backdrop of centuries of discrimination and exclusion of minorities from Texas's political process.

81.     "Texas has a long, well-documented history of discrimination that has touched upon the rights of African Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 682-83 (S.D. Tex. 2017) (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439-40 (2006) (*LULAC*)). Dr. Lichtman's declaration provides a detailed review of this history. Lichtman Decl. at 8-18.

82.     This pattern of discrimination reaches back to the nineteenth century and continues to present day. After Reconstruction, Texas officials worked tirelessly to prevent minority voters

---

[59] *Id.*

from participating in the State's elections. As restrictive voter qualifications caused the Democratic Party to dominate Texas politics in the early twentieth century, Texas required the holding of primary elections, understanding that the Democratic Party would explicitly bar African American and Hispanic voters from participating in its primary. Indeed, in 1923, Texas passed a law explicitly providing that "in no event shall a negro participate in a Democratic primary in the State of Texas and declaring ballots cast by negroes as void." Tex. S. 44, 38th Cong. (1923). After the U.S. Supreme Court invalidated that law, Texas maneuvered around that ruling by giving political parties the ability to set their own qualifications, and the Democratic Party swiftly banned African American and Hispanic voters from its primaries.

83.    Aside from its white-primary system, Texas disenfranchised African Americans and Hispanics by capitalizing on language barriers and the enormous disparity in literacy rates. Texas first allowed white Democratic election judges to "assist"—that is, influence—illiterate and non-English-speaking voters. Eventually, Texas banned "illiterate" individuals and those who did not speak English from receiving any help at the polls. These restrictions remained in place until federal court intervention in 1970.

84.    Texas also implemented a poll tax as a way of disenfranchising African American and Hispanic voters, who were significantly more likely to be living in poverty. Texas's poll tax severely depressed registration and turnout among African Americans and Hispanics throughout much of the twentieth century.

85.    After the Voting Rights Act was passed in 1965 and increased registration rates among African Americans and Hispanics, Texas quickly enacted counteractive measures. The next year, Texas enacted a requirement that every voter re-register every year, a measure intended to mimic the poll tax's burdens on minority voters. After a federal court found this annual-registration

requirement unconstitutional, Texas attempted to purge minority voters from its registration lists by passing a law requiring all voters in the state to re-register before voting in the future.

86.     Texas has also utilized the redistricting process to dilute the power of votes cast by African Americans and Hispanics. In every redistricting cycle since 1970, a federal court has found that Texas diluted minority voting strength in violation of the Voting Rights Act or the U.S. Constitution. In 2006, the U.S. Supreme Court held that the State had enacted a congressional map that unlawfully diluted the voting strength of Hispanic voters in West Texas in direct response to those voters' growing political power. *LULAC*, 548 U.S. at 436-42. Aside from violating the Voting Rights Act, Texas's actions "b[ore] the mark of intentional discrimination that could give rise to an equal protection violation." *Id.* at 440. After the 2010 Census, Texas again created congressional and state house district maps that intentionally diluted African American and Hispanic voting strength. *Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017); *Perez v. Abbott*, 250 F. Supp. 3d 123 (W.D. Tex. 2017); *Texas v. United States*, 887 F. Supp. 3d 133, 159-62, 163-66, 177-78 (D.D.C. 2012), *vacated and remanded on other grounds*, 570 U.S. 928 (2013).

87.     Minority voters often experience intimidation at the polls in Texas. In 2004, for example, African American voters reported being subjected to racial insults and a disproportionate amount of screening compared to white voters. The same year, police officers stood outside a Harris County early voting site threatening to arrest people and demanding identification without any legal basis for doing so. In 2010, a conservative group called the King Street Patriots implemented an aggressive poll-monitoring campaign in minority neighborhoods that successfully depressed minority turnout. The group's website included a doctored picture of an African American woman holding a sign reading "I only got to vote once," and a white woman beside her holding a sign reading "I'm with stupid." This pattern continues today. In 2018, a white poll worker

in North Houston yelled racial insults at an African American voter, stating, "[m]aybe if I'd worn my blackface makeup today you could comprehend what I'm saying to you," and "[i]f you call the police, they're going to take you to jail and do something to you, because I'm white."

