**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION**

| | |
|---|---|
| TEXAS ALLIANCE FOR RETIRED AMERICANS; SYLVIA BRUNI; DSCC; and DCCC, | |
| *Plaintiffs*, | |
| v. | CIVIL ACTION NO. 5:20-cv-128 |
| RUTH R. HUGHS, in her official capacity as the Texas Secretary of State, | |
| *Defendant*. | |

**THE TEXAS SECRETARY OF STATE'S MOTION TO DISMISS**

# TABLE OF CONTENTS

Table of Contents ......................................................................................................ii

Introduction and Summary of the Argument...................................................1

Background................................................................................................................2

    I.     The Movement to Repeal Straight Ticket Voting..............................2

    II.    Plaintiffs' Lawsuits.....................................................................................4

Statement of the Issues.........................................................................................6

Argument ...................................................................................................................7

    I.     Plaintiffs' Injuries Are Speculative ....................................................7

        A.    The Court Has Already Decided This Issue ...............................7

        B.    Plaintiffs' Claims Rest on Speculation ......................................12

    II.    Plaintiffs Lack Standing for Other Reasons As Well ....................13

        A.    Plaintiffs Have Not Alleged Any Injury Based on the Right to Vote.............14

        B.    Plaintiffs Lack Associational Standing ......................................14

        C.    Plaintiffs Do Not Have Organizational Standing ..................15

        D.    Plaintiffs Cannot Rely on Third-Party Standing....................16

    III.   The Secretary Is Not a Proper Defendant.......................................17

        A.    Sovereign Immunity Bars Plaintiffs' Claims ..........................19

        B.    Plaintiffs Lack Article III Standing to Sue the Secretary.................21

    IV.   This Case Does Not Belong in the Southern District........................22

    V.    Federal Law Does Not Mandate Straight-Ticket Voting.................23

        A.    Plaintiffs' *Anderson-Burdick* Claims Fail ..............................24

            1.    HB 25 Does Not Burden the Right to Vote ....................25

            2.    HB 25 Furthers Important State Interests......................26

            3.    This Court Should Follow the Uniform Precedent Upholding Repeals of Straight Ticket Voting..............28

        B.    Plaintiffs' Section 2 Results Claim Fails ...................................30

            1.    HB 25 Is Lawful ...................................................................30

            2.    Plaintiffs Do Not Have a Private Cause of Action .............33

        C.    HB 25 is Neutral and Does Not Discriminate ........................35

        D.    Plaintiffs' Viewpoint-Discrimination Claim Fails..................37

    VI.   Laches Bars Plaintiffs' Claims .............................................................39

Conclusion ...............................................................................................................40

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967), *abrogated on other grounds by Califano v. Sanders*, 430
   U.S. 99 (1977) .................................................................................................................. 39

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018) ..................................................................................................... 35

*ACORN v. Fowler*,
   178 F.3d 350 (5th Cir. 1999) ........................................................................................... 16

*Acree v. Air Line Pilots Ass'n*,
   390 F.2d 199 (5th Cir. 1968) ....................................................................................... 8, 11

*Ala. State Conference of NAACP v. Alabama*,
   949 F.3d 647 (11th Cir. 2020) (Branch, J., dissenting) ................................................... 21

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) .............................................................................................. 33, 34, 35

*Allen v. State Bd. of Elections*,
   393 U.S. 544 (1969) ......................................................................................................... 35

*Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*,
   821 F.3d 352 (2d Cir. 2016) ............................................................................................. 17

*Ambraco, Inc. v. Bossclip B.V.*,
   570 F.3d 233 (5th Cir. 2009) ............................................................................................. 7

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ......................................................................................................... 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .................................................................................................... 35, 36

*Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental
   Retardation Ctr. Bd. of Trustees*,
   19 F.3d 241 (5th Cir. 1994) ............................................................................................. 15

*Baker v. Carr*,
   369 U.S. 186 (1962) ......................................................................................................... 39

*Ballas v. Symm*,
   351 F. Supp. 876 (S.D. Tex. 1972), *aff'd*, 494 F.2d 1167 (5th Cir. 1974) ...................... 20

*Bigham v. Envirocare of Utah, Inc.*,
    123 F. Supp. 2d 1046 (S.D. Tex. 2000) ...................................................23

*Boone v. Kurtz*,
    617 F.2d 435 (5th Cir. 1980) (per curiam) .............................................8

*Broadway Nat'l Bank v. Plano Encryption Techs., LLC*,
    173 F. Supp. 3d 469 (W.D. Tex. 2016) ..............................................7, 22

*Bruni v. Hughs*,
    No. 5:20-cv-35, 2020 WL 3452229 (S.D. Tex. June 24, 2020) .................... *passim*

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ...............................................................................26

*Bullock v. Calvert*,
    480 S.W.2d 367 (Tex. 1972) ..............................................................20

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ...........................................................................24

*Cabot Oil & Gas Corp. v. Water Cleaning Servs., LLC*,
    No. 4:12-cv-665, 2012 WL 2133589 (S.D. Tex. June 12, 2012) .................23

*Carrington v. Rash*,
    380 U.S. 89 (1965) .............................................................................38

*Cervantes v. Ocwen Loan Servicing, LLC*,
    No. 5:19-cv-7-MGM-JAK, 2019 WL 6003129 (S.D. Tex. Aug. 28, 2019) .............8

*City of Austin v. Paxton*,
    943 F.3d 993 (5th Cir. 2019) ........................................................20, 21

*City of Mobile v. Bolden*,
    446 U.S. 55 (1980) .............................................................................33

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...........................................................................12

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,
    140 S. Ct. 1009 (2020) .......................................................................36

*Comer v. Murphy Oil USA, Inc.*,
    718 F.3d 460 (5th Cir. 2013) ...............................................................8

*Concerned Home Care Providers, Inc. v. Cuomo*,
    783 F.3d 77 (2d Cir. 2015) .................................................................17

*Conn v. Gabbert*,
    526 U.S. 286 (1999) .................................................................................17

*Conservation Force v. Delta Air Lines, Inc.*,
    190 F. Supp. 3d 606 (N.D. Tex. 2016), *aff'd*, 682 F. App'x 310 (5th Cir. 2017) ..............33, 34

*Coon v. Ledbetter*,
    780 F.2d 1158 (5th Cir. 1986) ................................................................17

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ....................................................................6

*Crawford v. Marion Cty. Election Bd.*,
    553 U.S. 181 (2008) ........................................................................ *passim*

*Danos v. Jones*,
    652 F.3d 577 (5th Cir. 2011) ..................................................................17

*Def. Distributed v. U.S. Dep't of State*,
    No. 1:15-cv-372, 2018 WL 3614221 (W.D. Tex. July 27, 2018) ...........................16

*Delancey v. City of Austin*,
    570 F.3d 590 (5th Cir. 2009) ..................................................................34

*Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*,
    522 F.3d 796 (7th Cir. 2008) ..................................................................14

*Draper v. Healey*,
    827 F.3d 1 (1st Cir. 2016) (Souter, J.) ......................................................14

*Equal Access for El Paso, Inc. v. Hawkins*,
    509 F.3d 697 (5th Cir. 2007) ..................................................................34

*Faas v. Cascos*,
    225 F. Supp. 3d 604 (S.D. Tex. 2016) .....................................................28

*Feldman v. Ariz. Sec'y of State's Office*,
    208 F. Supp. 3d 1074 (D. Ariz. 2016) ......................................................38

*Gettman v. DEA*,
    290 F.3d 430 (D.C. Cir. 2002) ...............................................................15

*Gilby v. Hughs*,
    No. 1:19-cv-1063 (W.D. Tex.) ................................................................40

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ....................................................................14, 15

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982)..................................................................................15

*Hill v. Keliher,*
    No. 4:19-cv-2528, 2019 WL 3837113 (S.D. Tex. Aug. 14, 2019)........................22

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977)..................................................................................15

*IberiaBank Corp. v. Illinois Union Ins. Co.,*
    953 F.3d 339 (5th Cir. 2020) ........................................................................7

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee,*
    456 U.S. 694 (1982)....................................................................................8

*Jacobson v. Fla. Sec'y of State,*
    957 F.3d 1193 (11th Cir. 2020) ..................................................................21

*Kennedy v. Pablos,*
    No., 1:16-cv-1047, 2017 WL 2223056 (W.D. Tex. May 18, 2017).......................28

*Kiker v. Hefner,*
    409 F.2d 1067 (5th Cir. 1969) ......................................................................8

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004)..................................................................................17

*Larson v. Domestic & Foreign Commerce Corp.,*
    337 U.S. 682 (1949)..................................................................................21

*Lewis v. Hughs,*
    No. 5:20-cv-577 (W.D. Tex.).......................................................................40

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014)..................................................................................17

*Libertarian Party of Va. v. Alcorn,*
    826 F.3d 708 (4th Cir. 2016) ......................................................................27

*Logan v. U.S. Bank Nat'l Ass'n,*
    722 F.3d 1163 (9th Cir. 2013) ....................................................................34

*Lucas v. Townsend,*
    493 U.S. 1052 (1990)................................................................................31

*Lucas v. Townsend,*
    698 F. Supp. 909 (M.D. Ga. 1988) ..............................................................31

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..................................................................................6, 12, 22

*LULAC v. Abbott*,
    369 F. Supp. 3d 768 (W.D. Tex. 2019)..................................................28, 32, 33

*LULAC v. Perry*,
    548 U.S. 399 (2006)....................................................................................33

*LULAC, Council No. 4434 v. Clements*,
    999 F.2d 831 (5th Cir. 1993) (en banc) ................................................31, 32, 33, 37

*Magnus Elecs., Inc. v. La Republica Argentina*,
    830 F.2d 1396 (7th Cir. 1987) ....................................................................9

*Marshall v. Meadows*,
    921 F. Supp. 1490 (E.D. Va. 1996) ..............................................................40

*McDonald v. Grand Traverse Cty. Election Comm'n*,
    255 Mich. App. 674 (2003) ........................................................................29

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*,
    558 F.2d 1283 (7th Cir. 1977) ....................................................................37

*Meyer v. Texas*,
    No., 4:10-cv-3860, 2011 WL 1806524 (S.D. Tex. May 11, 2011)........................28

*Mich. State A. Philip Randolph Inst. v. Johnson*,
    326 F. Supp. 3d 532 (E.D. Mich. 2018)........................................................29

*Mich. State A. Philip Randolph Inst. v. Johnson*,
    749 F. App'x 342 (6th Cir. 2018) (Kethledge, J., concurring) ......................*passim*

*Mich. State A. Philip Randolph Inst. v. Johnson*,
    No. 18-1910, 2019 WL 4145547 (6th Cir. Jan. 14, 2019)....................................29

*Midwest Disability Initiative v. JANS Enters., Inc.*,
    929 F.3d 603 (8th Cir. 2019) ......................................................................12

*Miller v. Hughs*,
    No. 1:19-cv-1071 (W.D. Tex.).....................................................................40

*Miller v. Johnson*,
    515 U.S. 900 (1995)....................................................................................33

*Miller v. Wright*,
    705 F.3d 919 (9th Cir. 2013) ......................................................................10

*Morris v. Livingston*,
    739 F.3d 740 (5th Cir. 2014) .......................................................................20, 21

*Morse v. Republican Party of Va.*,
    517 U.S. 186 (1996) (Thomas, J., dissenting) .........................................33

*Munro v. Socialist Workers Party*,
    479 U.S. 189 (1986)...................................................................................28

*NAACP v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) .........................................................14, 16

*Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*,
    40 F.3d 698 (5th Cir. 1994) .......................................................7, 39, 40

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996).................................................15, 16

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) .......................................................21, 22

*Ohio Org. Collaborative v. Husted*,
    189 F. Supp. 3d 708 (S.D. Ohio), *rev'd on other grounds*, 834 F.3d 620 (6th
    Cir. 2016)...................................................................................38

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) (en banc) .......................................22

*One Wis. Inst., Inc. v. Thomsen*,
    198 F. Supp. 3d 896 (W.D. Wis. 2016) .............................27, 28, 38

*Orr v. Edgar*,
    298 Ill. App. 3d 432 (1998) .........................................................29

*Park Lake Res. Ltd. Liab. v. Dep't of Agric.*,
    378 F.3d 1132 (10th Cir. 2004) ...................................................9

*Personnel Administrator of Massachusetts v. Feeney*,
    442 U.S. 256 (1979)...............................................................36, 37

*Pignons S.A. de Mecanique v. Polaroid Corp.*,
    701 F.2d 1 (1st Cir. 1983)...........................................................9

*Prestage Farms, Inc. v. Bd. of Sup'rs of Noxubee Cty.*,
    205 F.3d 265 (5th Cir. 2000) .......................................................9

*Quern v. Jordan*,
    440 U.S. 332 (1979)...................................................................21

*Rucho v. Common Cause,*
    139 S. Ct. 2484 (2019) ..................................................................................38, 39

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,*
    549 U.S. 422 (2007) ............................................................................................22

*Southampton, Ltd. v. Le Norman,*
    No. 3:18-cv-1089, 2019 WL 7902959 (N.D. Tex. Sept. 3, 2019) ..........................23

