United States District Court
Southern District of Texas
**ENTERED**
September 25, 2020
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### LAREDO DIVISION

TEXAS ALLIANCE FOR RETIRED  §
AMERICANS, *et al*,  §
                                          §
        Plaintiffs,  §
VS.  §          CIVIL ACTION NO. 5:20-CV-128
                                          §
RUTH HUGHS,  §
                                          §
        Defendant.  §

## MEMORANDUM AND ORDER

Every day federal judges are called upon to make important decisions that impact people's lives. While these decisions may come to bear on political processes, they are wholly based on the law, the facts, and are devoid of political and personal preferences. The Constitution leaves decisions about the administration of elections to the states. But it assigns to the courts the duty to decide whether those laws cross constitutional boundaries. With that duty, the Court carefully and impartially considers all matters before it, including the one before it today.

We are a month away from the general election, and Texas, like the rest of our nation, is reeling from the effects of an ongoing pandemic. COVID-19 has strained our health systems, ravaged small businesses, and fundamentally altered the way we lead our day to day lives. In these extraordinary times, Plaintiffs call upon this Court to uphold the fundamental right to vote. This right, so necessary for our democracy to function and flourish, is guaranteed to all citizens regardless of race, color, ethnicity, gender, income, or political affiliation.

O

Plaintiffs renew their challenge of House Bill 25, a Texas election law which will eliminate straight-ticket voting, a century-old practice that allows Texan voters to cast their votes for all candidates of their preferred political party with the click of a single box at the top of their ballot. Plaintiffs seek to enjoin the State of Texas from implementing House Bill 25 and seek a declaration that this Bill places undue burdens on the rights of voters, contravenes Section 2 of the Voting Rights Act, and intentionally discriminates against the viewpoints of the Democratic Party (Dkt. No. 1). They also seek a preliminary injunction (Dkt. No. 5). The State of Texas, through Texas Secretary of State Ruth Hughs, is opposed (Dkt. Nos. 26, 29, 39).

The Court has carefully reviewed the parties' arguments, the record, and the applicable law, and for the reasons below Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 5) is **GRANTED;** Secretary Hughs' Motion to Dismiss (Dkt. No. 26) is **GRANTED IN PART** and **DENIED IN PART**; and the Secretary's Motion to Strike (Dkt. No. 39) is **DENIED.**

## Background

In a vote largely divided along partisan lines, Texas passed HB 25, *see* H.B. 25, 85th Leg., Reg. Sess. (Tex. 2017), which eliminates a 100-year-old practice that allows Texans to cast their votes for all candidates running under the banner of their preferred political party with a single punch. This practice, known as straight ticket voting ("STV") or one-punch voting, allows a voter to efficiently cast her votes by making an initial selection corresponding to her preferred party, which then automatically selects the party's nominee in each race. The voter could then modify

2

O

her choice in any individual race. As such, STV allowed not only for expedited straight-ticket voting, but also for expeditious split-ticket voting. Although Texas was not alone in its use of STV, most states no longer provide the option. *See Straight Ticket Voting States*, Nat'l Council of State Legislators (Mar. 25, 2020), https://www.ncsl.org/research/elections-and-campaigns/straight-ticket-voting.aspx (listing six states that will allow STV in 2020 elections). Still, Texas voters and election administrators have come to rely on STV as an integral component of the State's elections. For example, in the 2018 general election, approximately two-thirds of voters—over 5.6 million Texans—used STV to cast their ballots (Dkt. No. 1 at 12). Texans' reliance on STV likely stems from Texas' exceptionally lengthy ballots, which sometimes list as many as 95 races in a single county (*id.*).

Proponents of HB 25 claimed it would lead to a more educated and engaged electorate, reasoning that if voters are required to make an individual selection in every partisan race, voters will be more likely to seek out information about those individual races. The Bill's proponents also asserted that the elimination of STV would make races more competitive, lead to better qualified candidates, reduce confusion, and decrease unintentional "roll-off," the phenomenon of voters voting in the partisan races, but not the nonpartisan ones, which are often relegated to the end of the ballot (Dkt. No. 26 at 39–40).

Plaintiffs bring this lawsuit to challenge HB 25. Plaintiffs are three organizations—the Texas Alliance for Retired Americans ("TARA"), the national senatorial committee of the Democratic Party ("DSCC"), and the national

3

O

congressional committee of the Democratic Party ("DCCC") (collectively, "Organizational Plaintiffs")—and one individual, Sylvia Bruni, the Chair of the Webb County Democratic Party (Dkt. No. 1 at 7–10). Defendant Ruth Hughs is the Texas Secretary of State and is sued in her official capacity as the State's chief election officer (*id.* at 11 (citing Tex. Elec. Code § 31.001(a))).

In March 2020, Plaintiffs Bruni, DSCC, DCCC, along with the Texas Democratic Party ("TDP") and Jessica Tiedt, a candidate for the Texas State House of Representatives, challenged HB 25's validity under the United States Constitution and the Voting Rights Act. *See Bruni v. Hughs*, No. 5:20-CV-35, 2020 WL 3452229, at *1 (S.D. Tex. June 24, 2020). In brief, Plaintiffs predicted HB 25 would cause longer lines at polling places, increased roll-off, voter confusion, and lower turnout from Democratic Party voters. After careful scrutiny of the pleadings in that case, this Court dismissed the suit without prejudice, finding that Plaintiffs did not have standing to sue because their "alleged injuries fail[ed] to satisfy the imminence requirement of Article III because they are premised on numerous predicted 'effects' of HB 25 which [were] uncertain to occur." *Id.* at *5.

Plaintiffs have now dropped Tiedt and TDP as parties, added TARA, and filed this suit (*see* Dkt. No. 1). Plaintiffs still allege that the enforcement of HB 25 will cause long lines, burden Texan voters, have a disproportionate effect on the African-American and Hispanic population, and decrease turnout for the Democratic Party, all in violation of the First, Fourteenth, and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act (*id.* at 6–7). They filed this

O

lawsuit under 42 U.S.C. §§ 1983 and 1988 against Secretary of State Hughs, who is tasked with adopting rules for the elimination of STV. *See* 2017 Tex. Sess. Law Serv. Ch. 404. Ultimately, Plaintiffs seek an injunction to stop HB 25 from taking effect and a declaration that the Bill violates the above-named provisions of the Constitution and Voting Rights Act (Dkt. No. 1). For now, they seek a preliminary injunction (Dkt. No. 5).

The Court addresses Plaintiffs' pertinent factual allegations with the required legal presumption that at this stage of the litigation—Plaintiffs' allegations must be accepted as true. *Stratta v. Roe*, 961 F.3d 340, 349 (5th Cir. 2020). Plaintiffs point out that that Texans endure long lines when casting votes at polling places (Dkt. No. 1 at 13–15). They have several detailed studies and articles to support this allegation (*id.* at 13–14). These long lines, they allege, disparately impact minorities who "overwhelmingly" support the Democratic Party (*id.* at 27). They reason that minorities are more likely to "(1) live in poverty, (2) have less flexible job schedules, (3) lack access to transportation, and (4) lack access to child care assistance," which causes them to "leave polling-place lines" and avoid "attempting to vote" altogether (*id.*). In short, Plaintiffs allege that minorities are "less able to withstand long polling-place lines" (*id.* at 38).

Plaintiffs contend that STV "reduces voting time and minimizes wait times at polling places" (*id.* at 2). Stated differently, Plaintiffs reason that straight-ticket voting helps prevent long lines and increase the speed at which citizens cast their votes by permitting them to do so for all races on a given ballot with a single punch.

O

This is especially important because, as Plaintiffs point out, ballots in Texas elections are generally lengthy and may include up to 95 races (*id.* at 12).

