# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
March 16, 2022
Lyle W. Cayce
Clerk

No. 20-40643

Texas Alliance for Retired Americans; Sylvia Bruni; DSCC; DCCC,

*Plaintiffs—Appellees,*

versus

John Scott, *in his official capacity as the Texas Secretary of State,*

*Defendant—Appellant.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:20-CV-128

Before Higginbotham, Willett, and Duncan, *Circuit Judges.*
Stuart Kyle Duncan, *Circuit Judge*:

  Shortly before the November 2020 election, Plaintiffs challenged Texas's elimination of straight-ticket voting. Agreeing with Plaintiffs' claims that this change unconstitutionally burdened the right to vote, the district court enjoined the Texas Secretary of State. A motions panel of our court stayed the injunction. We now reverse the district court's order, vacate the injunction, and remand for further proceedings. Because the Secretary of State does not enforce the law that ended straight-ticket voting, Plaintiffs' constitutional claims are barred by sovereign immunity.

I.

Texas House Bill 25 (HB 25) eliminated straight-ticket voting in Texas elections. Straight-ticket or "straight-party" voting meant "cast[ing] a vote for all the nominees of one party . . . by placing an 'X' in the square beside the name of the party of [the voter's] choice." Tex. Elec. Code § 52.071(b), *repealed by* Act of May 20, 2017, 85th Leg., R.S., ch. 404, § 8, 2017 Tex. Gen. Laws 1081, 1083.[1] HB 25 ended that practice. It was signed June 1, 2017, and scheduled to go into effect over three years later on September 1, 2020. *Ibid.*

On August 12, 2020, Plaintiffs[2] filed suit challenging HB 25 on the grounds that eliminating straight-ticket voting would lengthen polling lines and therefore burden voting rights. They alleged claims under the First, Fourteenth, and Fifteenth Amendments to the United States Constitution and § 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301. The named defendant was the Texas Secretary of State ("the Secretary") in her official capacity.[3] Plaintiffs sought injunctive and declaratory relief, as well as a preliminary injunction.

On September 25, 2020, the district court issued a preliminary injunction based only on Plaintiffs' constitutional undue burden claims. *See Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983). In doing so, the district court rejected the Secretary's arguments that the suit should be dismissed on various grounds, including issue preclusion,

---

[1] All references to statutory sections in this opinion are to the Texas Election Code as effective at the time of the district court's order.

[2] Plaintiffs are three organizations—the Texas Alliance for Retired Americans ("TARA"), the national senatorial committee of the Democratic Party ("DSCC"), and the national congressional committee of the Democratic Party ("DCCC")—and one individual, Sylvia Bruni, the Chair of the Webb County Democratic Party.

[3] Ruth Hughs, the Secretary when suit was filed, has been replaced by John Scott.

lack of standing, and sovereign immunity. The Secretary timely appealed and moved for a stay pending appeal.

On September 30, 2020, a panel of our court stayed the preliminary injunction. *See Tex. All. for Retired Ams. v. Hughs*, 976 F.3d 564 (5th Cir. 2020) (per curiam). The stay rested on "[t]he principle . . . [that] court changes of election laws close in time to the election are strongly disfavored." *Id.* at 566–67 (citing *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, --- U.S. ---, 140 S. Ct. 1205, 1207 (2020) (per curiam); *North Carolina v. League of Women Voters of N.C.*, 574 U.S. 927 (2014) (per curiam); *Husted v. Ohio State Conference of N.A.A.C.P.*, 573 U.S. 988 (2014) (per curiam); *Veasey v. Perry*, 574 U.S. 951 (2019) (per curiam); *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). The panel declined to address standing, sovereign immunity, or the merits. *Id.* at 567.

## II.

"We review a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*." *Planned Parenthood of Greater Tex. v. Kauffman*, 981 F.3d 347, 354 (5th Cir. 2020) (en banc) (citation omitted). We review sovereign immunity and standing *de novo*. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019), *cert. denied* --- U.S. ---, 141 S. Ct. 1047 (2021); *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 236 (5th Cir. 2010) (citations omitted).