88.     The discrimination African Americans and Hispanics have faced in this State has led to significant disparities between the everyday lives of minority Texans and white Texans. African Americans and Hispanics make up a disproportionate number of Texans living in poverty. According to the 2017 ACS 1-Year estimate, 8.5 percent of non-Hispanic white Texans were living below the poverty line, compared to 19 percent of African-African Texans and 20.7 percent of Hispanic Texans.

89.     As stated above, similar disparities exist in educational attainment.

90.     Disparities also exist in the areas of employment and income. According to the 2011-2015 ACS 5-Year estimate, the median income among white Texans ($31,235 for individuals, $56,411 for households) was significantly higher than that of African American Texans ($26,786 for individuals, $39,469 for households) and Hispanic Texans ($22,402 for individuals, $41,248 for households). And according to a 2018 study by the Economic Policy Institute, white Texans had a significantly lower unemployment rate (3.9 percent) than African American Texans (5.7 percent) and Hispanic Texans (4.5 percent).

91.     Political campaigns in Texas commonly resort to racial appeals that rely on racial and ethnic stereotypes. Dr. Lichtman's declaration cites numerous recent examples of candidates in Texas engaging in racial appeals. Lichtman Decl. at 90-95. The 2018 election cycle was no exception. During the campaign for Texas's seat in the U.S. Senate, Senator Ted Cruz ran ads capitalizing on fears founded on the stereotype that Hispanic immigrants are violent criminals and mocked his opponent's call for an investigation into the police shooting of an unarmed African

American man in his own apartment. In support of Representative Pete Olson, who was facing a challenge by Sri Preston Kulkarni, the Fort Bend County Republican Party circulated an ad depicting a Hindu god, Lord Ganesha, and asking "Would you worship a donkey or an elephant? The choice is yours." Representative Pete Sessions claimed that his African American opponent, Colin Allred, wanted to legalize crack cocaine, and also ran a digital ad placing Allred's name over a picture of a dark-skinned hand clasping a white woman's mouth. Local campaigns also included racial appeals. For example, Vic Cunningham, a white candidate for Dallas County Commissioner, explained to the *Dallas Morning News* that he believed it would be "Christian" only if his children married a person "that's Caucasian." All of these statements were widely recognized by the public as capitalizing on race and ethnicity.

92.     As courts have long recognized, voting in Texas is severely racially polarized, with white voters consistently and cohesively supporting candidates different from those whom African American and Hispanic voters cohesively support. In the last three federal elections, white Texans' support for preferred candidates of African American and Hispanic Texans in statewide races has not exceeded 23.2%. Palmer Decl. at tbls. A2-A4. For this reason the State admitted in recent litigation that there is racially polarized voting in nearly all of its counties. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 638 (S.D. Tex. 2014).

93.     African Americans' and Hispanics' unequal opportunity to participate in Texas's political system is also reflected by the fact that they are underrepresented in the State's elected offices. While Hispanics constitute nearly 30 percent of the State's citizen voting-age population, just three Hispanic Texans occupy the State's 29 statewide offices, and less than 20 percent of seats in Texas's delegation to the U.S. House of Representatives and the Texas Senate are held by Hispanics. While African Americans constitute approximately 13 percent of the State's citizen

voting-age population, not a single African American occupies any of the State's 29 statewide offices, and only two African Americans sit in the 31-seat Texas Senate. At the local level, many communities with high African American or Hispanic populations lack any minority representation at all.

94.     Texas also continues to utilize voting practices that enhance the opportunity for discrimination against African Americans and Hispanics. For example, members of the Texas Supreme Court (the highest state court for civil and juvenile cases) and the Texas Court of Criminal Appeals (the highest state court for criminal cases) are elected to at-large positions with numbered places. Out of 18 judges on these two courts only one is Hispanic, and none are African American.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the First and Fourteenth Amendments to the U.S. Constitution
24 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202
Undue Burden on the Right to Vote**

95.     Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

96.     Under the First Amendment and the Fourteenth Amendment, a state cannot utilize election practices that unduly burden the right to vote. When addressing a challenge to a state election law, a court balances the character and magnitude of the burden the law causes on any First and Fourteenth Amendment rights the plaintiff seeks to vindicate against the justifications offered by the State in support of the challenged law. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

97.     "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty.*

*Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted).