*In re Southmark Corp.,*
    163 F.3d 925 (5th Cir. 1999) ................................................................................8

*In re Stalder,*
    540 S.W.3d 215 (Tex. App.—Hous. [1st Dist.] 2018) ..........................................20

*Stringer v. Hughs,*
    5:20-cv-46 (W.D. Tex.) ......................................................................................40

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................................................14

*Taylor v. Sturgell,*
    553 U.S. 880 (2008) .......................................................................................10, 11

*Tex. Democratic Party v. Hughs,*
    No. 5:20-cv-8 (W.D. Tex.) ..................................................................................40

*Tex. Democratic Party v. State of Texas,*
    No. D-1-GN-20-1610 (Tex. Dist. Ct.—Travis Cty.) ............................................40

*Tex. Indigenous Council v. Simpkins,*
    No. 5:11-cv-315, 2014 WL 252024 (W.D. Tex. Jan. 22, 2014) ..........................15

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) .........................................................................................31, 32

*Timmons v. Twin Cities Area New Party,*
    520 U.S. 351 (1997) ........................................................................................24, 28

*McCarthy ex rel. Travis v. Hawkins,*
    381 F.3d 407 (5th Cir. 2004) ...............................................................................20

*United States v. Salerno,*
    481 U.S. 739 (1987) ........................................................................................24, 30

*United Tribe of Shawnee Indians v. United States,*
    253 F.3d 543 (10th Cir. 2001) .............................................................................21

*Va. Office for Prot. & Advocacy v. Stewart*,
    563 U.S. 247 (2011)........................................................................................20

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) (Jones, J., concurring in part and dissenting in
    part)...............................................................................................................33

*Vieth v. Pennsylvania*,
    188 F. Supp. 2d 532 (M.D. Pa. 2002) ...........................................................17

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)........................................................................................36

*Voting for Am., Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) ..........................................................................24

*Watson v. Lifeshare Transplant Donor Servs. of Okla., Inc.*,
    No. 2:09-cv-130, 2009 WL 10702544 (S.D. Tex. Sept. 3, 2009)...................22

*White v. Daniel*,
    909 F.2d 99 (4th Cir. 1990) ............................................................................40

*Woodke v. Dahm*,
    70 F.3d 983 (8th Cir. 1995) ............................................................................23

*Woodruff v. Herrera*,
    No. 1:09-cv-449, 2010 WL 11505703 (D.N.M. Feb. 1, 2010)........................29

*Yamaha Corp. of Am. v. United States*,
    961 F.2d 245 (D.C. Cir. 1992).........................................................................9

*Ex parte Young*,
    209 U.S. 123 (1908)..........................................................................19, 20, 21

*Zapata v. Smith*,
    437 F.2d 1024 (5th Cir. 1971) ........................................................................21

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017).....................................................................................35

*Zimmerman v. City of Austin*,
    881 F.3d 378 (5th Cir. 2018) .....................................................................15, 16

**Statutes**

28 U.S.C. § 1391(b)(2) .....................................................................................23

42 U.S.C. § 1983...........................................................................................17, 21

52 U.S.C.
§ 10301(a) ........................................................................................30, 32, 34, 36
§ 10301(a) ........................................................................................................31
§ 10304(a) ........................................................................................................31
§ 10308 ............................................................................................................34

Tex. Elec. Code
§ 31.001(a) .......................................................................................................20
§ 31.012 ...........................................................................................................22
§ 31.012(a) .......................................................................................................19
§ 31.012(b-1) ...................................................................................................19
§ 31.012(d) .......................................................................................................19
§ 43.002 ...........................................................................................................18
§ 51.003 ......................................................................................................18, 25
§ 52.002 ...........................................................................................................18
§ 52.071 ...........................................................................................................18
§ 82.001–.004 ..................................................................................................25
§ 85.001(a) .......................................................................................................25
§ 85.006(a)–(c) ................................................................................................25
§ 85.006(d)–(e) ................................................................................................25
§ 85.062 ......................................................................................................18, 25
§ 123.031 ....................................................................................................18, 25
§ 125.001 ....................................................................................................18, 25
§ 221.003(a) .....................................................................................................22
§ 232.002 .........................................................................................................22

Tex. Loc. Gov't Code
§ 101.002–.003 ................................................................................................18
§ 101.022 .........................................................................................................18
§ 102.007 .........................................................................................................18

**Other Authorities**

28 C.F.R. § 51.13(h) .............................................................................................31

18 Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 4425 (3d ed.)..........................9

18A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 4456 (2002).......................12

18A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 4436 (3d ed.)......................8

Alexa Ura, *Harris County Clerk Apologizes to Voters, "Takes Full
    Responsibility" for Long Waits to Vote in Houston*, THE TEXAS TRIBUNE (Mar.
    6, 2020), https://www.texastribune.org/2020/03/06/harris-county-clerk-
    apologizes-long-waits-vote-houston/ ........................................................................19

An Act Relating to the Elimination of Straight-Party Voting, H.B. 25, § 8,
    https://capitol.texas.gov/tlodocs/ 85R/billtext/pdf/HB00025F.pdf...........................18

Bill Analysis, Tex. House Committee Report,
  https://www.legis.state.tx.us/tlodocs/85R/analysis/pdf/HB 00025H.pdf ................................3

Bill Analysis, Tex. House Committee Report,
  https://www.legis.state.tx.us/tlodocs/85R/analysis/pdf/HB 00025H.pdf. ..............................26

Bill Analysis, Tex. House Research Org.,
  https://hro.house.texas.gov/pdf/ba85r/hb0025.pdf ..............................................................3

Bill Analysis, Tex. House Research Organization,
  https://hro.house.texas.gov/pdf/ba85r/hb0025.pdf ............................................................26

Brianna Stone, *Texas Allows Straight-Ticket Voting, But for How Long? Curious
  Texas has the Answer*, THE DALLAS MORNING NEWS (Oct. 31, 2018),
  https://www.dallasnews.com/news/curious-texas/2018/10/31/texas-allows-
  straight-ticket-voting-but-for-how-long-curious-texas-has-the-answer/ ..................................4

Chief Justice John L. Hill, Jr., *The State of the Judiciary Message* (Jan. 22, 1985),
  https://www.sll. texas.gov/assets/pdf/judiciary/state-of-the-judiciary-1985.pdf ......................2

Chief Justice Nathan L. Hecht, *The State of the Judiciary in Texas* (Feb. 1, 2017),
  https://www.sll.texas.gov/assets/pdf/judiciary/state-of-the-judiciary-2017.pdf ......................2

Chief Justice Wallace B. Jefferson, *State of the Judiciary* (Feb. 23, 2011),
  https://www.sll.texas.gov/assets/pdf/ judiciary/state-of-the-judiciary-2011.pdf ......................2

Chief Justice Wallace B. Jefferson, *The State of the Judiciary in Texas* (Feb. 11,
  2009) https://www.sll.texas.gov/assets/pdf/judiciary/state-of-the-judiciary-
  2009. pdf ............................................................................................................................2

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45 ...................................17

Fed. R. App. P. 4(a)(1)(A) ...............................................................................................................6

Fed. R. Civ. P. 12(b)(3)....................................................................................................................22

Fed. R. Civ. P. 59(e) .........................................................................................................................6

Gov. Greg Abbott, Proclamation (July 27, 2020),
  https://lrl.texas.gov/scanned/govdocs/Greg%20Abbott/
  2020/proc07272020.pdf....................................................................................................25

Matt Welch, *Justin Amash: "Straight-Ticket Voting Makes it Prohibitive to Run
  Outside of the Major Parties"*, REASON (Aug. 30, 2018),
  https://reason.com/2018/08/30/justin-amash-straight-ticket-voting-make/ ............................27

National Conference of State Legislatures, Straight Ticket Voting States (Mar. 25, 2019), https:// www.ncsl.org/research/elections-and-campaigns/straight-ticket-voting.aspx .................................................................................................................2

Reggie Shuford, *This is Why the ACLU-PA Supports Legislation Reforming our Election Laws*, PENN. CAPITAL-STAR (Oct. 30, 3019), https://www.penncapital-star.com/commentary/this-is-why-the-aclu-pa-supports-legislation-reforming-our-election-laws-opinion/....................................25

Tx. House J., 85th Leg., Reg. Sess., at 3982–83 (May 20, 2017), https://journals.house.texas.gov/hjrnl/85r/pdf/85RDAY76FINAL.PDF#page=90 ..................................................................3

U.S. Const. amend. XV, § 1.................................................................................36

U.S. Const. amend. XV, § 2.................................................................................33

Witness List for HB 25, House Elections Committee (Mar. 13, 2017), https://www.legis.state.tx.us/tlo docs/85R/witlistbill/pdf/HB00025H.pdf............................27

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Court has already decided this case. In *Bruni v. Hughs*, No. 5:20-cv-35, 2020 WL 3452229 (S.D. Tex. June 24, 2020), the Court dismissed Plaintiffs' first suit challenging HB 25, the bill repealing straight ticket voting. "[A]ll of Plaintiffs' alleged injuries fail[ed] to satisfy the imminence requirement of Article III" standing. *Id.* at *5. If Plaintiffs were unhappy with the Court's ruling, they could have requested reconsideration or appealed. Instead, Plaintiffs refiled their lawsuit. They apparently hope to relitigate an issue this Court has already decided: their lack of standing.

Even if Plaintiffs could relitigate standing (which they cannot), the Court's previous ruling remains correct. Plaintiffs' injuries are speculative, not certainly impending, for four reasons. First, "all of Plaintiffs' alleged injuries fail to satisfy the imminence requirement of Article III because they are premised on numerous predicted 'effects' of HB 25 which are uncertain to occur." *Id.* Second, Plaintiffs continue to "assume 'local officials will not use their state-law authority to ameliorate the situation' at polling-places." *Id.* at *6. Third, the pandemic continues to "significantly amplify[] the uncertainty over Plaintiffs' allegations." *Id.* Fourth, Plaintiffs' "injuries [still] hinge on decisions of third parties who are not before the Court," Texas voters. *Id.* at *7.

Plaintiffs ask the Court to change its mind in the service of meritless claims. With HB 25, Texas joined forty-three other States in requiring voters to make individual selections on their ballots. Not one of those laws has been held unconstitutional. It is no surprise courts have upheld these laws. Repealing straight ticket voting does not burden anyone's right to vote. All eligible Texans can still vote for their preferred candidates. In fact, they can still vote for all candidates from one party, if they so choose. Voters simply have to make individual selections, just as they do in primary and non-partisan elections.

Finally, Plaintiffs are not entitled to the extraordinary equitable relief they seek. Plaintiffs filed this case more than *three years* after the Governor signed HB 25. Now, on the eve of an election, they

try to force emergency litigation on the State and this Court. Equity does not reward such behavior.

BACKGROUND

## I.     The Movement to Repeal Straight Ticket Voting

Forty-four States will not offer straight ticket voting in 2020.[1] In recent years, more and more States have repealed straight ticket voting. They recognize its central problem: encouraging voters to ignore every consideration except partisan affiliation. That is a recipe for bad governance.

Respected Texas judges have repeatedly warned about the dangers of straight ticket voting. Chief Justice Jefferson, for example, recommended "eliminat[ing] straight-ticket voting that allows judges to be swept from the bench . . . not for poor work ethic, not for bad temperament, not even for their controversial but courageous decisions—but because of party affiliation." He pointed to wave elections, some of which had harmed Republicans and some of which had harmed Democrats, but all of which had harmed the Texas judiciary: "We saw this in Dallas County four years ago and in Harris County in the 1990s, in 2008 and just last year. Hordes of judges replaced for no good reason."[2]

Unsurprisingly, many Texas legislators have attempted to repeal or limit straight ticket voting. Between 1999 and 2017, Texas legislators introduced at least 23 bills aimed at curtailing straight ticket

---

[1] National Conference of State Legislatures, Straight Ticket Voting States (Mar. 25, 2019), https://www.ncsl.org/research/elections-and-campaigns/straight-ticket-voting.aspx.