Thus, the elimination of STV, Plaintiffs allege, will significantly increase the length of lines at polling places and increase the risk voters will leave the line or choose to make no attempt at voting. Plaintiffs cite to a state legislator who summarizes their position:

> [L]ong waits at polling places already are huge problems in some parts of Texas, especially in urban areas where many voters line-up to vote for many races on the ballot. On the first day of early voting for the November 2016 election, for example, long waits—sometimes hours— were reported in Bexar, Harris, Nueces, and Denton counties. Lines and ballot fatigue can exhaust voters' patience, and eliminating the straight-party option would only make things worse and cause many either to skip down-ballot races altogether or not go to the polls at all. The effect would be to suppress voting and voter turnout.

(*id.*) (citing Tex. S.J., 8th Leg., Reg. Sess., Sen. Zaffirini (May 18, 2017)).

Moreover, Plaintiffs allege that "by unsettling a century-old reliance on STV" HB 25 will confuse voters and will frustrate Plaintiffs' missions at turning out voters who support their candidates and causes (*id.* at 9–12).

Significantly, Plaintiffs allege that the current public health crisis caused by the COVID-19 pandemic prevents Texas election officials from implementing adequate mitigation efforts (*id.* at 28–31). First, the need for adequate social distancing prevents election officials from increasing the number of voting machines (*id.* at 28–29). Second, the risk of becoming a vector for the disease's spread will cause venues to abstain from participating as polling places (*id.* at 28–30). Third, the risk of catching the virus will hamper efforts to recruit more poll workers or even maintain pre-pandemic volunteer numbers (*id.* at 30). And fourth, the delay of many March

6

O

2020 elections to this November's general election will further lengthen the already long ballots and further increase the problem of long lines and wait times (*id.* at 31).

Consequently, Plaintiffs allege that longer lines at polling-places will significantly burden Texans' right to vote, especially in light of the increased exposure to COVID-19 voters risk by waiting in longer lines (*id.* at 22–32). Given Texas' "existing problem of long polling-place lines," Plaintiffs argue, the elimination of straight-ticket voting will "exponentially increase" the time that Texans will wait to cast their ballots at polling places, which will cause "a substantial number of additional voters [to] leave polling-place lines without voting" and dissuade others from attempting to vote at all (*id.* at 22, 25). Plaintiffs also allege that they will be injured by the predicted effects of HB 25 because they will need to "divert and expend additional time and resources in voter education and turnout" (*id.* at 9–11).

Plaintiffs allege that these predicted effects will disproportionately burden minority voters and voters who support the Democratic Party (*id.* at 22–32). This will cause Democratic candidates to lose votes at polling-places that would have otherwise been cast for them (*id.* at 27–28). These effects, Plaintiffs allege, will be worse in subsequent elections, because the ballots in Texas' midterm elections are even longer than those used in general elections.

Finally, Plaintiffs allege that a substantial reason for HB 25's passage was the discriminatory effect the Bill would have on minority and Democratic voters (*id.* at 15–22). They cite, among other things, what they consider to be irregular legislative procedures and legislators' dismissal of calls for more research into the Bill's effects

7

O

(*id.* at 15–19). They also note that the Bill lacked any provisions to mitigate the concerns voiced by those opposing its passage and that the Bill's passage coincided with an increase in Democratic-voter STV use and a decline in Republican-voter STV use (*id.* at 19–22).

Secretary Hughs moves to dismiss this case under Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, 12(b)(3) for improper venue, and 12(b)(6) for failure to state a claim upon which relief can be granted (Dkt. No. 26) and has filed a response in opposition to Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 29). The Court will address each of these issues in turn.

## Discussion

### I.    The Secretary's 12(b)(1) Motion to Dismiss

A motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction. Secretary Hughs asserts a number of theories for why this Court lacks subject matter jurisdiction. First, she argues that Plaintiffs are barred from bringing suit because this Court has already addressed and dismissed their claims in *Bruni* (Dkt. No. 26 at 20–25). Second, Secretary Hughs argues that Plaintiffs lack standing to sue (*id.* at 20–30). Third, and finally, she asserts that she is not the proper defendant against whom this suit should have been brought (*id.* at 30–34).

Where, as here, a defendant lodges a "facial attack" under Rule 12(b)(1), the Court only examines the "sufficiency of the allegations in the complaint because they are presumed to be true." *Houston Home Dialysis v. Blue Cross and Blue Shield of*

O

*Tex.*, No. H-17-2095, 2018 WL 5249996, at *4 (S.D. Tex. Oct. 22, 2018) (citation omitted); *Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018). "This analysis is generally confined to review of the complaint and its proper attachments," *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008), and the complaint will stand "if the jurisdictional allegations are sufficient." *Houston Home Dialysis*, 2018 WL 5249996, at *4. Under this standard, the Court finds that Plaintiffs' allegations are sufficient to survive the Rule 12(b)(1) challenge.

## A.    Issue Preclusion

"Issue preclusion . . . bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001)). Along with the related doctrine of claim preclusion, this doctrine "preclud[es] parties from contesting matters that they have had a full and fair opportunity to litigate" and thereby "protect[s] against 'the expense and vexation attending multiple lawsuits, conserve[s] judicial resources, and foster[s] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Taylor*, 553 U.S. at 892 (quoting *Montana v. United States*, 440 U.S. 147, 153–54 (1979)).

The burden is on the Secretary to prove that issue preclusion applies to these circumstances. *Taylor*, 553 U.S. at 906–07. Moreover, because issue preclusion is an equitable doctrine, even if the Secretary demonstrates that every requirement of the doctrine is met, the Secretary must also show the Court *should* apply the doctrine.

9

O

*Copeland v. Merrill Lynch & Co., Inc.*, 47 F.3d 1415 (5th Cir. 1995). Secretary Hughs has not met her burden, and the Court finds that issue preclusion is inapplicable to any of Plaintiffs' claims and should not apply.

Issue preclusion cannot and should not apply here because the facts underlying the claims have changed significantly since *Bruni*, and "changes in facts essential to a judgment will render [issue preclusion] inapplicable in a subsequent action raising the same issues." *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 479 (5th Cir. 2002)(quoting *Montana v. United States*, 440 U.S. 147, 159 (1979)).

The "judgment" at issue here is this Court's Memorandum and Order granting dismissal in *Bruni*. 2020 WL 3452229. In that opinion, this Court found that Plaintiffs' predicted injuries were not imminent, even within the "somewhat elastic" confines of that concept. *Id.* at *4–5. In other words, this Court considered their predicted injuries too speculative because they relied on a chain of predicted effects HB 25 would have on the voting process. But several developments have since bolstered Plaintiffs' arguments that their predicted injuries are certainly impending. In fact, these new developments are so compelling that this Court, which only a few months ago dismissed Plaintiffs' claims, now holds that Plaintiffs' claims are sufficient to survive Secretary Hughs' Motion to Dismiss and, moreover, warrant extraordinary relief in the form of a preliminary injunction.

When Plaintiffs filed their Amended Complaint for Injunctive and Declaratory Relief in *Bruni* on March 27, the United States was only beginning to understand the impact that the COVID-19 outbreak would have on our everyday lives, and few would

10

O

have predicted that the pandemic would persist well into this election cycle and that it would have such a far reaching impact. At that time, the United States had about 100,000 confirmed infections. Jesse Yomtov & Grace Hauck, *U.S. Becomes the First Country to Reach 100,000 Confirmed Coronavirus Cases*, USA Today (Mar. 27, 2020, 6:29 P.M.), https://www.usatoday.com/story/news/health/2020/03/27/coronavirus-us-hits-100-000-confirmed-cases-1-500-deaths/2925968001/. Today, the number of confirmed infections is 7 million and the number of dead Americans is over 200,000. *See Covid in the U.S.: Latest Map and Case Count*, N.Y. Times (Sept. 25, 2020, 12:02 A.M.), https://nyti.ms/3cvsPPA (updating regularly). It is thus understandable that voter anxiety about exercising their voting rights in person is higher than at any time in recent memory. *See Election 2020: Voters are Highly Engaged, but Nearly Half Expect to Have Difficulties Voting*, Pew Research Center (Aug. 13, 2020), https://pewrsr.ch/2RY0RTl. This, in and of itself, warrants a rehearing on whether HB 25 will exacerbate the problem of long lines at polling places and infringe the rights of Texans to exercise their political views by casting their ballot this November.[1]

Texas' July primary runoff election demonstrated, although at a smaller scale, the amplifying effect the pandemic has on the problems caused by HB 25. During that election, Texans were faced with (1) the abrupt closure of voting facilities, which refused to take the risk that they would become vectors for spreading the virus, (2) a dwindling number of volunteer poll workers, who are often older and more vulnerable

---

[1] Although this Court did not reach the question of what burden, if any, HB 25 placed on voters, the ongoing pandemic undoubtably changes that analysis as well.