## III.

In addition to arguing the merits, the Secretary raises the threshold issue of sovereign immunity.[4] Because we agree with the Secretary that

---

[4] The Secretary also raises issue preclusion based on a prior suit involving some but not all the present plaintiffs. *See Bruni v. Hughs*, 468 F. Supp. 3d 817 (S.D. Tex. 2020). Because we resolve this appeal based on sovereign immunity, we need not reach issue preclusion. *See Gruver v. La. Bd. of Supervisors*, 959 F.3d 178, 182 n.3 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 901 (2020) ("While Eleventh Amendment immunity is a jurisdictional matter, . . . preclusion is not." (citations omitted)). For the same reason, we need not reach

Plaintiffs' constitutional claims are barred on that basis, we need not reach the merits.

States are immune from private suits unless they consent or unless Congress validly strips their immunity. *See Sossamon v. Texas*, 563 U.S. 277, 283–84 (2011) (citing *Alden v. Maine*, 527 U.S. 706, 715 (1999); THE FEDERALIST No. 81, p. 511 (B. Wright ed. 1961) (A. Hamilton)); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59 (1996); *see also* U.S. CONST. amend. XI. Despite this general rule, *Ex parte Young* permits plaintiffs to sue a state officer in his official capacity for an injunction to stop ongoing violations of federal law. *Ex parte Young*, 209 U.S. 123, 155–56 (1908); *see also Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021). The officer sued must have "*some* connection with the enforcement of the [challenged] act." *Young*, 209 U.S. at 157 (emphasis added).

How much of a "connection" has been hard to pin down, though. *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (*TDP*) (observing that "[our] circuit has not spoken with conviction" on this issue).[5]

---

the Secretary's argument that Plaintiffs lack standing. Finally, we recognize that sovereign immunity would not pertain to Plaintiffs' Voting Rights Act claims. *See Mi Familia Vota v. Abbott*, 977 F.3d 461, 469 (5th Cir. 2020) (noting "[o]ur court has held that the Voting Rights Act . . . 'validly abrogated state sovereign immunity'" (quoting *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017))). The injunction, however, was based on Plaintiffs' constitutional claims only.

[5] An open question is whether our court has adopted as binding precedent the plurality view in *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc), that an official must be "specially charged with the duty to enforce the statute" and "be threatening to exercise that duty." *Id.* at 414 (plurality op.). *See City of Austin*, 943 F.3d at 999–1000 (citing *K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010) (discussing *Okpalobi*); *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507 (2017); *Morris v. Livingston*, 739 F.3d 740 (5th Cir. 2014)); *see also Tex. Democratic Party v. Hughs*, 997 F.3d 288, 291 & n.12 (5th Cir. 2021) ("We have not outlined a clear test for when a state official is sufficiently connected to the enforcement of a state law so as to be a proper defendant under *Ex parte Young*.") (citing cases); *Tex. Democratic Party v. Hughs*, 860 F. App'x 874, 877 (5th Cir. 2021) (per curiam) (noting our precedents in this area "do not provide as much clarity as we would prefer").

4

Case 5:20-cv-00123 Document 56 Filed on 05/16/2022 in TXSD Page 5 of 18
Case: 20-40643      Document: 00516310969     Page: 5     Date Filed: 05/09/2022

No. 20-40643

But some guideposts have emerged. First, an official must have more than "the general duty to see that the laws of the state are implemented." *City of Austin*, 943 F.3d at 999–1000 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). Second, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *TDP*, 978 F.3d at 179 (citation omitted). This means the analysis is "provision-by-provision": The officer must enforce "the particular statutory provision that is the subject of the litigation." *Ibid.* (citation omitted); *see also Mi Familia Vota v. Abbott*, 977 F.3d 461, 467–68 (5th Cir. 2020). "Th[at] is especially true here because the Texas Election Code delineates between the authority of the Secretary of State and local officials." *Ibid.* Third, "enforcement" means "compulsion or constraint." *City of Austin*, 943 F.3d at 1000 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). If the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation. *See Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017) (noting "significant overlap between Article III jurisdiction, *Ex parte Young*, and equitable relief" (citation omitted)).