98.     HB 25 will place a severe burden on the fundamental right to vote by causing drastic increases in polling-place lines. If permitted to take effect, HB 25's elimination of STV will significantly increase line length throughout the State, forcing Texans to wait long periods of time before casting a vote. Long lines impose severe burdens on voters in the form of cost. For many voters, the increased wait times caused by HB 25 will prove too much, forcing them to leave their polling places without casting a vote. For many other voters, the increase in polling-place lines will dissuade them from voting at all. Even those who eventually do cast a vote will be burdened by the cost of waiting in line for a significantly longer period of time. HB 25's increase in polling-place lines throughout the State will decrease voter confidence in the accuracy of Texas's elections. Moreover, the increased voting and waiting time HB 25 will produce at the polls will increase voters' risk of contracting a deadly virus.

99.     HB 25 will unduly burden all Texans' fundamental right to vote, but African American and Hispanic voters will experience a disproportionately greater burden. African American and Hispanic voters in Texas are less able to withstand long polling-place lines than non-minority voters. HB 25 will also cause a greater increase in lines in areas with higher minority population. As a result, the cost of voting caused by HB 25 will be higher for minority voters than non-minority voters.

100.    HB 25's elimination of straight-ticket voting in Texas serves no legitimate, let alone compelling, governmental interest. HB 25 will severely burden Texans across the State, prevent voters from casting a ballot due to increased polling-place congestion, and depress voter confidence in election outcomes. As a result, the burdens imposed by HB 25 on the fundamental right to vote outweigh any alleged benefits of the law.

101.    Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Secretary of State and Plaintiffs, who have adverse legal interests, because HB 25 will subject Plaintiffs to serious, concrete, and irreparable injuries to their fundamental right to vote in future elections including, most immediately, the upcoming general election to be held in November 2020.

<u>**COUNT II**</u>

**Violation of the First and Fourteenth Amendments to the U.S. Constitution**
**24 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202**
**Undue Burden on the Right to Associate**

102.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

103.    First Amendment rights "include the right to band together for the advancement of political beliefs." *Hadnott v. Amos*, 394 U.S. 358, 364 (1969). Those who support a political party have a fundamental right "to associate in the electoral arena to enhance their political effectiveness as a group," protected by the First Amendment. *Anderson*, 460 U.S. at 794.

104.    In addition to harming voters generally, HB 25's elimination of STV will cause an unjustified severe burden on the First Amendment associational rights of those who support the Democratic Party. As discussed above, the elimination of STV from Texas's ballots will disproportionately cause African American and Hispanic voters to fail to vote. Because African American and Hispanic voters in Texas overwhelmingly prefer the Democratic Party over the Republican Party, HB 25's disproportionate and severe burden on African American and Hispanic voters also disproportionately and severely burdens the associational rights of those who support the Democratic Party.

105.    HB 25's burden on the associational rights of those who support the Democratic

Party is not justified by any legitimate, let alone compelling, governmental interest. By reducing turnout among African American and Hispanic voters, HB 25 will unconstitutionally make it harder for Democratic voters, organizations, and candidates to advance their political interests. As a result, the burdens imposed by HB 25 on the fundamental right to political association outweigh any alleged benefits of the law.

106.    Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Secretary of State and Plaintiffs, who have adverse legal interests, because HB 25 will subject Plaintiffs to serious, concrete, and irreparable injuries to their fundamental right to political association in future elections including, most immediately, the upcoming general election to be held in November 2020.

## COUNT III

### Violation of Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301(a)
### Results Test

107.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

108.    Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits the enforcement of any "standard, practice, or procedure" that either has the purpose or result of denying or abridging the right to vote on account of race. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

109.    African American and Hispanic Texans disproportionately utilize STV compared to non-minority voters. African American and Hispanic Texans also disproportionately live in the

- 40 -

State's most populous areas, in which voters encounter the longest ballot lengths and the longest polling-place lines.