[2] Chief Justice Wallace B. Jefferson, *State of the Judiciary* (Feb. 23, 2011), https://www.sll.texas.gov/assets/pdf/judiciary/state-of-the-judiciary-2011.pdf; *see also, e.g.*, Chief Justice Nathan L. Hecht, *The State of the Judiciary in Texas* (Feb. 1, 2017), https://www.sll.texas.gov/assets/pdf/judiciary/state-of-the-judiciary-2017.pdf ("removing judges from straight-ticket voting would help"); Chief Justice Wallace B. Jefferson, *The State of the Judiciary in Texas* (Feb. 11, 2009) https://www.sll.texas.gov/assets/pdf/judiciary/state-of-the-judiciary-2009.pdf ("So long as we cast straight ticket ballots for judges, the fate of all judges is controlled by the whim of the political tide."); Chief Justice John L. Hill, Jr., *The State of the Judiciary Message* (Jan. 22, 1985), https://www.sll.texas.gov/assets/pdf/judiciary/state-of-the-judiciary-1985.pdf (noting a committee's recommendation of "[b]allot changes to prevent straight-party voting in judicial races").

voting,[3] including five repeal bills authored or co-authored by Democratic legislators.[4]

More than three years ago, a bill succeeded: HB 25. Legislators were concerned "that straight-party voting pulls a voter's attention away from down-ballot candidates . . . and that this practice discourages a voter from researching all the candidates on the ballot."[5]

Another justification for HB 25 was avoiding unintentional "roll off," a phenomenon in which voters vote in up-ballot races but fail to vote in down-ballot races. Straight ticket voting "causes voters to miss out on casting votes in nonpartisan races or propositions."[6] After selecting a party at the top of the ballot, some voters thought they were finished. But the end of the ballot often contains nonpartisan races and propositions to which a straight party ticket does not apply. Because some voters thought they had no need to advance beyond the first page, they never even realized they were not voting on some races or propositions.[7]

HB 25 had bipartisan support. Nine Democratic legislators voted for it.[8] As one of them

---

[3] These bills are as follows: *76th Legislature, Regular Session (1999):* SB 59, HB 3837; *77th Legislature, Regular Session (2001):* SB 129, HB 405, HB 1518; *80th Legislature, Regular Session (2007):* SB 134; *81st Legislature, Regular Session (2009):* HB 135, HB 1768, SB 317, SB 392; *82nd Legislature, Regular Session (2011):* SB 139, HB 638; *83rd Legislature, Regular Session (2013):* SB 103; HB 1857, HB 2060; *84th Legislature, Regular Session (2015):* SB 1702, HB 25, HB 1288, HB 1444, HB 1555; *85th Legislature, Regular Session (2017):* HB 25, HB 433, SB 2175.

[4] The Democratic authors or co-authors of straight ticket voting repeal bills were Rodney Ellis, Robert Junell, Senfronia Thompson, Bob Turner, and Mark Homer. *See* Tex. Legislature Online, https://www.legis.state .tx.us/BillLookup/History.aspx?LegSess=76R&Bill=SB59 (SB 59); Tex. Legislature Online https://www.legis. state.tx.us/BillLookup/History.aspx?LegSess=77R&Bill=SB129 (SB 129); Tex, Legislature Online, https:// www.legis.state.tx.us/BillLookup/History.aspx?LegSess=77R&Bill=HB405 (HB 405); Tex. Legislature Online, https://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=77R&Bill=HB1518 (HB 1518); Tex. Legislature Online, https://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=81R&Bill=HB 1768 (HB 1768). These legislators' party affiliation can be confirmed at the following website: https://lrl.texas. gov/legeLeaders/members/lrlhome.cfm.

[5] Bill Analysis, Tex. House Committee Report, https://www.legis.state.tx.us/tlodocs/85R/analysis/pdf/HB 00025H.pdf.

[6] Bill Analysis, Tex. House Research Org., https://hro.house.texas.gov/pdf/ba85r/hb0025.pdf.

[7] *See, e.g.,* Hidalgo County Sample Ballot 145-05 for the November 2018 General Election, https://www .hidalgocounty.us/DocumentCenter/View/31392/145-05_Style64_English_Electronic.

[8] Tx. House J., 85th Leg., Reg. Sess., at 3982–83 (May 20, 2017), https://journals.house.texas.gov/hjrnl/85r/ pdf/85RDAY76FINAL.PDF#page=90. These nine legislators were Terry Canales, Ryan Guillen, Ina Minjarez, Renè Oliveira, Mary Ann Perez, Joseph Pickett, Senfronia Thompson, and Hubert Vo. *See id.* These legislators' party affiliations can be confirmed at https://lrl.texas.gov/legeLeaders/members/lrlhome.cfm.

explained, "I do not believe [HB 25] affects minority voting. I believe it promotes making an informed decision." He continued, "It's a good thing to encourage voters to look down the ballot and choose candidates who have varied opinions and don't prescribe 100 percent to whichever party they are associated with during an election."[9]

On June 1, 2017, Governor Abbott signed HB 25 into law. A delayed effective date, September 1, 2020, gave everyone time to adjust.[10]

## II.    Plaintiffs' Lawsuits

Plaintiffs first filed suit on March 5, 2020, two years and nine months after HB 25 was signed, and only months before ballots must be finalized for the next election. *See* No. 5:20-cv-35, ECF 1. Before the Secretary could file a motion to dismiss, Plaintiffs amended their complaint. *See* No. 5:20-cv-35, ECF 16. The Secretary moved to dismiss. *See* No. 5:20-cv-35, ECF 32; ECF 52. The Court granted that motion and dismissed Plaintiffs' claims on June 24. *See* No. 5:20-cv-35, ECF 67.

The Court correctly concluded that Plaintiffs had not plausibly alleged Article III standing. The issue was "whether Plaintiffs' injuries" were "certainly impending," a "constitutionally mandated standard." *Bruni v. Hughs*, No. 5:20-cv-35, 2020 WL 3452229, at *1 (S.D. Tex. June 24, 2020). To answer that question, the Court "carefully reviewed the parties' arguments, the record, and the applicable law." *Id.* The Court identified four major categories of uncertainty that prevented Plaintiffs from plausibly alleging standing.

First, the Court determined that "all of Plaintiffs' alleged injuries fail to satisfy the imminence requirement of Article III because they are premised on numerous predicted 'effects' of HB 25 which are uncertain to occur." *Id.* at *5. The Court enumerated "numerous suppositions that must occur

---

[9] Brianna Stone, *Texas Allows Straight-Ticket Voting, But for How Long? Curious Texas has the Answer*, THE DALLAS MORNING NEWS (Oct. 31, 2018), https://www.dallasnews.com/news/curious-texas/2018/10/31/texas-allows-straight-ticket-voting-but-for-how-long-curious-texas-has-the-answer/.
[10] *See* Tex. Leg. Online, https://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=85R&Bill=HB25.

before Plaintiffs might suffer any harm." *Id.* "Plaintiffs' injuries only *might* occur":

- "*if* the Bill causes longer lines at polling-places";

- "*if* the Bill causes increased roll-off at polling-places";

- "*if* the Bill causes voter confusion at polling-places";

- "*if* these predicted effects cause Democratic-party voters—and not voters of other political affiliations—to leave lines at polling-places or fail to show up at polling-places altogether";

- "*if* these predicted effects cause voters who would have voted for . . . Democratic-party candidates to engage in roll-off at polling places; and"

- "*if* all of these predicted effects—in a compounding fashion—cause Democratic-party candidates . . . to lose votes at polling-places that would have otherwise been cast for them."

*Id.*

Second, the Court noted the uncertainty surrounding governmental actions that could alter the effects of HB 25. Plaintiffs had improperly "assume[d] 'local officials will not use their state-law authority to ameliorate the situation' at polling-places." *Id.* at *6. Similarly, "[t]he Secretary's ability to provide . . . notice [about the elimination of straight ticket voting] to all Texans further weakens the chance that HB 25 will cause voters to be confused, ill-equipped, or uneducated about the Bill." *Id.*

Third, the Court stressed that "the nation's current public-health crisis" "significantly amplif[ied] the uncertainty over Plaintiffs' allegations." *Id.* "As the virus continues to spread, the pandemic is projected to transform in-person voting at polling-places *regardless* of HB 25's enforcement." *Id.* "All things considered, in-person voting at polling-places is wrought with uncertainty, which means that Plaintiffs' injuries—predicated on their predicted 'effects' of HB 25 *at polling-places*—are far from certainly impending." *Id.*

In addition, the Court emphasized an independent reason Plaintiffs lacked standing: "the occurrence of [Plaintiffs'] injuries remains in the hands of Texas voters." *Id.* at *7. Texas voters have choices. As the Court recognized, they "may choose to wait in line at polling places or not, to engage

in roll-off or not, or to manually vote for all members of their desired political party or not." *Id.* Those choices, combined "with an additional decision" about "voting in-person during the pandemic," "provide an additional reason that Plaintiffs lack standing: their injuries hinge on decisions of third parties who are not before the Court." *Id.*

The Court entered its order dismissing the case on June 24. *See* No. 5:20-cv-35, ECF 67. Plaintiffs did not file a motion for reconsideration within the 28 days allowed by rule. *See* Fed. R. Civ. P. 59(e). Nor did Plaintiffs file a timely notice of appeal. *See* Fed. R. App. P. 4(a)(1)(A).

Instead, Plaintiffs filed this new suit on August 12. *See* ECF 1. The new complaint is nearly identical to the old complaint. It includes the same allegations, the same claims, and the same counsel. As in the previous case, Plaintiffs Bruni, DSCC, and DCCC challenge HB 25. The Texas Democratic Party ("TDP") and Jessica Tiedt, plaintiffs in the last lawsuit, have not joined this lawsuit. In their place is the Texas Alliance for Retired Americans ("TARA"), which is affiliated with TDP through the AFL-CIO of Texas, as explained below.

## STATEMENT OF THE ISSUES

1.   Do Plaintiffs have standing when their claims rest on speculative injuries?

     No, this Court has already held that Plaintiffs lack standing to challenge HB 25. *See infra* Part I. In any event, Plaintiffs have not plausibly alleged an Article III injury in fact. *See infra* Parts I–II.

     Standard of Review: "The party invoking federal jurisdiction bears the burden of establishing" it. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "[A] trial court has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015) (quotation omitted).

2.   Can Plaintiffs challenge HB 25 by suing the Secretary when the Secretary does not enforce HB 25, does not cause their asserted injuries, and cannot redress those injuries?

     No, sovereign immunity and Article III standing requirements bar this suit. *See infra* Part III.

     Standard of Review: Same as Issue 1.

3.     Should this case be heard in the Southern District when the events giving rise to Plaintiffs claim did not occur in the Southern District?

No, venue is improper. *See infra* Part IV.

Standard of Review: "Once [venue is] challenged, the burden of sustaining venue lies with the plaintiff." *Broadway Nat'l Bank v. Plano Encryption Techs., LLC*, 173 F. Supp. 3d 469, 473 (W.D. Tex. 2016). "[I]n deciding whether venue is proper, 'the court is permitted to look at evidence beyond simply those facts alleged in the complaint and its proper attachments.'" *Id.* (quoting *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009)).

4.     Does federal law require States to offer straight ticket voting, contrary to the judgment of forty-four States and every court to consider the issue?

No, HB 25 is consistent with both the Constitution and the Voting Rights Act. *See infra* Part V.

Standard of Review: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Importantly, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *IberiaBank Corp. v. Illinois Union Ins. Co.*, 953 F.3d 339, 345 (5th Cir. 2020) (quotations and citations omitted).

5.     Can Plaintiffs seek equitable relief after inexcusably and prejudicially delaying this suit?

No, laches bars Plaintiffs' claims. *See infra* Part VI.

Standard of Review: To prove laches, the defendant must show "(1) a delay on the part of the plaintiff in instituting suit; (2) that is not excused; and (3) that results in undue prejudice to the defendant's ability to present an adequate defense." *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 708 (5th Cir. 1994).

ARGUMENT

## I.     Plaintiffs' Injuries Are Speculative

The Court has already ruled that Plaintiffs lack standing to challenge HB 25. Plaintiffs cannot relitigate that issue, but even if they could, their allegations would still be insufficient.

### A.     The Court Has Already Decided This Issue

"Issue preclusion . . . applies when the following elements are met: (1) the issue at stake must be identical to the one involved in the prior action; (2) the issue must have been actually litigated in the prior action; and (3) the determination of the issue in the prior action must have been a part of

the judgment in that earlier action." *In re Southmark Corp.*, 163 F.3d 925, 932 (5th Cir. 1999); *see also Cervantes v. Ocwen Loan Servicing, LLC*, No. 5:19-cv-7-MGM-JAK, 2019 WL 6003129, at *6 (S.D. Tex. Aug. 28, 2019), *adopted*, ECF 34 (S.D. Tex. Oct. 7, 2019).

Issue preclusion applies to this Court's previous determination that it lacked jurisdiction. "It has long been the rule that principles of res judicata apply to jurisdictional determinations—both subject matter and personal." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). "[T]he dismissal of a complaint for lack of jurisdiction . . . adjudicate[s] the court's jurisdiction, and a second complaint cannot command a second consideration of the same jurisdictional claims." *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 469 (5th Cir. 2013) (quoting *Boone v. Kurtz*, 617 F.2d 435, 436 (5th Cir. 1980) (per curiam)). Thus, a dismissal for lack of standing "preclude[s] relitigation of the precise issue of jurisdiction . . . that led to the initial dismissal." 18A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 4436 (3d ed.).

The Court's finding "that Plaintiffs lack Article III standing" to challenge HB 25 remains binding. *Bruni*, 2020 WL 3452229, at *7. In the face of the Court's reasoning in its 14-page opinion, Plaintiffs try to avoid the Court's previous conclusion on three grounds contained in a mere footnote.

First, Plaintiffs argue that the Court's previous ruling was erroneous. *See* ECF 1 at 1 n.1. For the reasons explained below, the Court's reasoning was correct, but even if it were not, that would not help Plaintiffs here. Because a jurisdictional dismissal "is conclusive as to matters actually adjudged," whether the decision "may have been erroneous" is "immaterial." *Acree v. Air Line Pilots Ass'n*, 390 F.2d 199, 203 (5th Cir. 1968). "[R]es judicata is applicable even if the former judgment may have been erroneous." *Kiker v. Hefner*, 409 F.2d 1067, 1068 (5th Cir. 1969).