O

to the virus, and (3) the need to reduce the number of voting machines at each polling place to maintain adequate social distancing (Dkt No. 1 at 28–30).

Since that election, Texas has done little to address these logistical challenges or the other concerns about the viability of an election where nearly every voter must, during a pandemic caused by an airborne virus, vote in person. Even now, the Secretary relies heavily on the fact that the number of early voting days have been increased by 50%, but that is an increase of only 6 days, and may not suffice to make up for the effects COVID-19 will have on the voting process or the predicted effects of HB 25. In fact, the extra time may barely cancel out the added time caused by the unusually high number of races and propositions likely to be on the ballot during the November general election.

Meanwhile, other states have taken significant steps to make voting easier, such as by expanding the use of mail-in voting and absentee voting. Texas has refused to implement many of these changes and, in some cases, has fought such measures in court. *See Texas Democratic Party v. Abbott*, No. 20-CV-50407, 2020 WL 5422917 (5th Cir. Sept. 10, 2020) (staying an injunction permitting the expansion of mail-in voting until decision is rendered on appeal). This is not to say that Texas is not within its rights to take, or not take, the measures mentioned above, but the failure to take the steps necessary to mitigate the risk caused by COVID-19 and HB 25 does require reconsideration of Plaintiffs' claims that HB 25 will unduly burden many Texans' right to vote.

O

### B.   Standing

Article III of the Constitution limits the subject matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. One requirement which stems from the need for a case or controversy is that a litigant must have standing to sue. For a party to demonstrate it has standing to bring a cause of action, the party must satisfy three requirements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations and footnote omitted).

The elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Id.* at 561. Thus, "each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation. *Id.* Moreover, when plaintiffs seek prospective relief to prevent future injuries, as they do here, they must prove that their threatened injuries are "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (internal quotation marks omitted).

Importantly though, "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Texas v. United States*, 945 F.3d 355, 377–78 (5th Cir. 2019). In such a case, the Court can address the merits of the case as to all

O

Plaintiffs without delving into the issue of standing as to the other plaintiffs. *See, e.g.,* *Clinton v. City of New York,* 524 U.S. 417, 431 n.19 (1998) ("Because both the City of New York and the health care [plaintiffs-]appellees have standing, we need not consider whether the [plaintiff-]appellee unions also have standing to sue."). For that reason, after addressing why Plaintiffs' claims are now certainly impending, the Court will focus on Organizational Plaintiffs and, finding that they meet Article III's case-or-controversy requirement, will not further analyze every other argument the Secretary presents. The Court will then address whether the Secretary is the proper defendant and whether Plaintiffs are otherwise barred from bringing this suit under 42 U.S.C. § 1983.

### 1.   Plaintiffs' Claims are Certainly Impending

Secretary Hughs' principal argument against Plaintiffs' standing is that their predicted injuries are not certainly impending. Of course, this Court dismissed Plaintiffs' previous case for this very reason, but as already discussed, much has changed since this Court dismissed Plaintiffs' March 2020 complaint in *Bruni.* In light of these developments, the Court finds Plaintiffs' injuries are certainly impending.

First, Plaintiffs alleged a great deal more than they did in their initial complaint. For example, they allege, via expert analysis, that because of the "non-linear relationship between voting time and average wait times," even small increases in the time it takes to vote could have exponentially greater impacts on the wait times at polling places (Dkt. No. 1-2 at 9).

14

O

Second, the passage of time, the further spread of the COVID-19 pandemic, and the events of the Texas July 2020 runoff election all demonstrate that Texas is unlikely to successfully mitigate the certainly impending harm caused by HB 25. As the virus has exacted its terrible toll, it is increasingly unlikely that Texas will be able to significantly increase the number of polling places, machines, and poll workers on election day (*see* Dkt. No. 1-1 at 3–4). In fact, the need for social distancing, coupled with the fear caused by this public health crisis, means that election officials will be using even *fewer* machines and *fewer* poll workers (Dkt. No. 1 at 28–29).

Third, the Secretary's claim that the pandemic may decrease voter turnout is unpersuasive. As an initial matter, it may be entirely untrue. As Plaintiffs note, Texans turned out in record numbers for the July 2020 election, despite the virus' spread in Texas also being at record highs. And even if Texas is correct that the pandemic will discourage some voters from voting, this decrease voter turnout does not excuse Texas for making it *more* difficult to vote. This is especially so because Texas is in control of many of their tools that could mitigate the risk to voters during this pandemic.

Finally, many of these effects are likely to be exacerbated in subsequent midterm elections, where Texas ballots are even longer than those in the general elections.

### 2.    Organizational Plaintiffs' Standing

"An organization can assert Article III standing on behalf of either its members or the organization itself." *East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 844

O

(9th Cir. 2020) (citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–79 (1982)).

Standing on behalf of an organization's members is often referred to as "associational

standing," whereas standing that an organization asserts for itself is "organizational

standing." Organizational Plaintiffs assert both associational and organizational

standing, but because they have adequately pled associational standing, the Court

does not delve into their arguments that they also have suffered direct organizational

harms.

An association has standing to bring suit on behalf of its members when (a) its

members would otherwise have standing to sue in their own right; (b) the interest it

seeks to protect are germane to the organization's purpose; and (c) neither the claim

asserted nor the relief requested requires the participation of individual members in

the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343

(1977). "Generally, such standing is limited to requests for prospective injunctive

relief because individual damages claims would require joinder of the individual

members." *Veasey v. Perry*, 29 F. Supp. 3d 896, 904 (S.D. Tex. 2014) (citing *Warth v.

Seldin*, 422 U.S. 490, 515 (1975)).

According to their complaint, and relevant to this analysis, TARA is

incorporated in Texas as a 501(c)(4) nonprofit, social welfare organization under the

Internal Revenue Code and is a chartered state affiliate of the Alliance for Retired

Americans (Dkt. No. 1 at 7). TARA's "mission is to ensure social and economic justice

and full civil rights that retirees have earned after a lifetime of work" (*id.* at 7–8).

TARA's membership is composed of 145,000 Texans, a portion of whom are too young

O

to qualify to vote by mail under Texas Election Code § 82.003 (*id.* at 8).  As such, TARA alleges that HB 25 "will burden—and in some cases entirely deprive—[TARA's] individual members of the right to vote, threatens the electoral prospects of its endorsed candidates whose supporters will face greater obstacles casting a vote and having their votes counted, and makes it more difficult for the alliance and its members to associate to effectively further their shared political purposes" (*id.*). Similarly, DSCC and DSSS, Democratic Party national committees whose missions include turning out Texas voters who support Democratic candidates for national office, allege that the rights of their members and constituents will be burdened due to HB 25 (*id.* at 10). This, in the context of all the pleadings under consideration here, is enough to establish associational standing on behalf of its members.

It is true that "at later stages of litigation, Plaintiffs may have to come forward with evidence to support its allegations that specific members of its organization who are eligible to vote in Texas have been harmed. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (requiring, at the merits stage, evidence of specific individual members of an organization). But for now, at the pleading stage, such proof is not required, and Plaintiffs' allegations are sufficient to confer associational standing. *See Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012) ("We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule12(b)(1) motion to dismiss based on lack of associational standing.").