We apply these principles to decide whether the Secretary has the necessary connection to enforcing HB 25's repeal of straight-ticket voting. The Secretary argues he lacks that connection and therefore is not a proper defendant under *Ex parte Young*. We agree.

As the Secretary points out, enforcement of HB 25 falls to local election officials. HB 25 repealed election code section 52.071, which required that a "square" for straight-ticket voting "*shall be printed* to the left of each political party's name." Tex. Elec. Code § 52.071(a) (repealed eff. Sept. 1, 2020) (emphasis added). Because the now-defunct statute did not name an official, we ask whether the Secretary "actually ha[d] the authority to enforce [it]." *City of Austin*, 943 F.3d at 998. Our precedent says

no. "The [Texas] Secretary [of State] is not responsible for printing . . . ballots." *Mi Familia Vota*, 977 F.3d at 468 (citing Tex. Elec. Code §§ 52.002, 31.043; *In re Cercone*, 323 S.W.3d 293, 294 (Tex. App.—Dallas 2010, pet. denied)). That task—and thus enforcement of section 52.071 and HB 25's repeal of it—belongs to the authority charged with preparing the ballot: a county clerk, county party chair, city secretary, or other local official, depending on the type of election. *See* Tex. Elec. Code § 52.002(1)–(4); *Mi Familia Vota*, 977 F.3d at 468 ("Th[e] responsibility [for printing ballots] falls on local officials."). Consequently, "directing the Secretary not to enforce [HB 25] would not afford the Plaintiffs the relief that they seek, and therefore, the Secretary of State is not a proper defendant." *Ibid.* (cleaned up).

Plaintiffs argue other election code provisions give the Secretary "responsibilities" for enforcing HB 25. Not so. Principally, Plaintiffs point to the Secretary's "voter education" duties in section 31.012. These require the Secretary to (1) post a notice on his website that HB 25 abolished straight-ticket voting, Tex. Elec. Code § 31.012(a); (2) send a similar notice to election officials, *id.* § 31.012(b-1); and (3) "adopt rules and establish procedures as necessary for the [State's] implementation of [HB 25] to ensure that voters and county election administrators are not burdened by the implementation," *id.* § 31.012(d). None of these duties makes the Secretary the "enforcer" of HB 25. In performing them, the Secretary does not "compel or constrain" officials to print ballots without the straight-ticket option. *TDP*, 978 F.3d at 180. Suppose a court enjoined the Secretary from sending notices about HB 25 or from making rules to facilitate the post-HB 25 system. The *Ex parte Young* question is whether that injunction would constrain election officials to restore straight-ticket voting, which is what Plaintiffs want. The answer is no. *See Mi Familia Vota*, 977 F.3d at 468

6

(Secretary's duties as to electronic voting did not make her proper defendant as to claims seeking "use [of] paper ballots").[6]

Plaintiffs also rely on *TDP v. Abbott*, which held the Secretary was sufficiently connected to a challenged statute that allowed voters 65-and-older to vote by mail. 978 F.3d at 179–80. That decision relied on the Secretary's duty to design the mail-in ballot application form. *Ibid.*; *see* Tex. Elec. Code § 31.002. But Plaintiffs miss a key distinction between that case and this one. In *TDP*, local election officials were *required* to use the Secretary's form, so an injunction ordering the Secretary to revise the form would have constrained those officials. *See* 978 F.3d at 179–80. Not so here. Plaintiffs have identified no duty of the Secretary that constrains election officials with respect to the straight-ticket option on ballots.