110.    HB 25's elimination of STV will thus disproportionately cause longer lines and waiting times among African American and Hispanic voters compared to non-minority voters. If HB 25 takes effect, the areas with the most voters switching away from STV will be those with the highest minority populations. HB 25's elimination of STV will thus disproportionately abridge and deny African Americans' and Hispanics' right to vote.

111.    Combined with social and historical conditions in Texas, the disproportionate impact of HB 25's elimination of STV will cause an inequality in the opportunities enjoyed by African American and Hispanic voters to elect their preferred representatives as compared to their non-minority counterparts.

112.    Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Secretary of State and Plaintiffs, who have adverse legal interests, because HB 25 will violate Plaintiffs' rights under the Voting Rights Act in future elections including, most immediately, the upcoming general election to be held in November 2020.

## COUNT IV

**Violation of the Fourteenth and Fifteenth Amendments of the U.S. Constitution and
Section 2 of the Voting Rights Act
24 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202; 52 U.S.C. § 10301(a)
Intentional Racial Discrimination**

113.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

114.    The Fourteenth Amendment invalidates any state law "'conceived or operated as [a] purposeful device[] to further racial discrimination' by minimizing, cancelling out or diluting

the voting strength of racial elements in the voting population." *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971)).

115.   The Fifteenth Amendment to the United States Constitution prohibits the denial or abridgement of the right to vote "on account of race." U.S. Const. amend. XV, § 1.

116.   As noted above, Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits the enforcement of any "standard, practice, or procedure" that either has the purpose or result of denying or abridging the right to vote on account of race.

117.   To determine whether a law was enacted with discriminatory purpose under the Fourteenth Amendment, the Fifteenth Amendment, and Section 2 of the Voting Rights Act, courts examine five non-exhaustive factors and consider both direct and circumstantial evidence. *Veasey v. Abbott*, 830 F.3d 216, 231-32 (5th Cir. 2016). The five factors are: (1) disparate impact on the protected class; (2) "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (3) "[t]he specific sequence of events leading up to the challenged decision"; (4) departures from usual legislative procedure or from the usual weighing of substantive factors of decision; and (5) "legislative or administrative history," including contemporaneous statements by legislators. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-268 (1977). While "[p]roof of racially discriminatory intent or purpose is required to show a violation," "racial discrimination need only be one purpose, and not even a primary purpose of an official action for a violation to occur." *Veasey*, 830 F.3d at 230 (quoting *Arlington Heights*, 429 U.S. at 265 and *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)). Where a Section 2 intentional discrimination claim has been brought, courts also consider the presence of racially polarized voting. *See, e.g., N.C. Conference of NAACP v. McCrory*, 831 F.3d 204, 222-23 (4th Cir. 2016). "[I]ntentionally targeting a particular race's access

to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose." *Id*. at 222.

118.    One of the motivating factors behind HB 25 was to discriminate against African American and Hispanic Texans. First, as discussed above African American and Hispanic Texans are disparately affected by the elimination of STV.

119.    Second, legislators in support of HB 25 refused to engage with concerns regarding this disparate impact on minority voters. The Legislature conducted no inquiry into whether minority voters would be disparately impacted, despite repeated requests and concerns from minority-party legislators and members of the community. The Legislature failed to provide for *any* measures to address these concerns, and it rejected all proposed amendments to HB 25 aimed at ameliorating the impacts of the bill on minority communities, which tend to reside in Texas's most populous counties. And despite claiming that HB 25 would result in a more educated electorate, proponents of HB 25 possessed no evidence whatsoever to support this assertion.

120.    Third, the Legislature departed from its usual practice of election bills being heard by the Senate State Affairs Committee. Instead, the only public hearing on HB 25 before a Senate Committee took place before the Senate Business & Commerce Committee. The Legislature also deviated from its usual course because the author of HB 25 failed to take a position on or answer questions regarding proposed amendments, and no fiscal note was created for the bill.