Second, Plaintiffs claim that their new complaint "supplements the prior allegations," provides new "evidence," and offers a "theory . . . the Court's June 24 ruling did not address." ECF 1 at 1 n.1. New allegations, evidence, and theories cannot overcome issue preclusion.

In *Park Lake Resources Limited Liability v. Department of Agriculture*, the plaintiffs' previous challenge to government action had been dismissed for lack of jurisdiction because they had failed to "show any present injury." 378 F.3d 1132, 1135 (10th Cir. 2004). The plaintiffs filed suit again. They "continuing to challenge the" same government action, but added "additional[] alleg[ation]s." *Id.* at 1134. The plaintiffs' new lawsuit claimed "a different injury," but "this additional injury was readily knowable when the complaint was filed in the initial litigation." *Id.* As a result, the plaintiffs were precluded from relitigating jurisdiction. Their "new theory" was no help because it was "not based on any facts postdating the prior litigation." *Id.* at 1137. "[I]t does not make sense to allow a plaintiff to begin the same suit over and over again in the same court, each time alleging additional facts that the plaintiff was aware of from the beginning of the suit, until it finally satisfies the jurisdictional requirements." *Id.* at 1138 (quoting *Magnus Elecs., Inc. v. La Republica Argentina*, 830 F.2d 1396, 1401 (7th Cir. 1987)). There is "no unfairness in denying Plaintiffs a second chance to argue ripeness on the same available facts." *Id.* The same is true of standing. *See Prestage Farms, Inc. v. Bd. of Sup'rs of Noxubee Cty.*, 205 F.3d 265, 268 (5th Cir. 2000) ("[R]ipeness and standing often intersect because the question of whether a plaintiff has suffered an adequate harm is integral to both.").

That is just one example of the established principle that issue preclusion bars "new theories, evidence, and arguments" when the proponent "had a fair opportunity to make th[o]se arguments and to introduce th[at] evidence the first time." *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 2 (1st Cir. 1983). "Once a plaintiff has had a chance to prove a fact, he cannot reopen the matter simply by stating that he wishes to introduce more or better evidence." *Id.*; *see also Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254–55 (D.C. Cir. 1992) ("Preclusion cannot be avoided simply by offering evidence in the second proceeding that could have been admitted, but was not, in the first."); 18 Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 4425 (3d ed.) ("Preclusion generally is appropriate if both the first and second action involve application of the same principles of law to a

historic fact setting that was complete by the time of the first adjudication.").

Here, Plaintiffs spend additional pages discussing the COVID-19 pandemic. Far from being a changed circumstance, the COVID-19 pandemic was indeed one of the very reasons why this Court dismissed Plaintiffs' claims in the first lawsuit. *Bruni*, 2020 WL 3452229, at *6 ("Moreover, significantly amplifying the uncertainty over Plaintiffs' allegations is the nation's current public-health crisis").

Third, Plaintiffs suggest that, even if the Court's previous ruling is binding on Bruni, DSCC, and DCCC, it should not bind TARA. *See* ECF 1 at 1 n.1. Although TARA was not formally listed as a plaintiff in *Bruni*, its relationships with the original plaintiffs support preclusion. Even "a nonparty may be bound by a judgment" when it "was adequately represented by someone with the same interests who was a party to the suit." *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008) (quotation and brackets omitted). Here, TARA's interests and the original plaintiffs' interests "are aligned." *Id.* at 900. In this new suit, TARA is represented by the same lawyers pursuing the same claims based on the same evidence that the original plaintiffs used in the original suit.

In *Miller v. Wright*, a seller of cigarettes and two of his customers challenged a cigarette tax imposed by an Indian tribe. 705 F.3d 919, 923 (9th Cir. 2013). The seller and one of the customers had previously brought (and lost) similar claims in other courts. *See id.* at 922. In *Miller*, however, they added a new plaintiff, a second customer who had not been a party to the earlier litigation. Nonetheless, *res judicata* barred all of their claims. The second customer was "in privity with [the seller] and [the first customer] given the substantial commonality of their interests." *Id.* at 928.

In addition, the original plaintiffs understood themselves "to be acting in a representative capacity." *Taylor*, 553 U.S. at 894. The Texas Democratic party, for example, described itself as "representing Democratic candidates and voters throughout the State of Texas." No. 5:20-cv-35, ECF 1 ¶ 23. It surely understood itself to be acting on behalf of affiliated organizations. TARA is listed as

a "constituency group" of the Texas AFL-CIO,[11] an official "auxiliary organization of the Texas Democratic Party" that controls two seats on the party's governing board.[12]

Moreover, TARA purports to bring its claims on behalf of members who were represented in the previous lawsuit. The plaintiffs in the previous suit purported to represent their "members, volunteers, and constituents," "including Texans who regularly support candidates affiliated with the Democratic Party." No. 5:20-cv-35, ECF 1 ¶¶ 21–23. Thus, the previous plaintiffs asserted "the rights of voters who support the Democratic Party." *Id.* ¶ 14. Like the previous plaintiffs, TARA says that it brings its claims "on behalf of its members and constituents," ECF 1 ¶ 21, and it asserts "the rights of voters who support the Democratic Party," *id.* ¶ 15. As a result, TARA is now litigating on behalf of individuals on whose behalf the previous plaintiffs previously litigated.

Those individuals would be precluded from bringing their own claims. Issue preclusion applies with no less force when a plaintiff claims associational standing. In *Acree*, the Fifth Circuit analyzed the res judicata effect of a previous decision that "considered the claims raised by [an association] in behalf of its individual members and dismissed them for lack of jurisdiction over the subject matter." 390 F.2d at 202. The Fifth Circuit ordered dismissal of an "identical suit . . . brought directly by the individual members" because preclusion principles apply with equal force to individuals on whose behalf an association sues. *Id.* at 203.

Because its members would be precluded from bringing this suit directly, TARA is precluded from bringing it on their behalves. "[A] party bound by a judgment may not avoid its preclusive force by relitigating through a proxy." *Taylor*, 553 U.S. at 895. In keeping with that general rule, plaintiffs cannot use associational standing to circumvent preclusion. An "association should not be able to

---

[11] Texas AFL-CIO, *Texas Alliance for Retired Americans*, https://www.texasaflcio.org/constituency-groups/texas-alliance-retired-americans; *see also* Texas AFL-CIO, *Constituency Groups*, https://www.texasaflcio.org/constituency-groups.

[12] Texas Democratic Party, *The Rules of the Texas Democratic Party: 2020-2021* art. II.D.2.a (Apr. 15, 2020), https://www.texasdemocrats.org/wp-content/uploads/2020/04/TDP-Rules-4_15_2020.pdf.

evade preclusion continually by averring that unidentified members are not bound and bringing successive suits by claiming injury to different identified members." *Midwest Disability Initiative v. JANS Enters., Inc.*, 929 F.3d 603, 609 (8th Cir. 2019) (quoting 18A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 4456, at p. 501 (2002)). Similarly, individuals should not be able to evade preclusion by continually naming a new association to represent their interests.

### B.      Plaintiffs' Claims Rest on Speculation

Even if Plaintiffs were entitled to relitigate their standing to challenge HB 25, dismissal would still be appropriate for the same reasons the Court dismissed their first suit. Plaintiffs' new complaint does not fix the deficiencies the Court previously identified.

Because Plaintiffs seek prospective relief, they must establish an "imminent" future injury. *Lujan*, 504 U.S. at 564. The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted). Plaintiffs have not plausibly alleged a certainly impending future injury.

Plaintiffs' claims are speculative for the same reasons this Court has already explained. First, "all of Plaintiffs' alleged injuries fail to satisfy the imminence requirement of Article III because they are premised on numerous predicted 'effects' of HB 25 which are uncertain to occur." *Bruni*, 2020 WL 3452229, at *5. Plaintiffs' "numerous suppositions" are no more certain now than they were before. *Id.* Second, Plaintiffs continue to "assume 'local officials will not use their state-law authority to ameliorate the situation' at polling-places." *Id.* at *6. Third, the pandemic continues to "significantly amplify[] the uncertainty over Plaintiffs' allegations." *Id.* Fourth, Plaintiffs' "injuries [still] hinge on decisions of third parties who are not before the Court": Texas voters. *Id.* at *7.

Plaintiffs changed their complaint in four ways, but they did not fix those problems.

First, Plaintiffs added new allegations regarding the pandemic, *see, e.g.*, ECF 1 ¶ 6, but the Court already considered that issue. *See Bruni*, 2020 WL 3452229, at *6. If anything, Plaintiffs' new allegations

provide further support for the Court's previous conclusion that the pandemic "significantly amplif[ies] the uncertainty over" the effects of HB 25. *Id.*

Second, Plaintiffs replaced allegations about TDP and Jessica Tiedt with allegations about TARA. *See* ECF 1 ¶ 21. But the Court's previous analysis did not rest on the precise identity of the plaintiffs. *See Bruni*, 2020 WL 3452229, at *4–*7. As the Court explained, whether and how HB 25 will affect anybody is uncertain. That is equally true whether the plaintiff is TARA or TDP.

Third, Plaintiffs' new complaint omits their previous allegations about "roll off." Thus, Plaintiffs have abandoned one of their previous theories of injury. *Cf. Bruni*, 2020 WL 3452229, at *2. That does not render their remaining theories more plausible.

Finally, Plaintiffs took the expert testimony attached to their previous motion for a preliminary injunction and added it to their new complaint. *See* ECF 1 ¶¶ 54–57, 63–64, 67. That does not make Plaintiffs' predictions about the future any less speculative. Plaintiffs' experts did not address the factors that this Court identified as making Plaintiffs' alleged injuries uncertain. For example, the Court previously recognized that, during the pandemic, some "Texans will experience *shorter* lines [at polling places] given that voters have been encouraged to steer clear from in-person voting where possible." *Bruni*, 2020 WL 3452229, at *6. But Plaintiffs' proffered expert on voting lines did not make any prediction about 2020 in-person turnout, much less analyze the effects of the pandemic. Instead, he used *2016* data without making any adjustments for the pandemic, or anything else. *See* ECF 1 ¶ 55; ECF 1-2 ¶¶ 10–11.

## II.    Plaintiffs Lack Standing for Other Reasons As Well

Even if Plaintiffs' alleged injuries were not speculative, they would not support Article III standing. Plaintiffs' objections to HB 25 relate to election results, not injuries in fact. Federal courts are "not responsible for vindicating generalized partisan preferences." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). Plaintiffs lack Article III standing because they complain about "group political interests,

not individual legal rights." *Id.*

### A.     Plaintiffs Have Not Alleged Any Injury Based on the Right to Vote

In appropriate circumstances, a voter can plausibly allege that a law interferes with his ability to vote. But Plaintiffs cannot do that here. Three Plaintiffs are artificial entities that do not vote. *See* ECF 1 ¶¶ 21, 23–24. The one individual Plaintiff does not allege that she is a registered voter who intends to vote in future elections. *See* ECF 1 ¶ 22. Thus, Plaintiffs have not plausibly alleged that HB 25 injures them by interfering with their rights to vote.

### B.     Plaintiffs Lack Associational Standing

For associational standing, Plaintiffs must "identify members who have suffered the requisite harm" to establish injuries in fact. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (requiring evidence of "a specific member").

As an initial matter, even if Plaintiffs could rely on the injuries of their members, they still would not have standing because any injuries to their members would be speculative for the reasons the Court has already explained. *See supra* Part I. None of Plaintiffs' members is injured.

In any event, Plaintiffs lack associational standing for additional, independent reasons. First, Plaintiffs have not identified any specific members, let alone specific members with certainly impending future injuries, so their claims should be dismissed. *See Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.) (dismissing under Rule 12(b)(1) because plaintiff did not identify a member who was affected by the challenged regulation); *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) (concluding a plaintiff "has not established associational standing" because its "Complaint does not identify any . . . disabled student with standing to bring suit").

Second, Plaintiffs have not alleged facts showing that they even have members within the meaning of the associational standing test. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). Plaintiffs must allege they have members who "elect leadership, serve as the organization's

leadership, and finance the organization's activities, including the case's litigation costs." *Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014). DSCC and DCCC say they have "members, volunteers, and constituents." ECF 1 ¶¶ 23–24. TARA claims to have "members and constituents." *Id.* ¶ 21. But no Plaintiff alleges that those individuals "participate in and guide the organization's efforts." *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994). Individuals affiliated with an association cannot support associational standing unless they satisfy the membership requirements explained above. *See, e.g.*, *Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002).

### C.    Plaintiffs Do Not Have Organizational Standing

To establish standing based on HB 25 "perceptibly impair[ing]" their activities, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), Plaintiffs must plausibly allege both that it makes their "*activities* more difficult" and that there is "a direct conflict between the defendant's conduct and [their] *mission*." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). Plaintiffs have not done so here.