17

O

### C.   The Secretary is the Proper Defendant

Yet, the Secretary argues she is not a proper defendant because sovereign immunity bars the claims brought against her, and, in the alternative, she argues that Plaintiffs' predicted injuries are not fairly traceable to and redressable by the Secretary.

First, the injuries alleged are fairly traceable to and redressable by the Defendant. In support of her argument to the contrary, the Secretary essentially disowns her role as the chief election officer of Texas. But, as the Fifth Circuit has recently confirmed, "[t]he facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state.'" *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017) (quoting Tex. Elec. Code § 31.001(a)). Here, Plaintiffs bring a facial challenge to a generally applicable Texas election statute, and Plaintiffs' injuries are therefore "fairly traceable to and redressable by" the Secretary. *See id.* Even more recently, the Fifth Circuit reiterated this principle in response to the Secretary making the same argument she offers here. *Texas Democratic Party*, 961 F.3d at 399 (rejecting argument that plaintiffs lacked standing because "local, rather than state, officials" implemented the challenged provision of the Texas Election Code).

For the same reasons the Secretary is the proper defendant in this suit, the *Ex Parte Young* exception to sovereign immunity applies. *Ex Parte Young* permits Plaintiffs' claims against the Secretary so long as: (1) the "complaint alleges an

O

ongoing violation of federal law and seeks relief properly characterized as prospective," *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002), and (2) the Secretary has "'some connection' to the state law's enforcement." *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017) (quoting *Ex Parte Young*, 209 U.S. 123, 157 (1908)). Having already concluded that the Secretary is sufficiently connected to the enforcement of the State's law, the only remaining question is whether the requested relief is "properly characterized as prospective." This Court concludes that it is.

The Secretary argues that Plaintiffs seek a mandatory injunction, an injunction requiring an official to take affirmative action, which the Secretary argues puts it outside the scope of *Ex Parte Young*. But Plaintiffs do not seek a mandatory injunction. Instead, Plaintiffs ask this Court to enjoin "Defendant . . . from implementing, enforcing or giving any effect to HB 25" (Dkt. No. 1 at 46). In other words, Plaintiffs seek to maintain the status quo. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (prohibitory injunctions "maintain the status quo"). Thus, even if the *Ex Parte Young* exception does not apply to mandatory injunctions, it does apply to the injunction requested here.

### D.    Statutory Standing

The Secretary also argues that Plaintiffs may not bring their suit under Section 1983 because they are relying on the rights of others (Dkt. No. 26 at 29–30). But plaintiffs have standing to sue for voting rights violations using Section 1983 as a vehicle for *remedial*, not monetary, relief. *See Ass'n of Am. Physicians & Surgeons,*

O

*Inc. v. Texas Med. Bd.*, 627 F.3d 547, 551 (5th Cir. 2010) (association had standing to assert Section 1983 claims on behalf of members in seeking prospective declaratory and injunctive relief); *see also Veasey v. Perry*, 29 F. Supp. 3d 896 (2014). Having found that Organizational Plaintiffs have adequately pled associational standing, the Secretary's argument here lacks merit.

## II.      The Secretary's 12(b)(3) Motion to Dismiss

Venue is proper where "a substantial part of the events . . . giving rise to [Plaintiffs'] claim[s]" will occur. 28 U.S.C. § 1391(b)(2). As pled, HB 25 will cause substantial injuries in this District, making venue proper.   The Southern District of Texas covers a fourth of the State and includes a significant number of Texas voters, and as Plaintiffs point out, "some of the highest rates of STV use, the longest polling place lines, and the lengthiest ballots exist in the Southern District" (Dkt. No. 33 at 31) (citing Dkt. No. 1 at 13–14, 17–18). As such, HB 25 will unduly burden the voting rights of Organizational Plaintiffs' members in the Southern District (*id.*).

Secretary Hughs argues that venue is only appropriate in the Western District of Texas, where HB 25 was passed and where Secretary Hughs works. The legislative history and text of the venue statute undermine this position. In 1990, Congress liberalized Section 1391(b)(2) by altering its prior focus on "the" judicial district in which such events occurred or will occur, to "a" judicial district in which such events occurred or will occur. *Udeobong v. Hawkins*, No. H-08-1833, 2009 WL 7326072, at *1–2 (S.D. Tex. Feb. 19, 2009). In doing so, Congress clarified that a given case will often have "more than one proper venue." *Id.* Thus, while it may be the case the

O

Western District is also an appropriate venue, it is not the case that the Southern District is an inappropriate venue.

## III.    The Secretary's 12(b)(6) Motion to Dismiss

Having considered and rejected the Secretary's Rule 12(b)(1) and Rule 12(b)(3) arguments, the Court now turns to her 12(b)(6) arguments. Plaintiffs state five causes of action. First, they claim that HB 25 imposes an undue burden on their right to vote in violation of the First and Fourteenth Amendments. Second, they claim HB 25 imposes an undue burden on their right to associate in violation of the First and Fourteenth Amendments. Third, they claim HB 25 violates Section 2 of the Voting Rights Act ("VRA") because it has discriminatory results. Fourth, they claim that HB 25 intentionally discriminates against minority voters in violation of Section 2 of the VRA and the Fourteenth and Fifteenth Amendments. And fifth, they claim that HB 25 discriminates on the basis of viewpoint in violation of the First and Fourteenth Amendments.

Federal Rule of Civil Procedure 8(a)(2) requires no more than "a short and plain statement of the claim showing that the pleader is entitled to relief." "Pleadings must be construed so as to do justice." Rule 8(e). To show they are entitled to relief, "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, Plaintiffs must "state a claim to relief that is plausible on its face." *Id.* at 547. For the limited purpose of analyzing Defendant's Motion to Dismiss, the Court accepts Plaintiffs' factual allegations as true and draws all reasonable inferences in Plaintiffs' favor.

21

O

### A.     Plaintiffs' Undue Burden Claims

Plaintiffs make two undue burden claims with respect to HB 25. Plaintiffs allege that (1) HB 25 places an undue burden on Texans' right to vote and (2) HB 25 places an undue burden on Texans' right to associate. Indeed, there is a close nexus between the right to vote and the right to associate at the polls to advance one's beliefs and ideas through the ballot. "[T]he right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively" are "two different, although overlapping kinds of rights." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

To survive a 12(b)(6) motion to dismiss, Plaintiffs must plausibly allege that the restrictions burden their asserted rights and are not sufficiently justified by the State's interest. *See Lewis v. Hughs*, No. 5:20-CV-577, 2020 WL 4344432 (W.D. Tex. July 28, 2020); *Miller v. Doe*, 422 F. Supp. 3d 1176, 1185–86 (W.D. Tex. 2019); *League of Women Voters of Fla., Inc. v. Detzner*, 354 F. Supp. 3d 1280 (N.D. Fla. 2018) ("It is sufficient for a 12(b)(6) motion that Plaintiffs have alleged [that the challenged laws] have burdened their voting rights."). Accordingly, the Court, using what is known as the "Anderson-Burdick test" will

> weigh "the character and magnitude of the asserted injury of the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justification for the burden imposed by its rule" taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

22

O

The severity of the burden imposed on the right to vote and the right to associate determines the level of scrutiny applied to the State's justification. *Burdick*, 504 U.S. at 434. If the burden is severe, then strict scrutiny applies and the regulation "must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But if the restrictions impose only a small and reasonable burden, then the level of scrutiny is much lower and "the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434. Restrictions that are neither severe nor minimal trigger "a flexible analysis" and the burden on plaintiff's rights must be weighed "against the state's asserted interest and chosen means of pursuing it." *Michigan State A. Phillip Randolph Inst. v. Johnson*, 326 F. Supp. 3d 532, 556 (E.D. Mich. 2018).