It is true, as Plaintiffs point out, that the Secretary plays a role in designing write-in and provisional ballots. *See* Tex. Elec. Code § 105.002(c) (write-in ballots) (repealed eff. Sept 1, 2021); *id.* § 124.006 (provisional ballots). But Plaintiffs fail to show how these duties relate to voting at polling locations. Plaintiffs also overstate the Secretary's role in designing electronic ballots. Yes, the Secretary has *discretion* to alter the form and content of electronic ballots, but that discretion is cabined to encoding ballots (prepared by local officials) for compatibility with an electronic voting system. *Id.* § 52.075(a). Plaintiffs fail to show how that clerical discretion is a duty at all, much less a duty tied to the inclusion of a straight-ticket voting option on ballots. *See TDP*, 978 F.3d at 179.

Finally, Plaintiffs rely on the Secretary's "expansive duties" in enforcing election laws—such as his role as "chief election officer," Tex.

---

[6] For the same reasons, we reject Plaintiffs' reliance on the Secretary's duty to "prescribe the form and content of the instruction poster" at polling places, which must instruct voters on "marking and depositing the ballot." Tex. Elec. Code § 62.011(b), (c)(1). Enjoining the Secretary from explaining HB 25 on the instructional poster would do nothing to restore straight-ticket voting.

ELEC. CODE § 31.001, his duty to "obtain and maintain uniformity" in the laws' application, *id.* § 31.003, and his authority to "take appropriate action to protect" voting rights, *id.* § 31.005. None of these statutes creates the relevant connection between the Secretary and HB 25. Such "general duties under the [Texas Election] Code" fail to make the Secretary the enforcer of specific election code provisions. *TDP*, 978 F.3d at 180 (citing TEX. ELEC. CODE §§ 31.003–.004).[7] More is needed—namely, a "connection to the enforcement of the particular statutory provision that is the subject of the litigation." *Ibid*; *see also City of Austin*, 943 F.3d at 999–1000 (distinguishing "general duty" to implement state law from "particular duty to enforce the statute in question" (quoting *Morris*, 739 F.3d at 746)). The district court arrived at the opposite conclusion, relying mistakenly on *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017). But that decision addressed only standing and has no bearing on the *Ex parte Young* analysis. *See id.* at 614 ("Sovereign immunity has no role to play here."). The general duties referenced by Plaintiffs fail to show the Secretary's particular duty to enforce HB 25.[8]

In sum, the Secretary is not a proper defendant under *Ex parte Young*.

---

[7] *See also Bullock v. Calvert*, 480 S.W.2d 367, 371–72 (Tex. 1972) (Reavley, J.) (rejecting argument that Secretary's role as "chief election officer" or his duty to "maintain uniformity" in application of election laws is "a delegation of authority to care for any breakdown in the election process"); *In re Hotze*, 627 S.W.3d 642, 646 (Tex. 2020) (Blacklock, J., concurring) (same).

[8] For those reasons, we must respectfully disagree with our esteemed colleague's erudite dissenting opinion. *See post*, at 2.

8

Case 5:20-cv-00123 Document 105-1 Filed on 05/10/22 in TXSD Page 10 of 22
Case: 20-40643 Document: 00516310969 Page: 9 Date Filed: 05/09/2022

No. 20-40643

IV.

We REVERSE the district court's order, VACATE the preliminary injunction, and REMAND for further proceedings consistent with this opinion.[9]

---

[9] Plaintiffs' pending motion to dismiss the appeal as moot due to the alleged expiration of the injunction is DENIED. Even assuming the injunction expired, we can review under the collateral order doctrine the order denying the Secretary sovereign immunity. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993). And even if the appeal were moot, the remedy would be the same as the one we order here—vacatur. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950).