121.    Fourth, proponents of HB 25 admitted that the bill was intended to disadvantage Democratic voters, who are disproportionately minority and live in larger counties and who utilized straight-ticket voting to vote out Republican judges.

122.    Finally, there is no doubt Texas has a lengthy and recent history of state-sponsored discrimination. For example, as late as 1975, Texas attempted to suppress minority voting through

purging the voter rolls, after its former poll tax and re-registration requirements were ruled unconstitutional, and in every redistricting cycle since 1970, Texas has been found to have violated the Voting Rights Act. *Veasey*, 830 F.3d at 239. In the three months prior to HB 25's passage, three federal courts found that Texas had intentionally discriminated against African American and Hispanic Texans with its voting laws. All of this evidence indicates that the Legislature enacted HB 25 with the intent to discriminate against minority voters in Texas.

123.    Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Secretary of State and Plaintiffs, who have adverse legal interests, because HB 25 will subject Plaintiffs to serious, concrete, and irreparable injuries to their right against racial and ethnic discrimination in future elections including, most immediately, the upcoming general election to be held in November 2020.

## COUNT V

**Violation of the First and Fourteenth Amendments of the U.S. Constitution**
**24 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Viewpoint Discrimination Based on Partisan Affiliation or Voting**

124.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

125.    In *Carrington v. Rash*, 380 U.S. 89, 94 (1965), the Supreme Court held that the Equal Protection Clause prohibits "fencing out" from access to the right to franchise "a sector of the population because of the way they may vote." Likewise, the First Amendment protects citizens against "a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring).

126.    The elimination of STV in Texas disproportionately burdens the right to vote of

individuals who are significantly more likely to vote for Democratic candidates than Republican candidates. Because African American and Hispanic voters in Texas overwhelmingly prefer the Democratic Party over the Republican Party, HB 25's disproportionate and severe burden on African American and Hispanic voters also disproportionately and severely burdens the associational rights of those who support the Democratic Party.

127.     The Texas Legislature eliminated STV precisely for that reason. Texas Republicans chose to pass HB 25 following consistent growth in Democratic use of STV and consistent decline in Republican use of STV, which resulted in electoral gains for Democratic candidates. Between 2004 and 2016 in every one of Texas's seven largest counties, which account for about 50 percent of Texas's current population, straight-ticket votes for the Democratic Party increased, while straight-ticket votes for the Republican Party fell.

128.     The Texas Legislature, without a compelling reason and with intent to achieve a partisan advantage, manipulated the State's election mechanics in way that will burden Democratic voters. Thus, HB 25 violates the First and Fourteenth Amendments to the United States Constitution.

129.     Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Secretary of State and Plaintiffs, who have adverse legal interests, because HB 25 will subject Plaintiffs to serious, concrete, and irreparable injuries to their right against intentional partisan discrimination in future elections including, most immediately, the upcoming general election to be held in November 2020.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

    a.   Declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that HB 25

violates the First, Fourteenth, and Fifteenth Amendments to the United States Constitution, as well as Section 2 of the Voting Rights Act;

b.  Preliminarily and permanently enjoining Defendant, her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to HB 25 under the authority granted to this Court by Federal Rule of Civil Procedure 65(a) and 28 U.S.C. § 2202;

c.  Awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d.  Granting such other and further relief as the Court deems just and proper.

August 12, 2020                                Respectfully submitted,

Marc E. Elias*                                 /s/ Skyler M. Howton
Bruce V. Spiva*                                Skyler M. Howton
Lalitha D. Madduri*                            Attorney-in-Charge
Daniel C. Osher*                               TX# 24077907
Emily R. Brailey*                              SDTX#2395101
Stephanie I. Command*                          PERKINS COIE LLP
MElias@perkinscoie.com                         500 North Akard St., Suite 3300
BSpiva@perkinscoie.com                         Dallas, TX 75201-3347
LMadduri@perkinscoie.com                       Telephone: (214) 965-7700
DOsher@perkinscoie.com                         Facsimile: (214) 965-7799
EBrailey@perkinscoie.com                       SHowton@perkinscoie.com
SCommand@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W. Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211

*Pro Hac Vice Application Forthcoming