Plaintiffs do not allege that HB 25 prohibits their activities. Nor could they. The statute does not regulate Plaintiffs at all. Plaintiffs remain free to engage in all of their previous political activities. Plaintiffs instead rely on the contention that HB 25 affects "the electoral prospects of" candidates they support. ECF 1 ¶¶ 21, 23–24. But making Plaintiffs' campaign activities less likely to succeed is not equivalent to making the activities themselves more difficult to undertake. *Compare Gill*, 138 S. Ct. at 1933 (rejecting standing to "vindicat[e] generalized partisan preferences"), *with Zimmerman v. City of Austin*, 881 F.3d 378, 389–90 (5th Cir. 2018) ("[G]overnment action that chills protected speech [*e.g.*, campaign activity] without prohibiting it can give rise to a constitutionally cognizable injury.").

In addition, Plaintiffs' contention is speculative, as the Court has already held. The idea that HB 25 will cause "candidates whom Plaintiffs support[] to lose votes at polling-places that would have

otherwise been cast for them" is an uncertain "supposition[.]" *Bruni*, 2020 WL 3452229, at *5.

Moreover, there is no "direct conflict" between HB 25 and Plaintiffs' mission (*i.e.*, their preferred candidates winning elections). *Nat'l Treasury Emps. Union*, 101 F.3d at 1430. As the Court has already recognized, HB 25 leaves the electoral fates of Plaintiffs' preferred candidates "in the hands of Texas voters." *Bruni*, 2020 WL 3452229, at *7.

Finally, Plaintiffs cannot establish standing based on diversions of resources. "[A]lthough a change in a plaintiff's 'campaign plans or strategies in response to an allegedly injurious law' can itself confer an injury-in-fact, 'the change in plans must still be in response to a reasonably certain injury imposed by the challenged law.'" *Id.* at *5 (quoting *Zimmerman*, 881 F.3d at 390). Also, "an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its 'routine [] activities,'" and must "identify 'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Def. Distributed v. U.S. Dep't of State*, No. 1:15-cv-372, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238). Plaintiffs cannot satisfy either requirement. First, their alleged reactions to HB 25 do not meaningfully differ from their "day-to-day operations." *ACORN v. Fowler*, 178 F.3d 350, 359 (5th Cir. 1999). Plaintiffs' only alleged reactions are to engage in political activities, which is what they do anyway. *See* ECF 1 ¶¶ 21–24. "Plaintiffs have not explained how" their reactions "differ from [their] routine [political] activities." *City of Kyle*, 626 F.3d at 238. Second, Plaintiffs "have not identified any specific projects that [they] had to put on hold or otherwise curtail in order to respond to" HB 25. *City of Kyle*, 626 F.3d at 238. Vague references to "other efforts" do not suffice. ECF 1 ¶¶ 21–24.

### D.    Plaintiffs Cannot Rely on Third-Party Standing

Even if Plaintiffs had Article III standing, they would lack statutory standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 nn.3–4 (2014). Section 1983 provides a cause of action only when *the plaintiff* suffers "the deprivation of any rights" at issue. 42 U.S.C. § 1983. It

does not provide a cause of action to plaintiffs claiming an injury based on a *third party's* rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45. When "[t]he alleged rights at issue" belong to a third party, the plaintiff lacks statutory standing, regardless of whether the plaintiff has suffered his own injury. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999).

Here, all of Plaintiffs' claims depend on the right to vote. *See* ECF 1 ¶¶ 96, 108, 115–16, 126. But as discussed above, Plaintiffs have not plausibly alleged they are registered voters who intend to vote in future elections. *See supra* Part II.A. "It goes without saying that political parties, although the principal players in the political process, do not have the right to vote." *Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002); *see also Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 91 (2d Cir. 2015). As a result, Plaintiffs are necessarily asserting the rights of third parties and therefore cannot sue under § 1983. Because this follows from the statute itself, Plaintiffs cannot invoke any prudential exceptions. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016); Currie, 1981 Sup. Ct. Rev. at 45.

But even if this were an issue of prudential rather than statutory standing, Plaintiffs have not alleged any prudential exception to the bar on third-party standing. Plaintiffs do not allege that they have "a 'close' relationship with" voters or that voters face any "hindrance" to protecting their "own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

## III.     The Secretary Is Not a Proper Defendant

Lack of standing is reason enough to dismiss this case, but Plaintiffs' claims also suffer from additional jurisdictional defects stemming from the Secretary's limited role under the Election Code. The Secretary does not implement the challenged portions of HB 25. Under Texas law, various local officials are charged with preparing ballots, depending on the type of election. *See* Tex. Elec. Code § 52.002. Before HB 25, those local officials were charged with formatting the ballot to allow for

straight ticket voting. *See id.* § 52.071. But HB 25 deleted that provision.[13] As a result, local officials will now prepare ballots that do not provide a "straight ticket" option.

Plaintiffs' assertion that the Secretary "will order the elimination of" straight ticket voting is incorrect as a matter of law. ECF 1 ¶ 8. Under HB 25, the Secretary does not have the authority to eliminate straight ticket voting. The Legislature already did that, and local officials will implement its decision regardless of whether the Secretary does anything.

Plaintiffs suggest that their purported injuries flow from the way polling places will be operated in 2020. *See* ECF 1 ¶¶ 29–33. But the Secretary does not operate polling places and does not control the length of lines to vote. Local officials have primary responsibility for reducing lines.

Plaintiffs' sources generally blamed lines to vote on two factors: a shortage of voting machines and the closing of polling sites. In Texas, local officials control those factors. The Election Code gives local officials significant discretion in determining the number of voting sites and their locations. *See* Tex. Elec. Code § 43.002 (local control over precincts); *id.* § 85.062 (local control over early voting polling places). Local officials also have broad authority to procure election supplies and equipment as well as to determine how such materials will be distributed among that county's polling places. *See* Tex. Elec. Code §§ 51.003, 123.031, 125.001. A county has its own budget and can appropriate funds toward elections as it sees fit. *See* Tex. Loc. Gov't Code §§ 101.002–.003, 101.022, 102.007.

With 254 counties, Texas sees some variation in how local officials exercise their discretion. Conditions differ from county to county. When mistakes are made, local officials are eager to fix them going forward. For example, Plaintiffs allege voters faced long lines in Harris County during the March 2020 primary elections. *See* ECF 1 ¶ 33. Harris County's Clerk, a Democrat, publicly apologized, took

---

[13] An Act Relating to the Elimination of Straight-Party Voting, H.B. 25, § 8, https://capitol.texas.gov/tlodocs/85R/billtext/pdf/HB00025F.pdf (repealing Section 52.071).

"full responsibility," and "committed to rethinking voting machine allocations."[14]

True, HB 25 requires the Secretary to provide information about the elimination of straight ticket voting to the public and officials. *See* Tex. Elec. Code § 31.012(a), (b-1). But Plaintiffs do not complain about the Secretary keeping people informed. In fact, "[t]he Secretary's ability to provide such notice to all Texans further weakens the chance that HB 25 will cause voters to be confused, ill-equipped, or uneducated about the Bill." *Bruni*, 2020 WL 3452229, at *6; ECF 1 ¶¶ 22–24.

Similarly, HB 25 directs the Secretary to "adopt rules and establish procedures as necessary for the implementation of the elimination of straight-party voting to ensure that voters and county election administrators are not burdened by the implementation." Tex. Elec. Code § 31.012(d). Again, Plaintiffs do not challenge that aspect of HB 25. Those rules and procedures do not even exist yet. In any event, the rules and procedures will not themselves eliminate straight ticket voting. The statute does that. Regulations eliminating burdens can only benefit Plaintiffs. They do not allege otherwise.

In sum, the Legislature eliminated straight ticket voting by altering its instructions to the local officials who prepare ballots. This results in two independent jurisdictional defects. First, the *Ex parte Young* exception to sovereign immunity does not apply. Second, Plaintiffs cannot sue the Secretary for the relief that they seek.

### A.     Sovereign Immunity Bars Plaintiffs' Claims

Sovereign immunity protects state officials unless the *Ex parte Young* exception applies. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004). *Ex parte Young* "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation . . . ." *Va. Office for Prot. & Advocacy v. Stewart*,

---

[14] *See* Alexa Ura, *Harris County Clerk Apologizes to Voters, "Takes Full Responsibility" for Long Waits to Vote in Houston*, THE TEXAS TRIBUNE (Mar. 6, 2020), https://www.texastribune.org/2020/03/06/harris-county-clerk-apologizes-long-waits-vote-houston/.

563 U.S. 247, 255 (2011) (citation omitted). Consequently, *Ex parte Young* applies only when the defendant has "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014); *see Ex parte Young*, 209 U.S. 123, 157 (1908); *City of Austin v. Paxton*, 943 F.3d 993, 1001–02 (5th Cir. 2019).

As explained above, the Secretary does not implement the elimination of straight ticket voting. Local officials do so when they prepare ballots. Plaintiffs identify no enforcement actions taken by the Secretary. Because Plaintiffs are trying to change the behavior of local officials, not the Secretary, the Secretary is not sufficiently connected to the enforcement Plaintiffs seek to enjoin.

Plaintiffs highlight the Secretary's role as "chief elections officer," ECF 1 ¶ 25 (citing Tex. Elec. Code § 31.001(a)), but that title is not "a delegation of authority to care for any breakdown in the election process." *Bullock v. Calvert*, 480 S.W.2d 367, 372 (Tex. 1972) (narrowly interpreting "chief election officer"). It does not empower the Secretary to coerce local officials into enforcing (or not enforcing) HB 25. Local officials do not report to the Secretary. They are elected or appointed locally, and they are not bound by the Secretary's policies. *See In re Stalder*, 540 S.W.3d 215, 218 n.9 (Tex. App.—Hous. [1st Dist.] 2018) (expressing doubt that a "party chair lacked the authority to then form and act upon her own ultimate legal judgment" despite "having received the Secretary of State's assistance and advice in response to an inquiry"); *Ballas v. Symm*, 351 F. Supp. 876, 888 (S.D. Tex. 1972), *aff'd*, 494 F.2d 1167 (5th Cir. 1974) ("Plaintiff admits that the Secretary's opinions are unenforceable at law and are not binding.").

Even if the Secretary could coerce local officials, it would not help Plaintiffs. When a government official "has the authority to enforce" a challenged statute, *Ex parte Young* still requires the plaintiff to show that the official "is likely to do" so. *City of Austin v. Paxton*, 943 F.3d 993, 1001–02 (5th Cir. 2019). Without evidence of likely enforcement, the government official "lacks the requisite connection to the enforcement of" the challenged law. *Id.* (quotations omitted). The Secretary's

understanding of her role—that she cannot coerce local officials in these circumstances—means she is not "likely to do [so] here," even if the Court disagrees with her interpretation of state law. *City of Austin*, 943 F.3d at 1002. Regardless of whether the Secretary has a "duty to enforce the statute in question," she has not "demonstrated [a] willingness to exercise that duty." *Morris*, 739 F.3d at 746.

Moreover, a federal court could not order the Secretary to exercise her supposed authority over local officials. The *Ex parte Young* exception is limited to injunctions "prevent[ing] [a state official] from doing that which he has no legal right to do." *Ex parte Young*, 209 U.S. at 159. It does not authorize injunctions directing "affirmative action." *Id.* Sovereign immunity bars constitutional claims "if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign," *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949), including "cases where the [defendant] sued could satisfy the court decree only by acting in an official capacity." *Zapata v. Smith*, 437 F.2d 1024, 1026 (5th Cir. 1971); *see also United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 548 (10th Cir. 2001). Thus, the Court cannot order "the Secretary to promulgate a rule requiring [local election officials] to [perform their duties] contrary to" currently existing state law. *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1211–12 (11th Cir. 2020).[15]

### B.    Plaintiffs Lack Article III Standing to Sue the Secretary

Plaintiffs cannot establish standing to sue the Secretary because her actions do not cause their alleged injuries. Whether a ballot includes a straight ticket voting option depends on the actions of local officials, not the Secretary. Plaintiffs' asserted injuries are not "fairly traceable to the challenged

---

[15] *OCA-Greater Houston v. Texas* held, without analysis, that the Voting Rights Act abrogates sovereign immunity. *See* 867 F.3d 604, 614 (5th Cir. 2017). That holding does not apply to Plaintiffs' other claims because Section 1983 does not abrogate sovereign immunity. *See Quern v. Jordan*, 440 U.S. 332, 341 (1979). Also, the Secretary preserves the argument that *OCA-Greater Houston* was wrong. "Congress did not unequivocally abrogate state sovereign immunity under Section 2 of the Voting Rights Act." *Ala. State Conference of NAACP v. Alabama*, 949 F.3d 647, 655 (11th Cir. 2020) (Branch, J., dissenting). Nor could it have. *See id.* at 656 & n.2.

action of the defendant"; they are "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quotation and alterations omitted); *see also Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc) (dismissing for lack of standing because courts should not "confuse[] the *statute's* immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the *defendants*").