Here, the Court finds that Plaintiffs' undue burden claims survive Defendant's Motion to Dismiss. Plaintiffs argue that the elimination of STV will impose severe burdens on Texans' right to vote (Dkt. No. 1 at 37–39). Specifically, requiring the more than 5.6 million Texans who used STV in the past to make individual selections for every candidate and proposition on the ballot will increase average voting time, which, in turn, will lead to incrementally longer wait times at the polls (*id.* at 22). At worst, longer wait times at the polls will disenfranchise a substantial number of Texas voters who must return to work or their families and cannot afford the long wait (*id.* at 5). At best, longer wait times will still unduly burden the rights of Texans

O

who must now wait longer times in line to exercise their fundamental right to vote (*id.*).

For example, Plaintiffs' expert declarations suggest that increasing average voting time in Travis County by only 79 seconds triples the countywide average wait time at the polls—24% of voters in the county would expect to wait more than half an hour to cast their vote on election day (Dkt. No. 1-2 at 12–23). Increasing average vote time in Fort Bend County would also increase the countywide average wait time from no wait at all to almost fifteen minutes, with several polling places predicting average wait times greater than 100 minutes (Dkt. No. 1-2 at 23–32).[2]

Significantly, Plaintiffs point out, the COVID-19 pandemic prevents counties from implementing measures to mitigate the burdens caused by the increased wait times that would result from HB 25 (Dkt. No. 1 at 4, 28–31). While counties might, in ordinary times,[3] work to reduce wait times by increasing the number of voting machines at any given polling place, CDC guidance that persons keep a six feet distance from each other make this form of mitigation impractical and even risky. Indeed, social distancing may even require decreasing the number of machines at polling places to keep voters safe. In the July 2020 election, Collin County had to

---

[2] Plaintiffs' expert's predictions are based on data from the 2018 election and do not consider the challenges COVID-19 places on the administration of an election. Any effects on wait time Plaintiffs' expert has predicted may well be exacerbated as counties are forced to decrease the number of voting machines and as the shortage of poll workers strains the effective administration of the polls.

[3] HB 25 does not include any provisions to mitigate its likely impact on voting times. Instead, it leaves mitigation to the county election administrators. This pandemic shows no signs of abating before the November 2020 election, and the Secretary offers little evidence to show how counties can take other measures to the effects of HB 25.

O

decrease the number of voting machines at its main polling place from 20 to 8. Alex Ura, *What Officials are Doing to Make Runoff Election Voting Safe*, The Tex. Trib. (June 29, 2020, 5:00 A.M.), https://www.texastribune.org/2020/06/29/texas-election-first-test-voting-safety-pandemic/. While counties could also decrease wait times at the polls by increasing the number of polling places, Plaintiffs point out that this is unlikely to be a successful strategy. First, in the July 2020 runoff election, counties lost polling place venues that were unwilling to host voters during the pandemic (Dkt. No. 1-1 at 27). Second, most states across the country, including Texas, have seen a dramatic decline in the number of poll workers, most of whom are older citizens at increased risk of serious infection should they contract COVID-19. Benajmin Siegel & Olivia Rubin, *Officials Seek Thousands of Poll Workers Ahead of Election Day, Fear Shortage Due to COVID-19,* ABC News (Sept. 8, 2020, 7:47 A.M.) https://abcn.ws/331VU27. Without an increase in the number of poll workers, counties will be unable to administer more polling places. Other mitigation measures, such as the expansion of mail-in voting, have not been implemented. *See Texas Democratic Party*, 2020 WL 5422917 (5th Cir. Sept. 10, 2020) (staying an injunction permitting the expansion of mail-in voting until decision is rendered on appeal).

Longer wait times, moreover, place the health of Texas voters at risk. The longer a voter must stand in line before voting this fall—and for however long this pandemic is a reality in the United States—the higher the risk of virus transmission (Dkt. No. 1-3 at 4–10). Recent evidence from the Wisconsin election shows that people did in fact contract the virus during in-person voting. *See* Devi Shastri, *In-Person*

O

*Voting Was Likely a 'Disaster' for Wisconsin's Efforts to Flatten Coronavirus Curve,*
*National Experts Say,* Milwaukee J. Sentinel (Apr. 8, 2020, 10:41 A.M.)
https://www.jsonline.com/story/news/politics/exlections/2020/040/08/cornonavirus-
wisconsin-election-likely-hurt-effort-flatten-curve/2961718001/.

While these long wait times at the polls will burden all Texans' right to vote,
Plaintiffs assert that congestion at the polls has a disproportionately greater burden
on African-American and Hispanic voters (Dkt. No. 1 at 38). African-American and
Hispanic voters in Texas are "more likely to, among other things (1) live in poverty,
(2) have less flexible job schedules, (3) lack access to transportation, and (4) lack
access to child care assistance" (*id.* at 27). Even on election day, this class of voters
faces important constraints on their time. Consequently, long wait times at the polls,
Plaintiffs argue, will cause these voters to leave polling-place lines more quickly or
forgo their fundamental right to vote altogether (*id.*).

Finally, Plaintiffs allege that the elimination of STV serves "no legitimate, let
alone compelling governmental interest" (*id.* at 38). They highlight that the Secretary
does not offer evidence to demonstrate how the removal of STV, and the increased
wait times that accompany it, would result in a more informed and engaged electorate
(*id.* at 31). Plaintiffs also note that despite being forewarned about the possible
disproportionate burden HB 25 would have on Hispanic and African-American
Texans, supporters of HB 25 did relatively little to investigate those claims (Dkt. No.
1 at 16).

O

The Secretary makes several arguments against these allegations. First, she asserts that forty-three other States will not offer STV in 2020, none of those state's laws have been declared unconstitutional, and therefore Texas' decision to eliminate STV cannot run afoul of the Constitution (Dkt. No. 26 at 36–37). She further argues that any alleged burden created by HB 25 is minimal, because requiring all Texas voters to make individual selections on the ballot does not deprive Texans of their right to vote (*id.* at 38). Any increases in wait time created by HB 25, the Secretary argues, will be sufficiently offset by Texas' early voting period (*id.*). As for the stated interest in eliminating straight ticket voting, the Secretary cites the State's desires to encourage more informed voting, encourage better qualified candidates to run for office, reduce unintentional voter roll-off in nonpartisan races or propositions, make elections more competitive for third-party and independent candidates, and reduce voter confusion (*id.* at 39–41).

The Court will not weigh the merits of Plaintiffs' claims. Taking Plaintiffs' allegations as true, Plaintiffs sufficiently allege that HB 25 will burden Texans' right to vote and right to associate at the polls. It is true, HB 25 dictates the method by which Texans vote, not whether they may cast a ballot. However, Plaintiffs' complaint sufficiently shows that the method in which a voter casts a ballot affects the voting process in a way that burdens the right to vote. First, Plaintiffs' complaint and their expert declarations make a sufficient showing that the elimination of STV will increase wait times at the polls. Most significantly, Plaintiffs have shown Texas' ability to mitigate the increased wait times is severely limited by the ongoing

O

COVID-19 pandemic. The Court recognizes that the economic and time constraints on many Texans, a disproportionate number of whom are African-American or Hispanic, leave only a limited window of opportunity during which to cast their vote. "Life does not stop on election day." *NAACP State Conf. of Penn. v. Cortes*, 591 F. Supp. 2d 757, 765 (E.D. Pa. 2009). The long wait times will prevent many Texans from casting a ballot.

Plaintiffs' allegations sufficiently show that the increased wait times caused by HB 25 will place a burden that is greater than minimal on Texans' right to vote and right to associate at the polls. HB 25 will cause important delays at polling places, place Texan voters at increased risk of catching a deadly virus, and discourage voters, particularly those most vulnerable to the disease or under significant economic pressure, from exercising their rights on election day.

The Court finds that the burden Plaintiffs allege is greater than minimal. The State's interests, therefore, are not on their own sufficient to dismiss Plaintiffs' claims at this stage. Accordingly, the Court denies the Secretary's Motion as to Plaintiffs' undue burden claims.