No. 20-40643

Patrick E. Higginbotham, *Circuit Judge*, dissenting:

I must dissent with this case as well as its companion cases.[1] None present an issue of sovereign immunity, as the Eleventh Amendment does not bar these claims under the Fourteenth Amendment. Our issue is rather the antecedent question of Article III standing, turning on injury and redressability.

## I.

I write to remind failing memories of the signal role of *Ex parte Young* in directly policing the path of cases and controversies to the Supreme Court from our state and federal courts and warn against its further diminution.[2] As I explained over twenty years ago in *Okpalobi v. Foster*, "*Ex parte Young* poses no threat to the Eleventh Amendment or to the fundamental tenets of federalism. To the contrary, it is a powerful implementation of federalism necessary to the Supremacy Clause, a stellar companion to *Marbury* and *Martin v. Hunter's Lessee*."[3] Just as then, "the destination of the majority's trek today is inevitably a narrowing of the doctrine of *Ex parte Young* . . . I decline passage on that voyage. I decline because I am persuaded that familiar principles

---

[1] *Lewis v. Scott*, No. 20-50654, --- F.4th ---, (5th Cir. March 16, 2022); *Richardson v. Scott*, No. 20-50774, --- F. 4th ---, (5th Cir. March 16, 2022).

[2] 209 U.S. 123 (1908).

[3] *Okpalobi v. Foster*, 244 F.3d 405, 432 (5th Cir. 2001) (Higginbotham, J. concurring).

10

of standing are better suited to answer these questions with less risk to the vital role of *Ex parte Young*."[4]

The majority continues this Court's effort to shrink the role of *Ex parte Young*, by overly narrow readings of the state officer's duty to enforce Texas's election laws. Unlike in *Okpalobi* "where the defendants had no enforcement connection with the challenged statute,"[5] the Texas Secretary of State is the "chief election officer of the state" and is directly instructed by statute to "obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code."[6] Moreover, the Secretary is charged to "take appropriate action to protect the voting rights of the citizens of this state from abuse by the authorities administering the state's electoral processes" and "to correct offending conduct."[7] Although recent decisions by this Court have split hairs regarding the level of enforcement authority required to satisfy *Ex parte Young*,[8] the Secretary is charged to interpret both the Texas Election Code and the election laws outside the Code, including federal law, to gain uniformity, tasks it is clearly

---

[4] *Id.*

[5] *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017).

[6] Tex. Elec. Code § 31.001(a) and Tex. Elec. Code § 31.003.

[7] Tex. Elec. Code § 31.005(a), (b).

[8] *Compare Mi Familia Vota v. Abbott,* 977 F.3d 461 (5th Cir. 2020); *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) *with Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020); *Texas Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020); *Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020); *OCA-Greater Houston*, 867 F.3d at 613–14.

bound to do.[9] The allegation in these cases is that the Secretary is failing in that duty. This charge should satisfy our *Ex parte Young* inquiry.

## II.

None other than the inimitable Charles Alan Wright saw *Ex parte Young* as "indispensable to the establishment of constitutional government and the rule of law."[10] Professor Wright's views, drawn as they were from a lifetime of disciplined study stand on their own, gaining their strength from years of recording judicial performance and the currency of our system by the teachings of the Constitutional Convention and the acts of our first Congress. This is the wisdom of a scholar and practitioner, here grounded by the reality that *Ex parte Young* brings the axis necessary for the courts to harness the power vested in them by the Constitutional Convention of 1787—the direction of the flow to the Supreme Court of challenges to the validity of state action, a function essential to the splitting of the atom of sovereignty in a sovereign nation of sovereign states in a young republic and today.

The three-judge district courts, with direct appeal to the Supreme Court, were quickly established as a needed counter to the reach of *Ex parte Young*.[11] And with this concern faded by the creation of three-judge district

---

[9] *See Texas Democratic Party*, 961 F.3d at 401; *City of Austin*, 943 F.3d at 1002.