Similarly, Plaintiffs' purported injuries are not redressable. Relief against the Secretary would not help Plaintiffs. Local officials would still prepare ballots without straight ticket voting. And Plaintiffs' requested injunction might exacerbate their alleged injuries by preventing the Secretary from informing the public and from "ensur[ing] that voters and county election administrators are not burdened." Tex. Elec. Code § 31.012.[16]

## IV.     This Case Does Not Belong in the Southern District

This Court should dismiss for improper venue. Fed. R. Civ. P. 12(b)(3).[17] "Once challenged, the burden of sustaining venue lies with the plaintiff." *Broadway Nat'l Bank*, 173 F. Supp. 3d at 473. Plaintiffs claim that "venue is proper in the Laredo Division of the U.S. District Court for the Southern District of Texas because a substantial part of the events that give rise to Plaintiffs' claims occurred here." ECF 1 ¶ 19 (citing 28 U.S.C. § 1391(b)(2)). But that is not true. The analysis "require[s] courts to focus on relevant activities of the defendant, not of the plaintiff." *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995); *see also Cabot Oil & Gas Corp. v. Water Cleaning Servs., LLC*, No. 4:12-cv-665, 2012 WL

---

[16] *OCA-Greater Houston* found standing to sue the Secretary, but its reasoning does not apply here. *OCA-Greater Houston* distinguished *Okpalobi* on the ground that *Okpalobi* involved a private right of action. *See OCA-Greater Hous.*, 867 F.3d at 613. This case also involves a private right of action. Although the Secretary cannot enforce HB 25 against local officials, in appropriate circumstances a losing candidate can through an election contest. *See* Tex. Elec. Code §§ 221.003(a), 232.002. Also, the extent of the Secretary's power must be determined on a case-by-case basis. *OCA-Greater Houston*'s ruling on that issue cannot extend beyond the record and briefing before that court. To the extent it does, the Secretary preserves the argument that it was wrongly decided.

[17] The Court can consider venue before other issues, even jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425, 429 (2007); *Hill v. Keliher*, No. 4:19-cv-2528, 2019 WL 3837113, at *3 (S.D. Tex. Aug. 14, 2019); *Watson v. Lifeshare Transplant Donor Servs. of Okla., Inc.*, No. 2:09-cv-130, 2009 WL 10702544, at *2 n.1 (S.D. Tex. Sept. 3, 2009).

2133589, at *2 (S.D. Tex. June 12, 2012) (similar). The only events giving rise to Plaintiffs' claims against the Secretary occurred in the Western District. Plaintiffs focus on the fact that "the Texas Legislature passed HB 25," which occurred in Austin. ECF 1 ¶ 35. Plaintiffs also claim the Secretary "will order the elimination of the STV option from all Texas ballots pursuant to House Bill 25." *Id.* ¶ 8. That is not true, for the reasons explained above, *see supra* Part III, but even if it were, it would also occur in Austin, where the Secretary's office is located. Any official action the Secretary takes regarding HB 25 would occur in the Western District.

This case has no significant ties to the Southern District. The Secretary does not maintain an office in the Southern District, and no relevant action that can "be attributed to" the Secretary has been taken in the Southern District. *Southampton, Ltd. v. Le Norman*, No. 3:18-cv-1089, 2019 WL 7902959, at *5 (N.D. Tex. Sept. 3, 2019). One of the four Plaintiffs seems to reside in the Southern District, but that does not matter. "[T]he fact that a plaintiff residing in a given judicial district feels the effects of a defendant's conduct in that district does not mean that the events or omissions occurred in that district." *Bigham v. Envirocare of Utah, Inc.*, 123 F. Supp. 2d 1046, 1048 (S.D. Tex. 2000).

## V.     Federal Law Does Not Mandate Straight-Ticket Voting

Forty-four States will not offer straight ticket voting in 2020.[18] "None of [those States' laws] have ever been declared unconstitutional." *Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 355 (6th Cir. 2018) (Kethledge, J., concurring). Plaintiffs ask this Court to upend American election law. The Court should decline.

Plaintiffs' claims all proceed from the premise that selecting individual candidates takes more time than casting a straight-party ticket does. They predict that the extra time will lead to longer lines at the polls. As this Court has already explained, Plaintiffs' predictions rest on speculation about the

---

[18] National Conference of State Legislatures, Straight Ticket Voting States (Mar. 25, 2020), https://www.ncsl.org/research/elections-and-campaigns/straight-ticket-voting.aspx.

actions of third parties not before the Court. *See supra* Part I. But even if Plaintiffs' speculation were right, their claims would fail on the merits.

### A.   Plaintiffs' *Anderson-Burdick* Claims Fail

Plaintiffs challenge HB 25 under the *Anderson-Burdick* framework. *See* ECF 1 ¶¶ 95–106 (Counts I and II). This challenge fails as a matter of law.  The *Anderson-Burdick* test requires a court to:

> (1)  consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate; then
>
> (2)  identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule; and finally
>
> (3)  weigh the character and magnitude of the asserted injury against the precise interests put forward by the State, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

*Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387–88 (5th Cir. 2013) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "Lesser burdens . . . trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quotation omitted).

Plaintiffs challenge HB 25 on its face, so they must plausibly allege that the statute lacks a "plainly legitimate sweep," *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 202 (2008) (plurality), and "that no set of circumstances exists under which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987). But Plaintiffs do not allege that HB 25 will burden the rights of all voters in all counties. *See* ECF 1 ¶ 41 (complaining the Legislature did not adopt an amendment that would have limited HB 25 to counties with fewer than twenty-five ballot items).

HB 25 satisfies *Anderson-Burdick*. It imposes at most a *de minimis* burden and furthers weighty state interests. But even if HB 25 were likely to cause problems in some places (it is not), Plaintiffs' facial claim would fail.

1.      **HB 25 Does Not Burden the Right to Vote**

HB 25 does not burden anyone's right to vote. It simply channels votes through individual selections. As the American Civil Liberties Union of Pennsylvania has explained, "eliminating the straight party voting option" does not create "a barrier to voting," and "[n]o one will lose the right to vote because of [it]."[19] To the extent having to make individual selections is a burden, it represents no more than "the usual burdens of voting." *Crawford*, 553 U.S. at 198 (plurality); *id.* at 209 (Scalia, J., concurring in the judgment). Any burden is also neutral and non-discriminatory because all voters will now make individual selections.

Moreover, Plaintiffs ignore crucial context: mitigation measures. For example, Texas provides nearly two weeks of early voting in most elections, *see* Tex. Elec. Code § 85.001(a), but for the November election, Governor Abbott has expanded early voting so that it is even longer.[20] Texas's expansive early voting framework includes weekend voting in the large counties on which Plaintiffs focus. *See id.* § 85.006(d)–(e). Of course, local officials have discretion to increase early voting capacity as needed. *Id.* § 51.003 (procuring and allocating election supplies); *id.* § 85.006(a)–(c) (weekend voting); *id.* § 85.062 (additional polling places); *id.* § 123.031 (acquiring voting system equipment); *id.* § 125.001 (allocating voting machines). Plaintiffs do not dispute that local officials can and do make use of these powers. Texas also allows various people to vote by mail, *see id.* §§ 82.001–.004, which reduces demand for in-person polling places. By contrast, some States do not allow early voting at all or do not allow it on weekends.[21]

Plaintiffs have not plausibly alleged that HB 25 will burden anyone's right to vote. They

[19] Reggie Shuford, *This is Why the ACLU-PA Supports Legislation Reforming our Election Laws*, PENN. CAPITAL-STAR (Oct. 30, 3019), https://www.penncapital-star.com/commentary/this-is-why-the-aclu-pa-supports-legislation-reforming-our-election-laws-opinion/.
[20] Gov. Greg Abbott, Proclamation (July 27, 2020), https://lrl.texas.gov/scanned/govdocs/Greg%20Abbott/2020/proc07272020.pdf.
[21] *State Laws Governing Early Voting*, NCSL, https://www.ncsl.org/research/elections-and-campaigns/early-voting-in-state-elections.aspx.

certainly have not alleged it creates a severe burden in all applications (as is necessary for a facial claim) or when considered "categorically" rather than based on "the peculiar circumstances of individual voters" (as is necessary for all claims). *Crawford*, 553 U.S. at 206 (Scalia, J., concurring in the judgment).

### 2. HB 25 Furthers Important State Interests

Texas, like forty-three other States, decided "that it is better if voters are encouraged or required to make individual assessments of candidates, rather than mass choices." *Mich. State*, 749 F. App'x at 346 (6th Cir. 2018) (Boggs, J.). "That choice is not an arbitrary one." *Id.* It "is supported by good policy reasons." *Id.* at 355 (Kethledge, J., concurring).

*More-Informed Voting*: "Democracy depends on a well-informed electorate." *Buckley v. Valeo*, 424 U.S. 1, 49 n.55 (1976). Straight ticket voting undermines that interest. It "pulls a voter's attention away from down-ballot candidates for certain offices that most directly affect the voter" and "discourages a voter from researching all the candidates on the ballot."[22] With straight ticket voting, a voter chooses numerous candidates based on only a single piece of information: party affiliation.

*Better Qualified Candidates*: Straight ticket voting helps unqualified candidates. First, it sometimes leads voters to select a candidate who they would not have selected if they had considered the race individually. Second, straight ticket voting discourages qualified candidates from running for office in the first place.

*Reducing Unintentional Roll Off*: Straight ticket voting "causes voters to miss out in casting votes in nonpartisan races or propositions."[23] Voters who stop reading the ballot after selecting a straight ticket option fail to vote on nonpartisan propositions and amendments down ballot. Eliminating straight ticket voting reduces the risk voters will accidentally overlook non-partisan down-ballot items. *See One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 946 (W.D. Wis. 2016).

---

[22] Bill Analysis, Tex. House Committee Report, https://www.legis.state.tx.us/tlodocs/85R/analysis/pdf/HB00025H.pdf.

[23] Bill Analysis, Tex. House Research Organization, https://hro.house.texas.gov/pdf/ba85r/hb0025.pdf.

*Making Elections More Competitive*: HB 25 also benefits Texans by making third-party and independent candidates more viable. Representatives from the League of Independent Voters, the Green Party of Texas, and the Libertarian Party all testified in favor of HB 25.[24] As Representative Justin Amash, an Independent, explained, "Straight-ticket voting makes it prohibitive to run outside of the major parties."[25]

*Reducing Voter Confusion*: Finally, the combination of straight ticket voting and electronic voting machines led to voter confusion. After selecting a straight party option, some voters attempt to "emphasize" or "confirm" their selections by touching the box for particular candidates. Contrary to those voters' intents, that leads to a deselection. To the extent voters do not review their selections before final submission, their attempts to vote in those races will be unsuccessful. To the extent they do review their selections, they often conclude that their votes have been lost or changed. At best, fixing the issue takes time. At worst, it decreases voter confidence in the election.

Plaintiffs' unsupported assertion that the Legislature acted with partisan intent is both untrue and irrelevant. *See* ECF 1 ¶ 46. "[I]f a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators." *Crawford*, 553 U.S. at 204 (plurality).

Nor should the State's interests be ignored because this case is at the pleading stage. *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 719 (4th Cir. 2016) (rejecting the argument that the court "may not weigh [the State's] interests without discovery"). The Secretary need not provide "elaborate, empirical verification of the weightiness of the State's asserted justifications." *Timmons*, 520 U.S. at 364. Courts do not require States to "demonstrat[e] empirically the objective effects" of their election

---

[24] *See* Witness List for HB 25, House Elections Committee (Mar. 13, 2017), https://www.legis.state.tx.us/tlo docs/85R/witlistbill/pdf/HB00025H.pdf.

[25] Matt Welch, *Justin Amash: "Straight-Ticket Voting Makes it Prohibitive to Run Outside of the Major Parties"*, REASON (Aug. 30, 2018), https://reason.com/2018/08/30/justin-amash-straight-ticket-voting-make/.

laws. *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986) (rejecting "endless court battles over the sufficiency of the 'evidence' marshaled by a State"). Thus, courts in this Circuit frequently dismiss *Anderson-Burdick* claims at the pleading stage. *See, e.g.*, *LULAC v. Abbott*, 369 F. Supp. 3d 768, 781–84 (W.D. Tex. 2019); *Kennedy v. Pablos*, No., 1:16-cv-1047, 2017 WL 2223056, at *3–5 (W.D. Tex. May 18, 2017); *Faas v. Cascos*, 225 F. Supp. 3d 604, 607 (S.D. Tex. 2016); *Meyer v. Texas*, No., 4:10-cv-3860, 2011 WL 1806524, at *3–7 (S.D. Tex. May 11, 2011).

### 3.    This Court Should Follow the Uniform Precedent Upholding Repeals of Straight Ticket Voting

Repealing straight ticket voting imposes no serious burden on voters but advances important state interests. That is why numerous courts have upheld laws like HB 25.