### B.   Plaintiffs' Voting Rights Act Claim: HB 25 has Discriminatory Results

Plaintiffs allege that HB 25 has discriminatory results in violation of Section 2 of the Voting Rights Act (Dkt. No. 1 at 40–41).[4] Section 2 of the Voting Rights Act

---

[4] As a preliminary matter, the Secretary argues that HB 25 does not fall within the scope of Section 2 and that even if it does, Section 2 of the Voting Rights Act does not give Plaintiffs a private cause of action. The statutory language of Section 2 plainly applies to *any* discriminatory "standard, practice or procedure" that results in denial or abridgement of the right to vote on account of race or color. *Veasey v. Abbott*, 830 F.3d 216, 243 (2016). Like many

O

forbids any state or political subdivision from imposing or applying a voting qualification, prerequisite to voting, standard, practice, or procedure that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of" race, color or minority status. 52 U.S.C. § 10301(a). Unlike discrimination claims brought under the Fourteenth Amendment, Congress has clarified that violations of Section 2(a) can "be proved by showing discriminatory effect alone." *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986); *see also* 52 U.S.C. § 10301(b).

This is not a vote dilution claim. Because Plaintiffs allege that HB 25 "denies or abridges" the right to vote, Plaintiffs are required to make a plausible showing that: (1) the challenged "standard, practice, or procedure" imposes a discriminatory burden on members of a protected class, leaving them with "less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice," and (2) "that burden must in part be caused by or

---

other courts that have considered the merits of similar controversies, this Court finds that the elimination of STV is a practice or procedure that squarely falls within the protection of Section 2 of the Voting Rights Act.

Initially, the Voting Rights Act expressly conferred standing upon the Attorney General. The Supreme Court, however, has recognized that private litigants had standing to bring suit to effectuate the goals of the Act. *Allen v. State Bd. of Elections*, 393 U.S. 544 (1969). The Secretary does not supply any cases in which aggrieved persons or organizations have been denied the right to enforce Section 2 of the VRA. In fact, organizations, like private parties, have historically been able to enforce Section 2 of the VRA. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (Seven Indiana organizations were all parties to a Section 2 challenge of a photo identification law); *LULAC v. Perry*, 548 U.S. 399 (2006) (LULAC challenged Texas' redistricting plan under Section 2); *Johnson v. DeGrandy*, 512 U.S. 997 (1994) (State conference of NAACP Branches sued on a voter dilution challenge under Section 2); *Chisom v. Roemer*, 501 U.S. 380 (1991) (Louisiana Voter Registration/Education Crusade challenged voter dilution under Section 2); *LULAC v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012) (LULAC challenged vote dilution under Section 2); *Veasey v. Perry*, 29 F. Supp. 3d 896 (2014) (Six organizations challenge Texas's voter identification law under Section 2).

O

linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Veasey v. Abbott*, 830 F.3d 216, 244 (5th Cir. 2016).[5] The first part of this two-part framework requires the Court look at the nature of the burden imposed and whether it denies or abridges the ability of members of a protected class the same opportunity to participate in the political process as other members of the electorate. The second part of the framework requires the Court look at factors enumerated by the Senate (the "Gingles factors")[6] to examine the causal link between the burden alleged by Plaintiffs and social and historical conditions produced by discrimination. *Id.*

---

[5] The Secretary suggests that we analyze Plaintiffs' Section 2 disparate impact claim under the three-part framework enunciated in *LULAC No. 4434 v. Clements*, 999 F.2d 831, 849 (5th Cir. 1993). This suggestion is inapposite, as it deals not with a vote denial or abridgement claim, but rather a vote dilution claim. The Fifth Circuit established the framework for vote denial or abridgement claims in *Veasy v. Abbott*, 830 F.3d 216 (5th Cir. 2016).

[6] These are also often referred to as the "Senate Factors" and include, but are not limited to: (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction. *Thornburg v. Gingles*, 478 U.S. 30, 45 (1986) (quoting from S. Rep. 97-417, at 30, 1982 U.S.C.C.A.N. 208). Additional factors that in some cases have probative value as evidence to establish a violation of the Voting Rights Act are: (1) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; (2) whether the policy underlying the state's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous. *Thornburg*, 478 U.S. at 36–37.

O

Plaintiffs allege that HB 25 will have discriminatory results on African-American and Hispanic Texans (Dkt. No. 1 at 42). Plaintiffs argue that African-American and Hispanic Texans disproportionately utilize STV compared to non-minority voters (Dkt. No. 1-5 at 3–14). The elimination of STV will thus have a greater effect on wait times in precincts with the highest minority populations because those precincts have the highest number of voters who would otherwise use the STV option.

Disparate impact, however, is not the entirety of a discriminatory results claim. Plaintiffs are required to show that the challenged law interacts with social and historical conditions of discrimination and thus causes inequalities in political opportunities. Here, taking the plausible disparate impact of HB 25 into consideration along with the issues arising from the Gingles factors, which Plaintiffs have pled in their expert reports (Dkt. No. 1-4 at 19–101), Plaintiffs plausibly show that HB 25 interacts with social and historical conditions to decrease the opportunities of African-American and Hispanic voters to cast a ballot.

There is no serious dispute that the State of Texas, like many states, has a regrettable history of discriminatory policies and practices designed to suppress minority voters. While Plaintiffs' expert report indicates that African-American and Hispanic Texans have recently received electoral successes, it also outlines a history of discrimination that shows African-American and Hispanic Texans have, on average, substantially fewer economic resources than white Texans, substantially lower levels of educational attainment than white Texans, and more difficult access

31

O

to polling locations (Dkt. No. 1-4 at 9–16). Plaintiffs' expert report notes that minorities are more likely to get infected due to the increased possibility for exposure at their workplaces, and once infected, experience worse outcomes (Dkt. No. 1-3 at 5–6). Moreover, the economic constraints African-American and Hispanic Texans face have, on average, only become more acute over the course of the pandemic and its accompanying economic downturn. *See* Hugo Lopez, Abby Budiman & Lee Rainie, *Financial and Health of COVID-19 Vary Widely by Race and Ethnicity*, Pew Research Center: Fact Tank (May 5, 2020, 2:00 PM), https://pewrsr.ch/2ExuUy2.

The Court finds that Plaintiffs make a plausible showing that eliminating STV would impose a discriminatory burden on African-American and Hispanic voters and create comparatively less opportunities for these voters to participate in the political process. Further, Plaintiffs plausibly show that HB 25 is linked to historical socioeconomic experiences of discrimination, which have been exacerbated by the current public health crisis. Accordingly, Plaintiffs' Section 2 Discriminatory Results claim must survive Defendant's Motion to Dismiss.

## C.    Plaintiffs' Claim of Intentional Discrimination

Plaintiffs' fourth claim alleges that HB 25 is the product of intentional racial discrimination in violation of Section 2 of the Voting Rights Act, and the Fourteenth and Fifteenth Amendments of the United States Constitution.

Here, Plaintiffs must state sufficient facts to support a finding of racially discriminatory intent. In determining racially discriminatory intent, the Court considers whether the impact of the decision bears more heavily on one racial group

O

than another; contemporaneous statements by the decisionmakers; the historical background of the decision; the sequence of events leading up to the decision; and whether the decision departs from the normal practice. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977). In considering a discriminatory intent claim under Section 2, the Court considers the Arlington-Heights factors along with the Gingles factors. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009); *Terrazas v. Clements*, 581 F. Supp. 1329, 1343, 1347 (N.D. Tex. 1984).

Defendants contest that Plaintiffs are required to show that discriminatory purpose was the but-for cause of HB 25's passing. This is simply not so. Racial discrimination need not be the primary purpose of the official act for a violation to occur. *Brown*, 561 F.3d at 433. So long as Plaintiffs plausibly show that racial discrimination was one of the motivating factors behind HB 25, their complaint survives a motion to dismiss. *Id.*

Here, Plaintiffs' complaint clearly alleges specific facts relevant to the Arlington Heights and Gingles factors (Dkt. No. 1-4 at 16–101). Traditionally, bills that make changes to Texas electoral law are heard before the Senate State Affairs committee (Dkt. No. 1 at 15). Here, the legislator presented this bill to the Senate Business & Commerce Committee (*id.* at 15–16). Additionally, the author of HB 25, contrary to customary practice, did not take a position on proposed amendments (*id.*). Plaintiffs' complaint also shows that despite requests and concerns from legislators and members of the community about the potential effects HB 25 could have on minority voters, proponents of HB 25 did not engage with those concerns (*id.* at 43).