[10] Charles Alan Wright & Mary Kay Kane, *Law of Federal Courts* 14 (6th ed. 2002).

[11] 36 Stat. 557; Michael E. Solimine, *The Strange Career of the Three-Judge District Court: Federalism and Civil Rights, 1956-76*, 72 CASE W. RES. L. REV. __, *4–5 (forthcoming); Barry Friedman, *The Story of* Ex parte Young, *in* FEDERAL COURTS STORIES 269-71 (Vicki C. Jackson and Judith Resnick ed., 2010).

courts, there came a list of seminal decisions protecting civil liberties, long and distinguished.[12] Recall that it was a three-judge district court, with its injunctive power, that brought *Brown v. Board of Education* to the federal courts, sustaining the integration of public schools.[13]

### III.

Another strand of history completes the relevant frame for this state-federal tension. While the need for a Supreme Court was never an issue for the delegates at the Constitutional Convention, as its absence was a driving force for its convening, whether to create a tier of lower courts divided the delegates. The cornerstone Madisonian Compromise resolved the impasse—authorizing Congress to create the lower federal courts. And it did, over resistance born of a concern of potential federal court intrusion into state affairs, the work of its judiciary. That lingering concern of the Convention led the first Congress to enact the Anti-Injunction Act: providing that "a writ

---

[12] *See e.g.*, *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925), *aff'g Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary* 296 F. 928 (D. Ore. 1924); *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), *aff'g Barnette v. W. Virginia State Bd. of Educ.*, 47 F. Supp. 251, 252 (S.D.W. Va. 1942); *Baker v. Carr*, 369 U.S. 186 (1962), *rev'g Baker v. Carr*, 179 F. Supp. 824 (M.D. Tenn. 1959); *Younger v. Harris*, 401 U.S. 37 (1971), *rev'g Harris v. Younger*, 281 F. Supp. 507, 508 (C.D. Cal. 1968); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973), *rev'g Rodriguez v. San Antonio Indep. Sch. Dist.*, 337 F. Supp. 280, 281 (W.D. Tex. 1971); *Roe v. Wade*, 410 U.S. 113 (1973), *aff'g Roe v. Wade*, 314 F. Supp. 1217, 1219 (N.D. Tex. 1970).

[13] 347 U.S. 483 (1954); *Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*, 98 F. Supp. 797 (D. Kan. 1951), *rev'd sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955). *See also Briggs v. Elliot*, 98 F. Supp. 529 (E.D.S.C. 1951) *and Davis v. County School Bd.*, 103 F. Supp. 337 (E.D. Va. 1952).

of injunction [shall not] be granted to stay proceedings in any court of a state," assuring direct review of state courts by the Supreme Court.[14] An exception clause later added: "except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."[15] And there it rested, through the Civil War with its attending Constitutional amendments.

With the turn of the century, we entered the *Lochner* period, characterized by federal injunctions blocking state efforts to address social issues in the rising industrial world.[16] It is significant that from Reconstruction to the *Lochner* era, lawyers seldom reached for § 1983 given its inclusion of the language of the Privileges and Immunities Clause, language neutered in the *Slaughterhouse* cases.[17] In more recent times, § 1983 came to be a major pathway to the lower federal courts, prompting challenges to its injunctive power as violating the Anti-Injunction Act. The Supreme Court's response sheds light on the wielding and melding of federal injunctions and our federalism.

From these threads of history, the Supreme Court in *Mitchum v. Foster* laid bare the subtle relationship of the Anti-Injunction Act, § 1983, and *Ex parte Young*. The Court saw the then sixty-four-year-old *Ex parte Young* as a critical valve to direct the flow of cases from the state courts to the Supreme

---

[14] 1 Stat. 334 § 5 (1793).

[15] 28 U.S.C.A. § 2283 (West).

[16] *Lochner v. New York*, 198 U.S. 45 (1905).

[17] 83 U.S. 36 (1872).