*Wisconsin*: In *One Wisconsin Institute*, the court upheld Wisconsin's repeal of straight ticket voting against a challenge brought by some of the same Plaintiffs, represented by some of the same counsel. *See* 198 F. Supp. 3d at 906, 945–46. The *One Wisconsin* plaintiffs made the same argument Plaintiffs make here: that the repeal of straight ticket voting creates long voting lines and voter confusion and thus "burdens the right to vote, particularly for voters with lower levels of educational attainment." *Id.* at 945–46. The court found the plaintiffs' claims speculative. *See id.* It noted that eliminating straight ticket voting "creates only a slight burden on the right to vote, even among populations with lower levels of educational attainment or who have less time to spend voting." *Id.* at 945. The court found that repealing straight ticket voting advanced Wisconsin's important interests of: (1) "decreas[ing] the chance of a voter selecting a straight-ticket option and then voting for candidates on the rest of the ballot"; (2) "encourage[ing] voters to become more informed about candidates or issues"; and (3) "ensur[ing] that voters do not accidentally overlook items on a ballot." *Id.*

*Illinois*: Illinois' repeal of straight ticket voting was upheld in *Orr v. Edgar*, 298 Ill. App. 3d 432, 436–37 (1998). Applying the rational basis test, the court concluded:

[T]he legislation in question does not infringe upon the right to vote. Rather, the

legislation affects the manner in which citizens exercise their right to vote. The Act does not prohibit voters from voting a straight-party ballot. Indeed, an individual voter still has the right to cast a ballot entirely for candidates of one political party. The Act only dictates the manner in which the voter may select candidates.

*Id.* at 438. The court found that the repeal was rationally related to Illinois' legitimate interests of: (1) increasing voter awareness; (2) selecting better qualified candidates by the political parties; and (3) increasing involvement by third-party groups in the political process. *Id.* at 439.

*New Mexico & Michigan (State Court)*: In these cases, minority or independent parties challenged the laws that prevented them from benefiting from straight ticket voting while allowing major-party candidates to benefit. *See Woodruff v. Herrera*, No. 1:09-cv-449, 2010 WL 11505703, at *2 (D.N.M. Feb. 1, 2010); *McDonald v. Grand Traverse Cty. Election Comm'n*, 255 Mich. App. 674, 676–77 (2003). Both courts rejected the challenges under the *Anderson-Burdick* test and found that the burden of voting without a straight ticket option was slight. *See Woodruff*, 2010 WL 11505703, at *4 (stating that "cast[ing] . . . votes individually rather than as a straight party vote" required only "slightly more effort"); *McDonald*, 255 Mich. App. at 685 (noting that "any voter who desired to vote for McDonald could do so"). The courts found that the States' important interests in maintaining reasonable regulations of ballots and elections outweighed the minimal burdens their straight ticket voting laws placed on voting rights. *Woodruff*, 2020 WL 11505703, at *5; *McDonald*, 255 Mich. App. at 687–88.

*Michigan (Federal Court)*: One federal court found Michigan's repeal of straight ticket voting unconstitutional, *see Mich. State A. Philip Randolph Inst. v. Johnson*, 326 F. Supp. 3d 532 (E.D. Mich. 2018), but the Sixth Circuit quickly vacated the opinion and criticized its reasoning. *See Mich. State A. Philip Randolph Inst. v. Johnson*, No. 18-1910, 2019 WL 4145547 (6th Cir. Jan. 14, 2019) (vacating opinion); *Mich. State*, 749 F. App'x at 344 ("The district court's opinion is extensive, but its underpinnings are quite weak."); *id.* at 354 (noting "very serious problems with both the factual underpinnings and the legal analysis of the district court's opinion"). The court explained that the burden—requiring voters to take "what would be at most very small additional time to register their

choices"—"is very small." *Id.* at 349. It also noted the strong "public interest in allowing states to control their own elections . . . as the Constitution itself makes clear." *Id.* at 349. Numerous States have determined that voters should be "encouraged or required to make individual assessments of candidates." *Id.* at 346. And a State's attempt to encourage a more informed electorate should not be discarded lightly. *Id.* at 346, 349.

Finally, overturning HB 25 due to potential increased voting time would mire courts in litigation about numerous other State policy choices. As the Sixth Circuit explained:

> [A]ny number of policy decisions might influence the length of time it takes an individual voter to vote . . . . Having judicial elections[,] . . . [h]aving non-partisan elections, . . . [and] [a]llowing citizens to vote on legislation or propositions . . . add[] to voting time. Deciding how many local offices to elect can add to that time: some states elect coroners, jailers, drain commissioners, and surveyors on partisan ballots. All of these are policy choices a state may legitimately make, and yet all would be subject to attack if individual voting time were a consideration that courts could use to strike down legislation.

*Id.* at 345. "Michigan . . . has shown far more than a rational basis for its decision." *Id.*

## B.      Plaintiffs' Section 2 Results Claim Fails

Plaintiffs' Section 2 "results test" claim fails as a matter of law. *See* ECF 1 ¶¶ 107–112. They have not plausibly alleged a violation as to *any* Texas voters, and they certainly have not "establish[ed] that no set of circumstances exists under which [HB 25] would be valid." *Salerno*, 481 U.S. at 745.

### 1.      HB 25 Is Lawful

As a threshold matter, the abolition of straight ticket voting is not a "voting qualification or prerequisite to voting or standard, practice, or procedure" covered by Section 2. 52 U.S.C. § 10301(a). As the Sixth Circuit noted, "[t]he language of the statute alone can hardly be read to cover a change in ballot format that applies to all voters, that keeps no one away from the polls, and that prevents no one from registering their vote." *Mich. State*, 749 F. App'x at 353.

Section 2 does not stretch so far. In *Lucas v. Townsend*, a Georgia school board wanted to hold a bond election. *See* 698 F. Supp. 909 (M.D. Ga. 1988). It decided to submit a single question to the

voters: whether to approve a $29 million bond covering three separate projects. *See id.* at 910. The plaintiffs wanted the projects submitted as three separate ballot questions and argued that the choice between those alternatives should have been precleared under Section 5. *See id.* The district court rejected that claim because "the form or structure of a question on a bond referendum is not a standard, practice or procedure affecting voting." *Id.* at 912.[26] "The discretionary decision to submit one or more questions to the electorate is one properly left to the political process." *Id.* The Supreme Court summarily affirmed. *See* 493 U.S. 1052 (1990). The same principle applies here. Whether voters select candidates individually or in the aggregate (through straight ticket voting) is no more a "standard, practice, or procedure" than whether voters approve bond projects individually or in the aggregate.

In any event, HB 25 would not violate Section 2. Under Section 2, a plaintiff must plausibly allege that: (1) the challenged law is "responsible for minority voters' inability to elect [their preferred] candidates," *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986), (2) minority voters' inability to elect their preferred candidates is "on account of race," 52 U.S.C. § 10301(a), and (3) "under the 'totality of circumstances,' [minority voters] do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters," *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993) (en banc). Plaintiffs cannot satisfy those requirements.

First, Plaintiffs have not plausibly alleged that HB 25 is "responsible for minority voters' inability to elect [their preferred] candidates." *Gingles*, 478 U.S. at 50. Plaintiffs do not allege that minority voters were able to elect candidates of their choice before HB 25 or that they will be unable to do so when it goes into effect. *See id.* at 50 n.17. Because Plaintiffs never allege HB 25 will cause minority voters to lose the ability to elect their candidates of choice, their Section 2 claim fails.

Instead of alleging HB 25 will prevent minority voters from electing their candidates of choice,

---

[26] The text of Section 5—"voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting"—is materially identical to the text of Section 2. 52 U.S.C. § 10304(a)

Plaintiffs rely on vague suggestions of "disparate[] impacts." ECF 1 ¶ 80. But any impact that does not affect minority voters' ability to vote or to elect candidates of choice cannot support a Section 2 claim. Moreover, Plaintiffs have not plausibly alleged a disparate impact. *See infra* Part V.C.

Second, even if Plaintiffs could establish that minority voters face a "lack of success at the polls," they would also need to plausibly allege that "the reasons for, or causes of, these electoral losses" are "racial," not "partisan." *LULAC*, 999 F.2d at 853–54. Courts must be careful not to "loose[] § 2 from its racial tether." *Id.* at 850. Political disadvantages are not actionable unless they are "on account of race." *Id.* at 854; 52 U.S.C. § 10301(a). "The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates. Rather, § 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats." *LULAC*, 999 F.2d at 854 (quotation and citation omitted).

Third, the totality-of-the-circumstances analysis cuts against Plaintiffs. This "inquiry . . . is not limited to factors listed in the legislative history of the Voting Rights Act." *Id.* at 871. "The weight, as well as tenuousness, of the state's interest is a legitimate factor in analyzing the totality of circumstances." *Id.* And the strong state interests discussed in Part V.A.2 support HB 25 here too.

The nearly nationwide consensus against straight ticket voting also favors the Secretary. In *LULAC*, the Fifth Circuit emphasized that twenty-five other States had a rule similar to Texas's. *See* 999 F.2d at 872. Here, forty-four States agree. That further "bolster[s]" the Secretary's position. *Id.*[27]

---

[27] Incorrectly interpreting Section 2 to prohibit HB 25 would take Section 2 beyond the scope of Congress's "power to enforce [the Fifteenth Amendment] by appropriate legislation." U.S. Const. amend. XV, § 2. At that point, Section 2 would represent "a substantive change in constitutional protections under the guise of enforcement." *Veasey v. Abbott*, 830 F.3d 216, 316 (5th Cir. 2016) (Jones, J., concurring in part and dissenting in part) (quotation and citation omitted); *see also LULAC v. Abbott*, 369 F. Supp. 3d 768, 787 (W.D. Tex. 2019), *aff'd*, 951 F.3d 311 (5th Cir. 2020). It would also violate the Equal Protection Clause. Requiring a State to maintain a practice it would otherwise abolish because of disparate racial impacts would require the State to make decisions based on race. That runs counter to the Equal Protection Clause's "central mandate"—"racial neutrality in governmental decisionmaking." *Miller v. Johnson*, 515 U.S. 900, 904 (1995). "If § 2 were interpreted" too broadly, "it would unnecessarily infuse race into virtually every" legislative debate about elections, "raising

### 2.      Plaintiffs Do Not Have a Private Cause of Action

Plaintiffs' Section 2 claim fails for an additional, independent reason: The Voting Rights Act does not provide them with a private cause of action. The Supreme Court has often "[a]ssum[ed], for present purposes, that there exists a private right of action to enforce" Section 2. *City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980) (plurality); *see also Morse v. Republican Party of Va.*, 517 U.S. 186, 288 n.21 (1996) (Thomas, J., dissenting). Multiple minority opinions have suggested, in *dicta*, that private plaintiffs can enforce Section 2, but the claims implicated a denial or abridgment of an individual's right to vote. *See Morse*, 517 U.S. at 232-33 (1996) (minority opinion of Stevens, J.) (quoting legislative history and discussing "a right to vote"); *id.* at 240 (Breyer, J., concurring in the judgment) (similar). That implied cause of action, if it exists, does not extend to Plaintiffs.[28]

The individual Plaintiff does not allege she is a registered voter, does not allege she intends to vote in future elections, and does not bring this suit in her (unalleged) capacity as a voter. She does not allege that her right to vote will be denied or abridged, and she cannot rely on the rights of third-party voters. *See supra* Part II.D; *Delaney v. City of Austin*, 570 F.3d 590, 593 (5th Cir. 2009) (quoting *Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697, 701 (5th Cir. 2007)).

Section 2 does not imply a private cause of action for non-voters. In *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001), the Supreme Court rejected its previous, looser approach to inferring causes of action. Today, "private rights of action to enforce federal law must be created by Congress." *Id.* at

---

serious constitutional questions." *LULAC v. Perry*, 548 U.S. 399, 446 (2006). The Court can avoid those questions by avoiding over-broad interpretations of Section 2.

[28] Moreover, *Morse*'s reasoning is inconsistent with the later majority opinion in *Sandoval*, which limited its "search for Congress's intent [to] the text and structure of" the statute. 532 U.S. at 288. "[D]ecisions before *Sandoval* frequently implied private rights of action without rigorous analysis; they did so by making a somewhat cursory inspection of the statute and its legislative history." *Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606, 616 (N.D. Tex. 2016), *aff'd*, 682 F. App'x 310 (5th Cir. 2017) (affirming "[e]ssentially for the reasons stated in the district court's comprehensive and well-reasoned opinion"). Such pre-*Sandoval* opinions are "are not binding nor persuasive." *Id.* (declining to follow a pre-*Sandoval* Fifth Circuit opinion). Under the Supreme Court's current approach, Section 2 does not create any private cause of action.

286. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* Unless Congress expresses that intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87.

First, Section 2 contains no indication that Congress intended to create a private right, much less a private remedy, for non-voters. The statute's text is focused on the governmental officials it regulates: "No voting qualification or prerequisite to voting or standard, practice, or procedure s*hall be imposed or applied by any State or political subdivision* in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a) (emphasis added). "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (quotation omitted). Section 2 "is framed in terms of the obligations imposed on the regulated party" (government officials) while voters are "referenced only as an object of that obligation." *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1171 (9th Cir. 2013); *see also Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606, 616 (N.D. Tex. 2016), *aff'd*, 682 F. App'x 310 (5th Cir. 2017). Non-voters like Plaintiffs are not mentioned at all. Section 2 therefore does not confer rights on Plaintiffs "in clear and unambiguous terms." *Delancey*, 570 F.3d at 593 (quotation omitted).