33

O

While Defendants may dispute the significance of these facts, that is a matter for trial which cannot be disposed of in the context of a motion to dismiss. The Secretary's Motion to Dismiss is denied with respect to her challenge to the claims of intentional discrimination under Section 2 of the Voting Rights Act, and the Fourteenth and Fifteenth Amendments.

### D.   Plaintiffs' Viewpoint Discrimination Claim

Finally, Plaintiffs claim that HB 25 was passed with the intent to discriminate on the basis of partisan affiliation (Dkt. No. 1 at 44). Specifically, that HB 25 was passed to discriminate against voters who support the Democratic Party to gain a partisan advantage in future elections (*id.*). Plaintiffs contend that to accomplish this objective, the legislature identified groups of voters who are likely to vote for Democratic candidates and then passed HB 25 to frustrate those voters' access to the ballot.

Plaintiffs derive this "partisan fencing claim" from *Carrington v. Rash*, 380 U.S. 89 (1965), a case in which the Supreme Court invalidated a provision in the Texas Constitution prohibiting members of the armed forces from voting if they moved to Texas during their service. "Fencing out" a sector of the population from the franchise because of the way they vote, the Court held, "is constitutionally impermissible. *Id.* at 94.

The Court finds that this theory does not give Plaintiffs a cause of action. No court in this district has established a framework for analyzing this claim, yet other courts that have grappled with the scope of a partisan fencing claim have concluded

O

that "[i]t does not appear to create a separate cause of action but may be a useful analytical tool in evaluating First Amendment and Equal Protection cases." *Lee v. Virginia State Bd. of Elections*, 188 F. Supp. 3d 577, 609 (E.D. Va. 2016); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016); *Ohio Organizing Collaborative v. Husted*, 189 F. Supp. 3d 708 (S.D. Oh. 2016). Supporting this position is the fact that courts that have applied *Carrington* have done so to analyze state laws that explicitly forbid a specific category of voters from casting a ballot—which HB 25 does not do. *See, e.g.*, *Cipriano v. City of Houma*, 395 U.S. 701, 704–06 (1969) (finding unconstitutional a state law that permits only property taxpayers to vote in certain elections and rejecting the argument that the law is justified by the interest in limiting the franchise to those who have a special pecuniary interest or will be directly affected by the election); *Evans v. Cornman*, 398 U.S. 419, 423–25 (1970) (applying heightened scrutiny and finding an equal protection violation where Maryland prohibited individuals residing on a federal reservation or enclave within the state from registering to vote); *Dunn v. Blumstein*, 405 U.S. 330, 355 (1972) (finding residential duration requirements for voter registration did not pass heightened scrutiny).

   *Carrington* and its progeny do not create a cause of action here and Plaintiffs fail to argue that HB 25 burdens their rights to free expression or association as Democrats under the traditional First Amendment framework. Plaintiffs' claim that HB 25 was enacted to suppress the votes of Democratic voters, therefore, fails.

O

Defendant's Motion to Dismiss is granted as to Plaintiffs' Viewpoint Discrimination claim.

### E.    Laches Do Not Bar Plaintiffs' Claims

The Secretary argues that the equitable doctrine of laches bar Plaintiffs' claims, because they are untimely brought. Specifically, the Secretary contends that because HB 25 was signed in June 2017, Plaintiffs should have challenged the law then. This argument is without merit, because there was no unreasonable delay in bringing this challenge. Though signed in June 2017, HB 25 was not intended to go into effect until the November 2020 election. Plaintiffs brought their first suit in March, which was dismissed for lack of jurisdiction. It is only natural that Plaintiffs would bring a new challenge after witnessing the difficulties of administering an election in the midst of a pandemic, learning how this disease could affect the health of voters, and recognizing the extent to which the pandemic has exposed and exacerbated pre-existing socioeconomic inequalities.

## IV.   Plaintiffs' Motion for Preliminary Injunction

Having addressed the Secretary's 12(b)(1), 12(b)(3), and 12(b)(6) arguments and finding that many of Plaintiffs' claims must survive, the Court finally turns to Plaintiffs' request for a preliminary injunction (Dkt No. 5). Plaintiffs seek a preliminary injunction preventing the Secretary from implementing HB 25 (*id.*). Requests for preliminary injunctions are extraordinary remedies designed to protect the status quo pending final resolution of a lawsuit. Here, because both parties have presented extensive briefing in support of their positions, the Court finds that a

O

hearing would be largely duplicative and add little, if any, value. Fed. R. Civ. P. 65(a)(1).

Issuance of a preliminary injunction falls within the sound discretion of the Court. To secure a preliminary injunction, Plaintiffs must establish: (1) a substantial likelihood that they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) their substantial injury outweighs the threatened harm to the party to be enjoined; and (4) granting the preliminary injunction will not disserve the public interest. *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (citing *Texas Med. Providers Performing Abortion Servs. v. Lakey*, 677 F.3d 570, 574 (5th Cir. 2012)); *Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006).

In response to Plaintiffs' motion, the Secretary argues that laches bar Plaintiffs' claims (Dkt. No. 29 at 14). The Court has already concluded that laches do not bar Plaintiffs' claims because there was no harmful and undue delay. Additionally, the Secretary invokes *Republican National Commission v. Democratic National Commission*, 140 S. Ct. 1205, 1207 (2020), for the proposition that "lower federal courts should not ordinarily alter the election rules on the eve of an election" (Dkt. No. 29 at 13–14). The injunction issued by the district court in *Republican National Commission* was issued five days before a primary election and addressed the question of whether absentee ballots could be mailed and postmarked after election day. The Supreme Court found that this preliminary injunction fundamentally altered the nature of the election, because the injunction required a

37

O

subsequent order further enjoining the public release of any election results for six days after election day. *Republican Nat'l Comm'n*, 140 S. Ct. at 1207. Here, the requested injunction would be issued far earlier, would not extend any deadlines, and would not create the sort of confusion *Republican National Commission* frowns upon. Significantly, the requested injunction would not impose such an onerous burden on election officials and merely allows a century-old practice to remain in place for one more election. Yes, we are nearing the election, but we are not so close as to deny Plaintiffs the ability to raise a challenge seeking to maintain the status quo. While states have a strong interest in their ability to enforce state election law, the public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)). The Court must react to burdens imposed on Constitutional rights, especially during this public health crisis.

The Secretary has also filed a Motion to Strike the Declaration of Dan Wallach or, in the Alternative, for Leave to File a Sur-Reply (Dkt. No. 39). She argues that Wallach's declaration, which was attached to Plaintiffs' reply in support of their motion for a preliminary injunction, should be struck because it constitutes untimely "new evidence." A reply brief is generally limited to addressing matters presented in a motion and response. *See AAR, Inc. v. Nunez*, 408 F. App'x 828, 830 (5th Cir. 2011) (A reply brief "is not the appropriate vehicle for presenting new arguments or legal theories to the court."); *see also* S.D. Tex. R. 7.7 ("If a motion or response requires consideration of facts not appearing of record, proof by affidavit or other documentary

O

evidence must be filed with the motion or response."). The Court has discretion, however, "on its own motion or upon application" to "request or permit additional authority or supporting material." S.D. Tex. R. 7.8. Here, Plaintiffs do not present new arguments or legal theories through Wallach's declaration. Rather, Wallach's declaration is specifically directed at and responsive to the Secretary's response, which argues that programming the voting machines is unduly burdensome (*see* Dkt. No. 29 at 13; Dkt. No. 30-1 at 2–5). The admissibility of the declaration is further supported by local rule 7.8. Because this is not a situation in which a completely novel issue was raised for the first time in a reply—the Secretary herself brought up the process of programming the voting machines and had ample opportunity to brief that issue in her response to Plaintiffs' request for an injunction—there is no need to give the Secretary an opportunity to respond before the Court rules on the injunction. Accordingly, the Secretary's Motion to Strike Wallach's Declaration or File a Sur-Reply is denied.[7]

We now turn to the merits of Plaintiffs' request for an injunction. First, having here found that almost all of Plaintiffs' claims survive past the Secretary's Rule 12 challenges, the Court now finds that Plaintiffs are likely to succeed on the merits of their undue burden claims. "The right to vote is protected in more than the initial allocation of the franchise." *Bush v. Gore*, 531 U.S. 98, 104 (2000). While there is no

---

[7] In any event, because of the importance of the right at stake and extensive experience Texas election administrators' have with straight ticket voting, Wallach's declaration had little bearing on the Court's analysis of whether a preliminary injunction should issue.

O

"litmus test" to "separate valid from invalid voting regulations courts must weigh the burden on voters against the state's asserted justifications and 'make the "hard judgment" that our adversary system demands.'" *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008)).

The Court finds that HB 25, especially as exacerbated by the ongoing pandemic, places a greater than minimal burden on Texans' right to vote and right to associate. HB 25 eliminates the STV option on ballots. For almost 100 years prior to the adoption of HB 25, Texans could mark a single bubble to vote for all the candidates affiliated with that particular party. By eliminating that option, Texans will have to make individual selections for the candidates they wish to vote for, and as such, the amount of time it will take to complete a ballot will increase. This in turn, will cause incrementally longer wait times and congestion at the polls (*see* Dkt. No. 6-2 at 10–28). As demonstrated by the administration of the July runoff elections, the challenges of running an election in the midst of a pandemic are significant. This pandemic limits the counties' ability to mitigate the longer wait times caused by HB 25: the number of voting machines cannot be increased without risking voters' safety, the number of polling locations is unlikely to be increased, and even if the number of polling locations can be increased, the national shortage of poll workers makes an increase in polling locations unlikely. Access to mail-in ballots continues to be restricted and curbside voting is not intended for mass usage.[8] The longer voters

---

[8] To date, at least 21 states have modified voting procedures for the November general election in light of the COVID-19 pandemic: six states have expanded absentee voting

O

stand in line, the greater the risk that they contract COVID-19. Texans already wait a long time to exercise their right to vote (Dkt. No. 6-3 at 8, 11, 13–14). Increasing wait times at the polls further could cause more Texans to leave polling place lines before they have exercised their fundamental right to vote (*id.*). Forcing Texas voters to stand in longer lines and increasing their exposure to a deadly virus burdens the right to vote.

The Secretary argues that early voting and mail-in voting are available to Texan voters, and thus any failure to overcome the burden to voting on Election Day is an individual choice that forecloses Plaintiffs' request for relief. This argument is meritless. *See United States v. Marengo Cnty. Com'n*, 731 F.2d 1546, 1556 (11th Cir. 1984) (rejecting the argument that Section 2 only ensures access to the political process without formal barriers); *see also Kirksey v. Bd. of Supervisors of Hinds Cnty.*, 554 F.2d 139, 145 (5th Cir. 1977) (en banc) (failure to register cannot be considered a matter of voter apathy without specific supporting evidence). An effective right to participate in the electoral process, regardless of race, color, ethnicity, or political affiliation, cannot be denied or abridged on election day.

The Secretary's stated reasons for HB 25 are underwhelming, especially when weighed against the risk of disenfranchisement and the risk to voters' health. The legislature's desire to encourage a more informed electorate by requiring individual

---

eligibility, eight states are automatically sending absentee ballot applications to all voters, two states are automatically sending absentee ballots to all voters in the general election. *See* Jerrick Adams, *States Begin Modifying General Election Voting Procedures in Response to COVID-19 Outbreak*, Ballotpedia (Jul. 29, 2020, 3:13 PM) https://news.ballotpedia.org/2020/07/29/states-begin-modifying-general-election-voting-procedures-in-response-to-covid-19-outbreak/.

O

selections of candidates on the ballot is not supported by any evidence, only by a belief (Dkt. No. 6-5 at 9–10). Eliminating STV does not prevent voters from casting a ballot exclusively for Democrats or exclusively for Republicans. Keeping the STV option during the November general election does not prohibit voters from making individual selections and splitting their ticket. It is equally unclear to the Court how requiring voters to spend more time voting and more time waiting in line at polling places, in turn, increasing voters' potential exposure to a deadly virus, will encourage more qualified candidates and better campaigns. Finally, the Secretary has not demonstrated how eliminating STV will reduce voter confusion and unintentional roll-off. **In fact, eliminating a practice that Texan voters have been accustomed to for 100 years is more likely to cause confusion among voters than eliminating it would.**

Accordingly, because the State's interests do not outweigh the burdens imposed by HB 25, Plaintiffs are likely to succeed on the merits of their undue burden claims.[9]

Plaintiffs argue they will be irreparably injured if an injunction is not granted and their harm outweighs any harm to the Defendant. Voting is a constitutional right and the violation of a constitutional right for even the shortest period constitutes an irreparable injury which justifies granting the motion for preliminary injunction. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). By causing mass lines at the polls and increasing the amount of time voters are exposed

---

[9] Plaintiffs only need to show likelihood of success on one claim to obtain a preliminary injunction. Accordingly, the Court will not address Plaintiffs remaining claims.

O

to COVID-19, HB 25 will cause irreparable injury to Plaintiffs and ALL Texas voters in the upcoming general election.

Plaintiffs' substantial injury outweighs any potential harm to the Secretary, should she be enjoined from enforcing HB 25. The Secretary and the 254 county election officials have already begun distributing paper ballots without an STV option (Dkt. No. 29 at 7). They have also programmed the software on the electronic voting machines that does not accommodate straight ticket voting (*id.*). But the question before the Court does not affect the mail-in ballots distributed to the limited number of Texans eligible to vote by mail. The question before the Court is HB 25's effect on those who, by state law, may only vote in person at the polls. The Court is not convinced that the burden on the state to recalibrate its machines, all of which have been used in the past with an STV option and which will be programmed and operated by officials familiar with the STV option, will be as onerous as Texas claims. Regardless, weighed against the deprivation HB 25 is likely to cause, the Court would still find that the substantial injury to the Plaintiffs is outweighed by the inconvenience to the Secretary. Re-printing paper ballots for in-person voters is also feasible and would, according to the Secretary's expert, take little more than a week (Dkt. No. 30-1 at 3).  The substantial injury to Plaintiffs is outweighed by the inconveniences resulting to the Secretary in making the necessary changes to allow Texan voters to use STV.

O

Granting this injunction is in the public's interest. Texas' rules around voting during the pandemic have been perplexing. Administering in-person voting the same way it has been administered for almost 100 years is not about a mere convenience to voters, it is about running an efficient electoral process that guarantees Texans a more effective opportunity to cast a ballot in a time where any additional time spent in line endangers the safety of voters, poll workers, and others not at the polls. This is a matter of utmost importance to the constitutional rights of Texan citizens, and in this most extraordinary time, the health of the Nation. The Court finds that a preliminary injunction is proper.

## V.    Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss (Dkt. No. 26) is **GRANTED IN PART** and **DENIED IN PART**; Defendant's Motion to Strike the Declaration of Dan Wallach (Dkt. No. 39) is **DENIED**; and Plaintiffs' Request for a Preliminary Injunction (Dkt. No. 5) is **GRANTED**. Defendant, her officers, agents, servants, employees, successors, and all persons in active concert or participation with them are **ENJOINED** from taking any action to implement or enforce HB 25. This Preliminary Injunction shall take effect immediately and shall remain in effect pending a final judgment in this action or further order of this Court.

It is so **ORDERED**.

**SIGNED** September 25, 2020.

Marina Garcia Marmolejo
United States District Judge

44