Court.[18] Justice Stewart explained that "Section 1983 was thus a product of a vast transformation from the concepts of federalism that had prevailed in the late 18th century when the anti-injunction statute was enacted."[19] Congress was "concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts."[20] He continued:

> The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, "whether that action be executive, legislative, or judicial."[21]

*Mitchum v. Foster* is itself a contemporary example of the on-going allocation of the flow of cases to the Supreme Court from the state courts and the Congressionally created lower federal courts, as well as the role of *Ex parte Young* in that cast.

In sum, *Ex parte Young*, birthed as a tool of the *Lochner* period, proved its effectiveness in sustaining challenges to state efforts to protect workers. *Mitchum v. Foster* presents as a parallel—protecting civil rights—giving to

---

[18] *Mitchum v. Foster*, 407 U.S. 225, 242 (1972).

[19] *Id.*; 42. U.S.C. § 1983.

[20] *Mitchum*, 407 U.S. at 242.

[21] *Id.* (quoting *Ex parte Commonwealth of Virginia*, 100 U.S. 339, 346 (1879)).

civil rights claimants a § 1983 with the power of the injunction, albeit not always a path around the Eleventh Amendment.

## IV.

Here however, as it was in *Okpalobi*, the threshold question is standing, the Article III door to the federal courthouse, which the majority stepped past. Standing doctrine was a product of the shift to the public law model. With its focus upon injury and redressability, it rejected an ombudsman role for the federal courts. Here, as all three of our cases bring claims of constitutional violation under § 1983, there is no immunity issue, no necessary role for *Ex parte Young*.[22] As the state has no immunity from enforcement of the Fourteenth Amendment here,[23] the remaining inquiry is standing—itself a constitutional demand of injury and redressability.[24]

Under a proper Article III analysis, these suits have a redressable injury because the Secretary is directed by the election laws of Texas to interpret and conform the election code to other election laws (as federal law is state law). Power to interpret to gain uniformity with state and federal law is

---

[22] These three cases also present claims under the Voting Rights Act and the Americans with Disabilities Acts, where Congress has specifically abrogated state sovereign immunity. *See e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 534 (2004); *Fusilier*, 963 F.3d at 455; *OCA-Greater Houston*, 867 F.3d at 614.

[23] *Reynolds v. Sims*, 377 U.S. 533, 537 (1964); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 454 (1976).

[24] *E.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

power to enforce.[25] And "our precedent suggests that the Secretary of State bears a sufficient connection to the enforcement of the Texas Election Code . . . to support standing."[26] Again, the claim is that the Secretary failed to discharge that duty or has done so in an unconstitutional manner. These claims can proceed if there is standing with its requirement of injury and redressability.

In sum, I am persuaded that these cases ought not fail on standing or sovereign immunity grounds. Rather, we should have fully considered the merits of the plaintiffs' arguments, especially where these cases also present claims under the Voting Rights Act and Americans with Disabilities Act, thin though they all may be.[27]

## V.

Even this quick glance back sheds light on threshold questions of the role of the Court in protecting the most vital Constitutional right of a democratic government: the right to vote. And so, I am troubled by this Court's narrowing of *Ex parte Young*. *Ex parte Young* is no culprit.[28]

---

[25] Tex. Elec. Code § 31.001(a) and Tex. Elec. Code § 31.003. *See Testa v. Katt*, 330 U.S. 236 (1947).

[26] *Texas Democratic Party*, 961 F.3d at 401 (citing *OCA-Greater Hous.*, 867 F.3d at 613).

[27] *See e.g.*, *Lane*, 541 U.S. at 534; *Fusilier*, 963 F.3d at 455; *OCA-Greater Houston*, 867 F.3d at 614.

[28] *Okpalobi*, 244 F.3d at 432.

17

No. 20-40643

About this we can agree, partisan views ought to prevail by persuading voters, not by denying their right to vote. With respect to my able colleagues, I must dissent.