Second, Section 2 does not create private remedies for non-voters. Instead, Congress authorized civil and criminal enforcement actions by the federal government. *See* 52 U.S.C. § 10308. "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290.[29]

---

[29] Even pre-*Sandoval* precedent does not help Plaintiffs. In *Allen v. State Bd. of Elections*, the Supreme Court held that Section 5 of the Voting Rights Act created a private cause of action, but that decision did not analyze Section 2 or non-voters. *See* 393 U.S. 544, 557 (1969). The Court relied on the fact that Section 5 was "passed to protect a class of citizens," *i.e.*, voters. *Id.* Of course, *Sandoval* abandoned that loose, legislative-history-based approach. *See Sandoval*, 532 U.S. at 287. Indeed, the Supreme Court itself recognized as much when it listed

### C.     HB 25 is Neutral and Does Not Discriminate

Plaintiffs also claim HB 25 intentionally discriminates on the basis of race. *See* ECF 1 ¶¶ 113–23. Nothing could be further from the truth. Plaintiffs cannot overcome "the presumption of legislative good faith." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

HB 25 applies equally to everyone. It does not discriminate on the basis of race or anything else. Under HB 25, no local official, regardless of race, will prepare a straight ticket ballot, and no voter, regardless of race, will cast a straight ticket ballot.

Plaintiffs affirmatively plead a lack of discriminatory intent. Plaintiffs complain that Texas legislators "ignored" concerns about disparate impacts on minority voters. ECF 1 ¶ 38. They fault legislators for acting without knowing "whether repealing STV would disparately impact minorities" and "[d]espite HB 25's impact on minority voters." *Id.* ¶¶ 38–39. Of course, legislators ignoring disparate impact could not have voted "because of, not merely in spite of, [the statute's] adverse effects upon an identifiable group." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quotation omitted).

Discriminatory intent is particularly implausible here. HB 25 was the culmination of a longstanding bipartisan push to eliminate straight ticket voting. Forty-three other States have adopted the same policy. None of those laws has been held unconstitutional. The idea that Texas adopted the same policy as its sister States, but did so for uniquely racial reasons, is implausible, especially given the longstanding bipartisan push to eliminate straight ticket voting.

Plaintiffs attempt to lower their burden on causation. They claim that "[o]ne of the motivating factors behind HB 25 was to discriminate against African-American and Hispanic Texans." *Id.* ¶ 118. Plaintiffs must plausibly allege but-for causation, not mere "motivating factor" causation. The motivating-factor standard does not apply to claims brought under Section 1983 or the Voting Rights

---

*Allen* as an example of the now-abandoned "*ancien regime.*" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). But even under *Allen*'s approach, there is no reason to think Congress "passed [Section 2] to protect" non-voters.

Act. *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1017–18 (2020) (rejecting application of the motivating-factor analysis to Section 1981 claims). Indeed, the text suggests the opposite. Language like "on account of," which is found in both the Fifteenth Amendment and the Voting Rights Act, "indicate[s] a but-for causation requirement." *Id.* at 1015; *see* U.S. Const. amend. XV, § 1; 52 U.S.C. § 10301(a).

Regardless, Plaintiffs have not plausibly alleged that race was a motivating factor. Their legal conclusions are "bare assertions" that "amount to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim, namely, that petitioners adopted a policy because of, not merely in spite of, its adverse effects upon an identifiable group. As such, the allegations are conclusory and not entitled to be assumed true." *Iqbal*, 556 U.S. at 681 (quotations omitted).

Plaintiffs invoke the *Arlington Heights* factors, but their allegations are implausible. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). Plaintiffs do not plausibly allege facts supporting a finding of disparate impact. *See* ECF 1 ¶¶ 109–11. Every voter, regardless of race, must make individual selections. To the extent that is a burden, it is an equal one.

Even limiting the analysis to voters who previously used straight ticket voting, as Plaintiffs suggest, does not produce a disparate impact. Plaintiffs concede straight ticket voting was widely used by voters of all races. *See* ECF 1 ¶ 26. Plaintiffs do not (and cannot) allege that most users of straight ticket voting were racial minorities. That precludes a finding of disparate impact. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) (holding that the fact that "significant numbers of nonveterans are men, and all nonveterans—male as well as female—are placed at a disadvantage" precludes "the inference that the statute is but a pretext for preferring men over women"); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977).

Regardless of how one slices the numbers, straight ticket voting is not about race. As the Sixth Circuit has explained, "actual use of straight-ticket voting is strongly correlated to the partisanship of

an area, but not to race directly." *Mich. State*, 749 F. App'x at 348. In the end, "[t]oo many [white voters] are affected by [HB 25] to permit the inference that the statute is but a pretext for preferring [white voters] over [minority voters]." *Feeney*, 442 U.S. at 275.

Indeed, it has been argued that straight ticket voting *hurt* the electoral prospects of minority candidates: "[U]ninformed and straight-ticket voting along party lines can, and in this case does, reinforce minority voters' unequal access to the political process." *LULAC*, 999 F.2d at 912 (King, J., dissenting). With judges declaring straight ticket voting bad for minority voters, it is implausible that the Legislature eliminated straight ticket voting to harm those same minority voters.

The Complaint details the arguments that opponents of HB 25 raised in the Legislature. *See* ECF 1 ¶¶ 13, 37–43. But courts "do not judge the intention of a bill's supporters by the characterization of its opponents." *Mich. State*, 749 F. App'x at 351. "[S]tatements of those opposing any bill cannot be taken as a sign that the proponents intended the predicted parade of horribles." *Id.*

Plaintiffs argue "the Legislature departed from its usual practice" because HB 25 was heard in the Senate Business and Commerce Committee and "because the author of HB 25 failed to take a position on or answer questions regarding proposed amendments." ECF 1 ¶ 120. These supposed departures from normal procedures cannot support an inference of discriminatory motive because Plaintiffs failed to allege what the "normal procedures" would be for this kind of high-priority bill when the legislative minority has signaled it intends to challenge the law in court.[30]

### D.   Plaintiffs' Viewpoint-Discrimination Claim Fails

Plaintiffs also press a viewpoint-discrimination claim. Citing *Carrington v. Rash*, 380 U.S. 89 (1965), Plaintiffs rely on a concept called "partisan fencing." *See* ECF 1 ¶¶ 124–29. "Recent cases, however, have approached partisan fencing claims skeptically." *Feldman v. Ariz. Sec'y of State's Office*,

---

[30] Insofar as Plaintiffs bring Count IV under the VRA, they lack a private cause of action for the reasons explained in Part V.B.2.

208 F. Supp. 3d 1074, 1094 (D. Ariz. 2016). And Plaintiffs' claim fails for multiple reasons.

As an initial matter, *Carrington* does not apply because "none of the challenged provisions categorically bar any citizen of [Texas] from voting." *One Wis. Inst.*, 198 F. Supp. 3d at 928. "*Carrington* dealt with an outright prohibition on voting." *Id.* HB 25 is not such a prohibition.

Even if Plaintiffs could bring a *Carrington* claim, it would be subject to "the *Anderson-Burdick* balancing framework." *Feldman*, 208 F. Supp. 3d at 1094; *see One Wis. Inst.*, 198 F. Supp. 3d at 928–29; *Ohio Org. Collaborative v. Husted*, 189 F. Supp. 3d 708, 767 (S.D. Ohio), *rev'd on other grounds*, 834 F.3d 620 (6th Cir. 2016). Plaintiffs cannot satisfy *Anderson-Burdick* for the reasons in Part V.A.

Plaintiffs make much of their contention that some supporters of HB 25 thought it would help Republican candidates. *See* ECF 1 ¶¶ 49–51. That is irrelevant. "[I]f a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators." *Crawford*, 553 U.S. at 204 (plurality). "[A] provision is not unconstitutional if the legislators who passed it were partly motivated by partisan gain, so long as there were sufficient valid justifications." *One Wis. Inst.*, 198 F. Supp. 3d at 929; *see also Mich. State*, 749 F. App'x at 350; *id.* at 355 (Kethledge, J., concurring).

Finally, Plaintiffs ask this Court to decide a non-justiciable political question. Sometimes "the judicial department has no business entertaining [a] claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) (quotation omitted). Such claims are nonjusticiable because they are "outside the courts' competence and therefore beyond the courts' jurisdiction." *Id.* "Among the political question cases the Court has identified are those that lack 'judicially discoverable and manageable standards for resolving [them].'" *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

*Rucho* held that partisan gerrymandering presented a political question. Plaintiffs' "partisan fencing" claim is analogous to *Rucho*'s "partisan gerrymandering" claim in three material ways. First,

"the Framers' decision to entrust districting to political entities" precluded "hold[ing] that legislators cannot take partisan interests into account." *Rucho*, 139 S. Ct. at 2497. The same is true here. The Framers entrusted ballot design to political entities, and that precludes holding that the Constitution forbids any consideration of partisan interests. Second, courts cannot "even begin to answer" whether partisan gerrymandering (or partisan ballot design) "has gone too far" unless they know the "fair" baseline from which to measure departures. *Id.* at 2500–01. Third, in the gerrymandering context, "fairness" can be defined in different ways, and "[t]here are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral." *Id.* at 2500. So too here. Does fairness depend on how much partisan intent (or how many other intents) are attributable to the Legislature? Does fairness turn on the significance of the effects on voter turnout? The Constitution does not say.

## VI.   Laches Bars Plaintiffs' Claims

Finally, Plaintiffs are not entitled to the equitable relief they seek. "[T]he declaratory judgment and injunctive remedies are equitable in nature, and other equitable defenses may be interposed." *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Here, laches bars Plaintiffs' claims. "Laches is founded on the notion that equity aids the vigilant and not those who slumber on their rights." *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 708 (5th Cir. 1994) (quotation omitted). "The defense consists of three elements: (1) a delay on the part of the plaintiff in instituting suit; (2) that is not excused; and (3) that results in undue prejudice to the defendant's ability to present an adequate defense." *Id.*

Plaintiffs have certainly delayed instituting suit. The Governor signed HB 25 on June 1, 2017. Plaintiffs could have challenged HB 25 years ago. Instead, they waited more than three years to file this suit. *See White v. Daniel*, 909 F.2d 99, 103 (4th Cir. 1990). As sophisticated parties represented by sophisticated counsel, Plaintiffs have no excuse. *Cf. Nat'l Ass'n of Gov't Emps.*, 40 F.3d at 709. Given

their involvement in the political process, Plaintiffs must have been aware of HB 25 and its alleged effects. That delay has prejudiced the Secretary. "Delay and prejudice are a complimentary ratio: the more delay demonstrated, the less prejudice need be shown." *Marshall v. Meadows*, 921 F. Supp. 1490, 1494 (E.D. Va. 1996); *see also White*, 909 F.2d at 103 ("Given that plaintiffs' delay is inexcusable and unreasonable, the County need not show the degree of prejudice that would be required if the delay had been less aggravated."). But in this case, the prejudice is serious.

DSCC, DCCC, and TARA have filed numerous lawsuits against the Secretary in recent months. *See Bruni v. Hughs*, No. 5:20-cv-35 (S.D. Tex.); *Miller v. Hughs*, No. 1:19-cv-1071 (W.D. Tex.); *Gilby v. Hughs*, No. 1:19-cv-1063 (W.D. Tex.); *Tex. Democratic Party v. Hughs*, No. 5:20-cv-8 (W.D. Tex.); *Stringer v. Hughs*, 5:20-cv-46 (W.D. Tex.); *Tex. Democratic Party v. State of Texas*, No. D-1-GN-20-1610 (Tex. Dist. Ct.—Travis Cty.); *Lewis v. Hughs*, No. 5:20-cv-577 (W.D. Tex.). Trying to cram so many cases into a compressed timeframe before an election taxes public resources and creates inefficiencies.

Moreover, the Secretary has already explained the benefits HB 25 gives the State. Losing those benefits would be prejudice enough, but a last-minute change in the rules would have costs of its own. Candidates have already begun campaigning for the 2020 general election. Political campaigns can make different choices based on whether ballots will include a straight ticket option. Changing the rules mid-campaign would undoubtedly disadvantage candidates and other political actors who have already invested resources in strategies that depend on the lack of straight ticket voting. If Plaintiffs had sued earlier, these harms probably would have been lessened.

## Conclusion

The Secretary respectfully requests that the Court grant her motion to dismiss.

Date: August 31, 2020

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

PATRICK K. SWEETEN
Associate Deputy for Special Litigation

JEFFREY C. MATEER
First Assistant Attorney General

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Deputy Chief for Special Litigation
Texas Bar No. 24081854
Southern District of Texas No. 2985472

RYAN L. BANGERT
Deputy First Assistant Attorney General
Attorney-in-Charge

WILLIAM T. THOMPSON
Special Counsel
Texas Bar No. 24088531
Southern District of Texas No. 3053077

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
ryan.bangert@oag.texas.gov
todd.disher@oag.texas.gov
will.thompson@oag.texas.gov

**COUNSEL FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2020, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER